# UNITED STATES DISTRICT COURT
### District of Columbia

|  |  |
|---|---|
| Jeremy E. Bigwood ) | |
| ) | |
| v.  ) | Civil Action No. 06-0635 |
| ) | |
| United States Agency for International Development ) | |
| ) | |

## DECLARATION OF RUSSELL T. PORTER

I, Russell T. Porter, hereby declare the following to be true and correct to the best of my knowledge.

1. I am the team leader for Latin America and the Caribbean for the Office of Transition Initiatives at the U.S. Agency for International Development (USAID/OTI).

2. I have read the complaint filed by Mr. Bigwood regarding USAID's withholding of personal identifying information from documents provided in a Freedom of Information Act response.

3. I became aware of the FOIA request from Mr. Bigwood in the spring of 2004. The request was broad in its scope and after reviewing the time and effort required to comply with the request, I requested that Sylvia Lankford go back to Mr. Bigwood and see if he would narrow his request. Thereafter, I received another email and subsequent memo with the narrowed request from Mr. Bigwood.

4. Most of the documents that Mr. Bigwood requested were located in Caracas, Venezuela. I sent a message to Miguel Reabold, USAID/OTI's country representative, requesting that he and his staff begin the process of pulling together the documents.

5. Specifically, the documents I asked Miguel to compile were the grant documents that we had signed with the local non-governmental organizations (NGO) in Venezuela. While we refer to these as "grants," in reality, they are not grants as the term is defined by USAID. They are small activities that are funded by a contractor. The contractor in this case is Development Alternatives, Inc., (DAI) Bethesda, Maryland, which is under contract by USAID/OTI to perform this service. The projects, in general, do not provide direct cash assistance to the recipients. Rather, they are in-kind support provided to carry out a project, such as a workshop, public forum, or similar activities. The nature of the activities and what will be paid for is clearly outlined in the agreements.

6. Around the time I received the request, I alerted Katherine Donohue to the request and asked her to assist in the compilation of documents. She is a program manager in USAID/OTI and works under my direction.

7. Mr. Reabold compiled the documents, made copies and sent them to my office.

8. When the documents arrived, I asked Ms. Donohue to review and organize them. While this process was ongoing, Mr. Bigwood made a similar request for information of National Endowment for Democracy, an independent organization funded directly by Congress, for their grant activities in Venezuela. The NED, which had far fewer grants than we did, provided their material. Mr. Bigwood immediately put the information on the internet, including the names and identities of the NED grantees.

9. Within days of the information identifying NED grantees being placed on the internet, the Government of Venezuela began harassment of several of the groups, although they specifically targeted an election watchdog group called Sumate. The directors of Sumate began receiving threats and the GOV initiated a court action against them

## DECLARATION OF RUSSELL T. PORTER.

for "treason" for accepting U.S. taxpayer money from the NED. A guilty verdict could carry a penalty of 16 years to life in prison, as reported in the Venezuela media.

10. Other groups were threatened as well, both publicly through public pronouncements in the media and privately. The program managers at NED reported to me some groups received threatening phone calls and others were suddenly cut off from their ability to meet with government counter-parts. At the same time, the Venezuelan National Assembly enacted a media content law, which made it illegal to criticize the government or government officials. I was told by contacts in Venezuela some media outlets would not interview or meet with these groups since if they printed anything critical of the government it could be used against the media outlet.

11. The director of a USAID-funded NGO implementing a human rights education project was questioned by the political police for two hours who were particularly interested in his collaboration with the USG - and making sure he understood that he and family were being watched. The director of a preschool which benefited from a social impact project was subsequently called into Caracas and during a 3 hour contentious meeting with the national director was threatened with having all future government support cut off. The reaction of the community assured that this didn't happen. Something similar happened a couple months later with an American Embassy supported Little League baseball team was informed that they could no longer play in the community field. Again the community assured that this did not happen and the kids were able to participate. There have since been other acts of would-be intimidation related to USAID-funded social impact projects.

12. As a result of these public actions, I decided it was in the interest of our partners in Venezuela to protect them by withholding their names. Ultimately, it was not my decision to make, but I made this recommendation to USAID's FOIA office. I also sought concurrence from the State Department to see if they too believed the well-being of our partners in Venezuela would be in jeopardy if we released their names. The State Department concurred with those concerns. At the same time, I believed, and still believe, that we should be as open and transparent as possible, while at the same time protecting our partners. All of our activities were perfectly defensible and reasonable given the political situation in Venezuela. I felt it was fair and reasonable to release the descriptions of the activities, which are outlined in detail in the agreements signed with the NGOs. The important thing in my mind was protecting our partners in Venezuela, but the activities we were supporting are described in the documents providing Mr. Bigwood with information about the substance of USAID-funded activities. It seemed reasonable to me that the release of the names and identifying information concerning the grantees would lead to the grantee's being prosecuted or intimidated in some way and that this limited information should be withheld.

13. Given the reaction to the information released by the NED and similar incidents, the FOIA office agreed. With this agreement with the FOIA office, Katherine Donohue under my supervision went through every document and highlighted the names and other identifying characteristics, such as addresses, phone numbers, social security numbers, etc. The FOIA office subsequently went through the marked up documents and made the final decision on what to redact and what to leave in.

14. I have attached the following documents to this declaration which are available to the public and of which I was aware during the processing of the FOIA response.

   a. Investigate Killings of Opposition Supporters in Venezuela, Human Rights Watch, February 19, 2003, http://hrw.org/English/docs/2003/02/19/venezu5323_txt.htm
   b. Venezuela: Country Reports on Human Rights Practices-2003, U.S. Department of State, February 25, 2004, http://www.state.gov/g/drl/rls/hrrpt/2003/27923.htm
   c. Letter to President Hugo Rafael Chavez Frias, Human Rights Watch, April 9, 2004, http://hrw.org/English/docs/2004/04/12/venezu8423_txt.htm
   d. Diplomatic Dispatches: Signing On To Challenge Hugo Chavez, Washingtonpost.com, July 9, 2004, Page A15, http://www.washingtonpost.com/wp-dyn/articles/A37649-2004Jul8.html
   e. Editorial: A Venezuelan Monitor, Washingtonpost.com, July 30, 2004; Page A18, http://www.washingtonpost.com/wp-dyn/articles/A26074-2004Jul29.html

DECLARATION OF RUSSELL T. PORTER.

    f.   Venezuela: Country Reports on Human Rights Practices - 2004, U.S. Department of State, February 28, 2005, http://www.state.gov/g/drl/rls/hrrpt/2004/41778.htm

    g.   Venezuela: Curbs on Free Expression, Human Rights Watch, March 24, 2005, http://hrw.org/english/docs/2005/03/24/venezu10368.htm

    h.   Repeat Class; Venezuela's Education Reforms, The Economist Newspapers Ltd , April 2, 2005

    i.   Venezuela: Rights Lawyer Faces Judicial Persecution, Human Rights Watch, April 5, 2005, http://hrw.org/English/docs/2005/04/05/venezu10423.htm

    j.   Venezuelan Activist Warns of Increased Crimes Against Human Rights, Financial Times Information-Global News Wire-Asia Africa Intelligence Wire, BBC Monitoring International Reports, June 17, 2005

    k.   Court Orders Trial of Civil Society Leaders, Human Rights Watch: Venezuela, July 8, 2005, http://hrw.org/English/docs/2005/07/08/venezu11299.htm

    l.   A Vengeful Prosecution; Our Opinion: Charges Against Sumate Attack Venezuela's Civil Society, The Miami Herald, August 1, 2005

    m.   Venezuela's Conscience, Washingtonpost.com, October 30, 2005; B06

    n.   The State of Democracy in Venezuela, States News Service, December 1, 2005

15. I am proficient in the Spanish language. I have read several articles by the Venezuelan and other international media detailing similar incidents of intimidation.

16. Late last year the names of NED grantees for the second half of 2005 were announced on Venezuelan television. Two of the NGOs were subsequently questioned by the political police - one organization for 12 hours

17. During a recent meeting with a group of NGOs to discuss programs related to social responsibility, one of the groups (which has been working in low-income neighborhoods for years) made the point that USG funding has become much more problematic of late in that members of the community have become afraid to work with them for fear of possible retaliation. A series of workshops in a Caracas university to promote the role of students as facilitators of dialogue was subjected to a leaf-letting campaign. The leaflet ended with the statement that "participants in the USAID-funded program would be identified and judged by the university community". The students reported that attendance at the workshops was light, but that subsequent follow-up activities in a nearby low-income neighborhood - which had active participation by many members of the community, thus making it harder to identify workshop participants - was heavily attended.

18. A few months ago the government purchased the building next to the DAI office in El Rosal. A few weeks ago, DAI discovered that occupant of the Venezuelan government building had been going through DAI's trash. More recently, a DAI staff member was followed from the office by two men in their 20s. The two men loudly spoke to each other, in a mocking way, saying words to the effect that the staff member worked for the CIA, they knew all the personal details of the staff member's daily routine and that DAI was going to be raided by the secret police any day.

Attestation. Pursuant to Title 28 United States Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31th day of May 2006 at the Ronald Reagan Building, Washington, District of Columbia.

Russell T. Porter
Latin America and the Caribbean Team Leader
Office of Transition Initiatives
U.S. Agency for International Development

HUMAN RIGHTS WATCH

# Investigate Killings of Opposition Supporters in Venezuela

(Washington. D.C., February 19, 2003) - The government of Hugo Chávez should carry out a thorough and impartial investigation into the abduction and murder of four opposition supporters whose bodies were found on February 16 and 17, Human Rights Watch said today.

The circumstances strongly suggest that these were political killings," said José Miguel Vivanco, executive director of the Americas Division of Human Rights Watch. "The government must launch a prompt and impartial investigation into this vicious crime, and must guarantee the safety of the reported witness to the killings."

Darwin Arguello, an army soldier, Angel Salas, a navy corporal, and Félix Pinto, an airman, were reportedly abducted together in Caracas during the night of February 15. The following day, police discovered Pinto's body and that of a twenty-eight-year-old woman, Zaida Perozo López, close to a highway in the state of Miranda, some forty kilometers east of Caracas.

The bodies of Arguello and Salas were discovered nearby a day later. All four had been bound, gagged with tape and shot repeatedly.

A fourteen-year-old girl, whose name has not been revealed, is believed to have witnessed at least one of the killings and to have been shot and left for dead. She is recovering in a hospital.

Arguello, Salas, and Pinto had joined a protest by dissident military officers against the Chávez government and had participated in opposition gatherings in the Plaza Altamira, a square where anti-Chávez activists have been camped for more than three months. Zaida Perozo is also reported to have frequented the square.

A witness to the abductions said that he had seen the victims being forced by men wearing ski-masks into two vehicles a short distance away from the Plaza Altamira.

The political situation in Venezuela remains tense in the wake of a two-month general strike called by the opposition Coordinadora Democrática, the business group Fedecámeras, and the country's largest union federation. President Chavez has rejected opposition demands for a constitutional reform to permit early elections, and has threatened tough measures against the strikers and against private television networks that supported the strike.

At least seven people have been killed and scores injured in street protests since December 2002, but there have been no confirmed reports of extrajudicial executions of opposition or government supporters.

**Related Material**

EXHIBIT

A

05/11/2006

A

U.S. DEPARTMENT of STATE

# Venezuela

## Country Reports on Human Rights Practices - 2003
Released by the Bureau of Democracy, Human Rights, and Labor
February 25, 2004

Venezuela is a constitutional democracy with a president and unicameral legislature in which citizens periodically choose their representatives in free and fair multiparty elections. In addition to the executive, legislative, and judicial branches of government, the Constitution provides for a "Citizen Power" branch of government--which includes the Ombudsman, the Public Prosecutor, and the Controller General--and an "Electoral Power" branch, the National Electoral Council (CNE). In July 2000, voters elected President Hugo Chavez of the Fifth Republic Movement (MVR) in generally free and fair elections. The MVR and the pro-Chavez Movimiento al Socialismo (MAS) party won 92 seats in the 165-member legislature; subsequent party splits reduced the pro-Chavez members to 83 seats. In December 2000, in a manner that some observers criticized as unconstitutional, the National Assembly named members of the Citizen Power and Supreme Court. In August, the Supreme Court appointed a transitional CNE after the National Assembly failed to do so. The civilian judiciary is legally independent; however, it was highly inefficient and sometimes corrupt, and judges at all levels were subject to influence from a number of sources, including the executive branch.

From December 2002 to February 1, opposition groups led a national work stoppage to demand the resignation of the President. The strike failed. On May 29, after months of negotiations under the Organization of American States' (OAS) auspices, government and opposition representatives signed an agreement that committed both sides to follow the Constitution and laws and acknowledged the constitutional right to hold recall referenda if legal criteria were met. On August 20, opposition groups submitted 3.2 million signatures gathered in February petitioning for a referendum on the presidency. On September 12, the CNE declared the petition invalid. The opposition then conducted another signature drive at the end of November. The Government and opposition also collected signatures to petition for referenda to recall the President and more than 70 legislators. The verification process for all collected signatures was underway at year's end.

The security apparatus includes civilian and military elements, both accountable to elected authorities. Active and retired military officers held high-ranking government positions, and 5 of the 14 presidential cabinet members previously served in the military. The presidents of two major state-owned corporations--Corporacion Venezolana de Guayana and Corporacion Zulia--are active duty military officers, and one one was placed in charge of the maritime operations of the state-owned oil company in response to the national work stoppage. The military was involved heavily with public service projects. The Defense Ministry controls the General Directorate for Military Intelligence (DIM), which is responsible for collecting intelligence related to national security and sovereignty. The National Guard, an active branch of the military, has arrest powers and is largely responsible for maintaining public order. The Interior and Justice Ministry controls the Investigative and Criminal Police Corps (CICPC), which conducts most criminal investigations, and the Directorate for Intelligence and Prevention Services (DISIP), which collects intelligence. Municipal mayors and state governors are responsible for local and state police forces and maintain independence from the central Government. The Caracas Metropolitan Police is the main civilian police force in the five municipalities that form the Federal District and is headed by a career police officer, rather than a military officer. While civilian authorities generally maintained control over security forces, individual members of the security forces committed numerous and serious human rights abuses during the year.

The population was approximately 25 million. The country has abundant natural resources and a mixed agricultural/industrial, market-based economy; however, the vast majority of natural resource extraction and production was done by entities owned and operated wholly or in part by the Government. The economy was in its second year of severe contraction, estimated at a decline of 10-12 percent, compared to an 8.9 percent contraction in 2002. Government statistics placed the unemployment rate at approximately 18 percent; however, about 52 percent of employed adults work in the informal sector of the economy. The petroleum sector provides the vast majority of foreign exchange earnings, although participation of employees of the state-owned oil company in the national work stoppage crippled production during the first quarter of the year. Despite a significant recovery in oil income and resulting tax revenue for the Government, the country faced ongoing deficits and other financial difficulties. Private economists estimated the government deficit for the year could reach as high as 6 percent of gross domestic product.

EXHIBIT
B

The Government's human rights record remained poor; although there were attempts at improvement in a few areas, serious problems remained. The police and military committed extrajudicial killings of criminal suspects. The police reportedly had links to vigilante death squads responsible for hundreds of killings in at least 11 states. Investigations into the forced disappearances by the security forces of criminal suspects remained extremely slow. Torture and abuse of detainees persisted, and the Government failed to punish police and security officers guilty of abuses. Prison conditions remained harsh; violence and severe overcrowding constituted inhuman and degrading treatment. Arbitrary arrests and detentions increased. Impunity was one of the country's most serious human rights problems. Crimes involving human rights abuses did not proceed to trial due to judicial and administrative delays. Corruption, lengthy pretrial detention, and severe inefficiency in the judicial and law enforcement systems also were problems.

The Government conducted illegal wiretapping of private citizens and intimidated political opponents. The President, officials in his administration, and members of his political party frequently criticized the media, the political opposition, labor unions, the courts, the Church, and human rights groups. Many government supporters interpreted these remarks as tacit approval of violence; they then threatened, intimidated, and physically harmed individuals from groups opposed to Chavez during the year. The Government abused its legal power to call national radio and television "chains" by requiring all television and radio stations to air over 136 hours of speeches by President Chavez and other government officials, and other programming favorable to the Government. Violence and discrimination against women, abuse of children, discrimination against people with disabilities, and inadequate protection of the rights of indigenous people remained problems. The atmosphere for independent labor unions deteriorated due to the Government's ongoing confrontation with the Venezuelan Workers Confederation (CTV) and fired petroleum sector employees. Child labor increased as economic conditions worsened. Trafficking in persons was a problem, although the Government took steps to reduce corruption among immigration authorities.


RESPECT FOR HUMAN RIGHTS


Section 1 Respect for the Integrity of the Person, Including Freedom From:


a. Arbitrary or Unlawful Deprivation of Life


At least a dozen killings during the year may have been politically motivated. Members of the political opposition received death threats and were the victims of intimidation by government supporters. Security forces were accused of committing extrajudicial killings, primarily of criminal suspects. The Venezuelan Program of Action and Education in Human Rights (PROVEA), a human rights nongovernmental organization (NGO), documented 130 extrajudicial killings from October 2002 through September, compared with 137 killings from October 2001 to September 2002. These figures reflected a range of killings in different situations committed by organizations with varying levels of control and responsibilities and included summary executions of criminal suspects and deaths resulting from mistreatment while in custody. Police continued to fire on criminal suspects who disobeyed orders to halt.

The police often failed to investigate crimes allegedly committed by their colleagues and, in 2002, the Government created a separate system for investigating and bringing to trial criminal cases that it deemed political. During the year, one such political case, that of Joao De Gouveia, who shot and killed three individuals present at an opposition rally in December 2002, resulted in a conviction. Prosecutors alleged that unsecured crime scenes, poor investigative techniques, and constantly changing or inexperienced personnel ensured that political cases were delayed indefinitely or had a pre-ordained result. In addition, the civilian judicial system struggled to implement the 1999 Organic Criminal Procedures Code (COPP) and remained highly inefficient and corrupt (see Section 1.e.).

On February 16 and 17, the bodies of three soldiers and one woman were found with hands tied and mouths taped shut. All had died from gunshot wounds. A young girl who had been shot and left for dead was found with the corpses. The soldiers had links to a group of dissident military officers who sought to establish an opposition headquarters in the Altamira neighborhood of Caracas in October 2002. Homicide division prosecutors initially began the investigation, only to have the case reassigned to the special police unit and prosecution team in charge of political cases. Police had several suspects in custody, and the investigation continued at year's end.

On April 12, Carlos Manuel Pico Gutierrez was killed under unknown circumstances. Neighbors testified that he had been injured by a police unit formed by four men.

On April 26, pro-government Fatherland for All (PPT) party leader Jorge Nieves was killed in Apure State. On September 23, another PPT-Apure leader, Edgar Patino, was killed. On October 1, Apure State PPT and farm worker

leaders accused the terrorist Colombian National Liberation Army (ELN) of the killings. National PPT leader Jose Albornoz disputed the accusation, calling it baseless and imprudent. At year's end, no suspects had been arrested or charged with the killings.

From January through August, eight ranchers were kidnapped and later killed. Their abductions did not follow the region's usual pattern of kidnapping for ransom of a wealthy victim. At times, the kidnappers demanded ransoms well beyond the financial means of the victims or made no ransom demand, then killed the victim, suggesting that some or all were killed at least partially for political reasons, according to ranchers' groups.

On August 27, human rights worker Joe Luis Castillo was killed while driving with his wife and child near their home in Machiques, Zulia State. Two assailants on a motorcycle opened fire on the family; Castillo was hit with 11 bullets in his torso and head. Castillo worked for the U.N. High Commissioner for Refugees (UNHCR) and dealt primarily with Colombians who had fled to Venezuela and indigenous groups. An investigation was under way at year's end.

The Government rarely prosecuted perpetrators of extrajudicial killings and characterized such incidents as "confrontations" (in which use of deadly force is legally justified), even when eyewitness testimony and evidence strongly indicated otherwise. "Death squads" comprised mostly of police reportedly killed hundreds of people during the year in the states of Anzoategui, Aragua, Bolivar, Carabobo, Falcon, Lara, Miranda, Portuguesa, Tachira, Yaracuy, and Zulia. From January to August, 854 cases were registered, according to news reports. In the small number of cases in which the courts convicted perpetrators of extrajudicial killings and other abuses, sentences frequently were light, or the convictions were overturned on appeal. Unlike common criminals, members of the security forces charged with or convicted of crimes were rarely imprisoned.

The Public Ministry's Directorate for the Protection of Fundamental Rights is responsible for investigating alleged abuses by officials, including the police. The Chief Prosecutor reported that death squads or police forces killed 1,541 people in 10 states since the end of 1999. In June, Attorney General Isaias Rodriguez instructed the Directorate to expedite death squad case investigations and prosecutions. Rodriguez also met with Portuguesa state officials to formulate a response to the state's death squad activity and conducted surprise inspections in Zulia. Although the number of death squad cases nationwide grew exponentially since 2002, official state responses remained mixed. For example, as of June, Portuguesa had indicted 15 police officers in the deaths of 95 individuals, while Falcon state officials denied the existence of local death squads. The human rights organization Committee for the Families of Victims of 1989 (COFAVIC) documented death squad activity in 11 states, including Falcon. In almost all cases, the victims were young, poor, and had criminal records. According to COFAVIC, death squads commonly demanded money from the victims, and when they were not able to pay, they were killed; such killings were not political. COFAVIC attributed the proliferation of extrajudicial killings to the lack of autonomous public institutions, resources to combat crime by legal means, and government will to root out corruption.

The Anzoategui State Human Rights Ombudsman registered 300 extrajudicial killings from 2000 through May in that state. Of those, 70 percent were attributed to Anzoategui state police and the remaining 30 percent to municipal police, CICPC, and National Guard members. In many of these cases, a family member was targeted for another individual's alleged violation.

There were some killings of demonstrators. On May 1, Ricardo Herrera was shot while participating in an opposition rally. On May 24, Modesto Martinez, described in news reports as an MVR militant and activist, was killed during an opposition march. Both men were killed by unidentified gunmen. On July 17, Juan Carlos Osorio was killed by a National Guardsman while demonstrating against job losses in the petroleum sector (see Section 2.b.).

There were no developments reported in the April 2002 case of 15-year-old Jose Gregorio Lopez, who was killed without provocation while riding his bicycle by municipal police forces.

There were no further developments reported in the September 2002 case of 22-year-old Adolfo Arcia and 19-year-old Elvis Montesinos who were killed by the Libertador municipality police force.

Security forces also killed some prisoners; however, the majority of the inmate deaths during the year resulted from gang confrontations, riots, fires, and generally unsanitary and unsafe conditions in prison facilities (see Section 1.c.).

On April 3, an Aragua State court ordered the release of army Lieutenant Alessandro Sicat. The Government appealed the decision, and on August 21, an appeals court reversed the state court ruling and ordered Sicat's immediate detention until the convening of a new trial. As of November, Sicat had not been detained. Sicat sprayed and ignited paint thinner in the holding cell of three allegedly disobedient soldiers in January 2001. Two men were seriously

burned; a third, Jesus Alberto Febres, died as a result of burns. A military court convicted Siccat; however, the Attorney General appealed, and in October 2001, the Supreme Court granted a civilian court jurisdiction.

In October, there was one attempted mob lynching in Caracas of an accused rapist. The Metropolitan Police intervened and prevented the lynching. A significant portion of the population tacitly supported "vigilante" death squad actions as the only viable means to control crime.

b. Disappearance

The Constitution prohibits forced disappearance and also states that an individual must refuse to obey an order to commit such a crime and provides for the prosecution of the intellectual author of the crime.

From January through August, 68 ranchers were kidnapped, according to the National Cattle Ranchers Federation (Fedenaga). Although rancher kidnappings by Colombian terrorist organizations have been a growing problem in the border states for decades, Fedenaga blamed most of the increase on common criminals and the Bolivarian Liberation Forces (FBL), a relatively new organization allegedly comprised of militant supporters of the President. The Government denied any links to the FBL. According to Fedenaga, organized and professional kidnappings by Colombian groups were being replaced by disorganized, and more dangerous, kidnappings from homegrown criminal gangs and the FBL. They believed the FBL targets ranchers as much for political reasons as economic considerations, demanded untenable ransoms, and was more likely to kill prisoners. Government officials downplayed the importance of the FBL, some even denying the group's existence.

More than half of rancher kidnappings tracked by Fedenaga since 1963 occurred during the past 5 years. There were 116 rancher kidnappings during the year and 103 in 2002. Some kidnappings during the year may have been politically motivated. According to Fedenaga, 22 victims remained captive at year's end.

In an attempt to curtail border lawlessness, the Government announced the movement of 2,700 additional troops to border states. Government officials argued that few resources, increased crime, and the difficulty of differentiating combatants from civilians have hampered their efforts. During the year, the Government discontinued providing National Guard troops to protect threatened ranchers, citing limited resources.

On August 22, the CICPC and the Colombian Police (DAS) freed Christian Democrat (COPEI) leader and former Tachira State Governor Sergio Omar Calderon, who was kidnapped from his Tachira farm on July 25. In a press conference after his release, Calderon stated that he doubted that his kidnappers had acted for political reasons, explaining that they believed that his television appearances indicated that he must be wealthy. The rescuers killed Calderon's five kidnappers during the rescue operation, and their identity remained under investigation.

In September 2002, an appeals court dismissed the case against DISIP Commissioner Jose Yanez Casimiro and retired Commissioner General Justiniano Martinez Carreno in the 1999 disappearances of Oscar Blanco Romero and Marco Monasterio. In February 2002, the Vargas state penal court dismissed charges against the two men because witnesses could not identify them. At year's end, the case was before the Inter-American Commission on Human Rights (IACHR).

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution prohibits torture and the holding of detainees incommunicado, provides for the prosecution of officials who instigate or tolerate torture, and grants victims the right to medical rehabilitation; however, security forces continued to torture and abuse detainees physically and psychologically. This abuse most commonly consisted of beatings during arrest or interrogation, but there were also incidents in which the security forces used near-suffocation and other forms of torture that left no telltale signs. Most victims were poor (see Section 1.a.).

PROVEA documented 137 cases of torture, beatings, and other abuse from October 2002 through September (affecting 567 victims), compared with 324 cases from October 2001 through September 2002 (affecting 1,064 victims). The human rights organization Support Network for Justice and Peace (Red de Apoyo) received 16 complaints from alleged torture victims during the period from January to May.

The Government did not ensure independent investigation of complaints of torture. COFAVIC questioned the Attorney General's ability to oversee neutral investigations, because he is an active member of the President's political party and served as Vice President. Human rights groups asserted that the Institute of Forensic Medicine, part of the

CICPC, was unlikely to be impartial in the examinations of cases that involved torture by CICPC members. Red de Apoyo claimed that the CICPC was the security force most often implicated in accusations of torture. Very few cases of torture resulted in convictions.

In December, a group of military officers and defense attorneys accused Prosecutor Danilo Anderson and other Public Ministry prosecutors of complicity in torturing prisoners. The evidence they presented included statements from two imprisoned National Guard officers.

In January, the DISIP arrested 24-year-old law student Jesus Soriano during a march at Central University of Venezuela. During his incarceration, Soriano claimed that he was placed in a cell with convicted murderer Joao De Gouveia, tortured, and denied medical attention. Two days later, he was released and was admitted to a hospital. The DISIP claimed he was beaten during the march, was a known criminal, and denied all of Soriano's charges.

Four bombings by unknown perpetrators occurred in Caracas from February to July: At the Spanish and Colombian diplomatic missions, at the Caracas Teleport Building, and at a PDVSA office building. FBL leaflets were found nearby after the bombing of the Colombian Consulate. The bombings, which resulted in minor injuries but extensive property damage, were still under investigation at year's end. During the same time period, a fifth bomb exploded in the town of Los Teques southwest of Caracas, for which the FBL claimed responsibility. No one was injured. On August 27, a fragmentary grenade exploded in front of the home of Juan Barreto, a National Assembly deputy and member of the MVR. Two neighbors were injured in that attack. On December 9, a fragmentary grenade exploded inside the Social Welfare Institute for Education Ministry Personnel building in Caracas. Three employees were injured.

Prison conditions were harsh due to scarce resources, poorly trained and corrupt prison staff, and violence by guards and inmates. The prison population was at 117 percent of capacity with 22 of the country's 30 prisons overpopulated, some severely, according to the Ministry of the Interior and Justice (MIJ). Severe overcrowding in some prisons constituted inhuman and degrading treatment. According to the MIJ, 48 percent of all prisoners were in pretrial detention. Underfunding resulted in the lack of such basic equipment as telephones in the prison director's office. Prisoners often complained of food and water shortages.

The Government failed to provide adequate prison security. In August, 25 prisoners escaped from the Yare I and II prisons in Valles del Tuy southeast of Caracas. The directors of both prisons were replaced, and officials opened an investigation into the possible complicity of guards. According to the MIJ, there were 340 deaths and 1,419 injuries from violence in jails from October 2002 through August. A Window to Freedom, a prison monitoring NGO, recorded approximately the same rate of deaths for the January-November period (300), but more injuries from violence (2,500). Security forces committed a small number of the killings in prisons, and many prisoners died as a consequence of poor sanitary conditions, poor diet, and inadequate medical care. However, most inmate deaths resulted from prisoner-on-prisoner violence, riots, fires, and from generally unsafe conditions in prison facilities.

On November 10, seven inmates were killed at the Vista Hermosa prison in Ciudad Bolivar. In addition, 6 inmates disappeared and 50 were injured. Official statements indicated that the violence was gang-related, but media reports claimed that the National Guard and prison guards were responsible for the massacre. Authorities were continuing to investigate the incident at year's end.

In May, inmates of La Planta Prison in Caracas became ill with what the Government claimed was salmonella. Two weeks later, 548 prisoners had become ill and 4 had died. Prison officials confirmed privately that the outbreak was caused by dead rats in the prison's water supply. The Government claimed that the outbreak was the result of contaminated food.

Inmates often had to pay guards and other inmates to obtain necessities such as space in a cell, a bed, and food. Because of the prison food's low quality and insufficient quantity, most prisoners got their food from their families, by paying prison guards, or in barter with other prisoners. Many inmates also profited from exploiting and abusing others, especially as convicted murderers and rapists often were housed with unsentenced or first-time petty offenders. Gang-related violence and extortion were fueled by the substantial trafficking in arms and drugs that occurred in prisons. Prison officials often illegally demanded payment from prisoners for transportation to judicial proceedings (see Section 1.e.).

On March 7, hundreds of prisoners in the Barcelona Prison took more than 300 visitors hostage to demand more food, medical attention, and COPP benefits, such as permission to work outside the prison and access to the early release program. The standoff ended on March 19 with the release of all hostages. No one was injured, and 52 prisoners won access to various COPP benefit programs.

Women inmates were held in separate prisons, where conditions generally were better than those in the men's facilities. Security forces and law enforcement authorities often imprisoned minors together with adults, even though separate facilities existed for juveniles. Because reform institutions were filled to capacity, hundreds of children accused of infractions were confined in juvenile detention centers where they were crowded into small, filthy cells, fed only once a day, and forced to sleep on bare concrete floors.

Despite objections from the Catholic Church and NGOs, the Government sporadically used the National Guard, normally charged with exterior prison security, to maintain internal control of prisons.

The Government permitted prison visits by independent human rights observers; however, internal criticism was not well tolerated (see Section 2.a.).

d. Arbitrary Arrest, Detention, or Exile

The Constitution and the 1999 COPP provide for freedom from arbitrary arrest and detention; however, the security forces continued to arrest and detain citizens arbitrarily.

The National Guard, an active branch of the military, has arrest powers and is largely responsible for maintaining public order, guarding the exterior of key government installations and prisons, conducting counter narcotics operations, monitoring borders, and providing law enforcement in remote areas. The Interior and Justice Ministry controls the CICPC, which conducts most criminal investigations, and the DISIP, which collects intelligence and is responsible for investigating cases of corruption, subversion, and arms trafficking. Municipal mayors and state governors are responsible for local and state police forces, and maintain independence from the central Government. Often, mayors and governors look to the National Guard for the top leadership for state and municipal police forces. The Caracas Metropolitan Police is the main civilian police force in the five municipalities that form the Federal District and is headed by a career police officer, rather than a military officer. The Government intervened in the administration of the Metropolitan Police in November 2002, alleging that the police force was repressing pro-government protests. Following a Supreme Court decision on October 7, the Government returned control to the local authorities approximately 2 weeks later.

The COPP states that a person accused of a crime cannot be incarcerated during criminal proceedings unless that person was caught in the act of committing a crime, or a judge determines that there was a danger that the accused may flee or impede the investigation. Detainees have the right to a judicial determination of the legality of their detention within 3 days, but there is no law to implement the constitutional protections. The law provides for the right to a judicial determination of the legality of the detention within 72 hours. Persons accused of crimes must be brought before a judge within 24 hours of arrest or be freed pending charges. In no case may the detention of a person accused of a crime exceed the possible minimum sentence for that crime, nor may it exceed 2 years. Under the COPP, persons accused of petty crimes who have not been convicted but already had been in custody 2 years or the minimum sentence possible for that crime (whichever is less) are to be released if they pass a psychiatric examination. However, confusion over implementation of the COPP still existed, and arbitrary arrests continued to be common. In 2001, the National Assembly broadened the definition of the "in flagrante" circumstances in which a person may be apprehended and lengthened slightly the time provided to police to present charges prior to the release of an arrested individual. Human rights groups claimed this change led to an increase in detentions.

Under the provisions and benefits provided by the law, approximately 9,000 prisoners were released in 2000, the last year for which statistics were available. There were 19,466 prisoners at the end of 2002, 49 percent of which had not been convicted of a crime and were held without bail. Prisoners had reasonably good access to counsel and family members.

There continued to be arbitrary detentions by the Caracas Metropolitan Police, the DISIP, municipal police forces, the National Guard, and the CICPC, especially during anticrime sweeps in poor sections of major cities. PROVEA documented 3,627 persons detained in sweeps from October 2002 through September, compared with 4,549 persons similarly detained from October 2001 through September 2002.

On October 5, 16-year-old Deivy Jaspe Gutierrez was arrested for offering resistance to police after he and three others were ordered to exit their vehicle, which was halted arbitrarily. Jaspe recognized one of the police officers as the alleged killer of his brother Carlos Manuel Pico Gutierrez (see Section 1.a.). At the police station, he was hit several times and then released.

On November 8, municipal police in Puerto La Cruz, Anzoategui State, detained six young men who were banging pots and pans in protest against the President, who had just arrived with his entourage. According to media reports, police accused the men of throwing rocks at the President and of trying to kill him. The men claimed they were beaten and robbed during their 5-day detention. On November 12, the judge hearing the case released the men, citing insufficient and unfounded evidence against them.

In December 2002, the DISIP detained National Guard General Carlos Alfonzo Martinez while participating in an anti-Government demonstration and placed him under house arrest. On February 28, the Attorney General charged him with rebellion, desertion, and violating national security zones before the Supreme Court. In September, Martinez was transferred to the Military Detention Facility in Los Teques, Miranda State; he had been under house arrest for approximately 8 months. The Supreme Court and the Inter-American Human Rights Court ruled that he should be released, but the Government had not responded at year's end.

Human rights activists in border areas alleged that security forces continued to detain individuals and groups arbitrarily, citing the need to examine identity documents. Hundreds of Colombian nationals reportedly were detained and deported without due process (see Section 2.d.).

Forced exile is illegal.

e. Denial of Fair Public Trial

The civilian judiciary is legally independent; however, it was highly inefficient and sometimes corrupt, and judges were subject to influence from a number of sources, including the executive branch.

From January 2001 to March, panels of legal experts selected judges in competitive examinations. On March 12, the Supreme Court suspended the competitive process without explanation, and announced that the Judicial Commission, composed of Supreme Court Justices, would select judges. By statute, the Supreme Court can suspend the competition only when it suspects irregularities in the process. The inability to establish a transparent and efficient selection process has led to a shortage of permanent (titled) judges, who make up less than 30 percent of all working judges. According to the DEM, corruption was widespread among the provisional and temporary judges who represented over 70 percent of working magistrates.

The judicial sector consists of the Supreme Court, which is the court of final appeal; the Public Prosecutor, who provides opinions to the courts on prosecution of criminal cases and brings to the attention of the proper authorities cases of public employee misconduct and violations of the constitutional rights of prisoners or accused persons; the Ministry of Interior and Justice, which manages the DISIP and the CICPC, files complaints in criminal courts, and oversees the prisons; and the Executive Directorate of the Magistracy (DEM), which oversees the lower courts as well as the selection and training of judges. The lower court system includes district and municipal courts as well as trial and appeal courts that deal with civil and criminal matters.

The 1999 COPP provides for the right to a fair trial and considers the accused innocent until proven guilty in a court. The COPP also introduced for the first time open, public trials with oral proceedings and verdicts by juries or panels of judges. Defendants and complainants have the right of appeal. The adversarial system establishes the right to plead guilty without trial and make reparation agreements; however, lengthy delays in trials remained common.

A November 2001 amendment to the COPP strengthens out-of-court settlements and increases victims' rights to compensation; provides physical protection to crime victims during trials; bolsters the work of juries for some crimes and eliminates them for others; eliminates some sentence reduction benefits for jailed criminals; and expands powers of detention (see Section 1.d.).

The law provides for public defenders for those unable to afford an attorney; however, there were not enough public defenders. According to statistics from the DEM, as of September there were 619 public defense attorneys for the entire country, of which 188 were dedicated exclusively to juvenile cases and 431 for all other cases. In 2002, public defenders handled more than 63,000 cases throughout the country, with an average caseload of 150 cases per public defender. In some states, the average annual caseload was as high as 520 per public defender.

Prison officials often illegally demanded payment from prisoners for transportation to judicial proceedings. Those who were unable to pay often were forced to forgo their hearings (see Section 1.c.).

On July 21, the Supreme Court declared a 60-day state of emergency in the DEM, placed it under the supervision of Justice Yolanda Jaimes Guerrero, and opened an investigation into alleged mismanagement by former DEM coordinators. The investigation continued at year's end.

On October 23, the Supreme Court ordered the replacement of the First Court for contentious administrative matters with two new courts for contentious administrative matters. On November 3 and 4, three of the First Court's five judges were dismissed, and the Supreme Court announced that they would not be appointed to either new court. The dismantled First Court heard cases involving alleged illegal government actions. The three dismissed judges formed a majority that issued several rulings contrary to key Government interests since December 2002. Domestic and international law groups criticized the actions against the First Court and the three judges as interference with the independence of the judiciary. At year's end, creation of the new courts and selection of judges were still in process.

The military courts continued to implement a reform similar to the COPP in the military justice system. The Constitution established that trials for military personnel charged with human rights abuses would be held in civilian rather than military courts. However, the provision does not apply to cases that predate the 1999 Constitution.

On April 3, an Aragua state court ordered the release of army Lieutenant Alessandro Sicat who had been charged with a human rights violation. The Government appealed the decision, and on August 21, an appeals court reversed the state court ruling and ordered Sicat's immediate detention until the convening of a new trial (see Section 1.a.).

Human rights NGOs continued to express concern that the Supreme Court's selection of military judges from a list of candidates provided by the Minister of Defense links the careers of military judges to the high command, making them more responsive to the views of their military leaders and influencing them to act slowly in cases in which the military is implicated.

There were no reports of political prisoners.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

Constitutional provisions prohibit arbitrary interference with privacy, family, home, and correspondence; however, the security forces continued to infringe on citizens' privacy rights by conducting searches of homes without warrants, especially during anticrime sweeps in poor neighborhoods. Reports of illegal wiretapping and invasion of privacy by the security forces increased during the year; many of these activities targeted members of the media (see Section 2.a.). In October and November, the Government released recordings of conversations it alleged occurred among opposition leaders. The Government did not acknowledge how it obtained the recordings.

On August 12, DISIP agents accompanied by a prosecutor with a search warrant entered the offices of an opposition political party ostensibly to search for counterfeiting equipment (none was found). Party members present claimed that the raid's actual purpose was to create a political distraction and possibly to plant listening devices. There were also reports that DISIP listened to phone conversations of witnesses to extrajudicial killings in Falcon State. Throughout the country, witnesses to abuses by security forces reported instances in which their family members later were harassed, threatened, or killed (see Section 1.a.).

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and of the press; although the Government generally respected these rights in practice, press freedom deteriorated during the year with efforts by some persons associated with the Government to provoke, threaten, or physically harm or encourage others to attack private media owners, their installations, and journalists working for them. Physical violence against the media declined during the year in comparison to 2002. Government pressure against the media?tax investigations, technical inspections and seizures, and verbal condemnation--increased, as did legislative efforts to limit private media's ability to exercise freedom of expression. During the year, both sides also continued accusing one another of broadcasting subliminal messages to incite violence against the other group.

There were reprisals against individuals who publicly criticized the Government. In April, the general coordinator of the prison monitoring NGO A Window to Freedom, was fired from his teaching position at the National University Institute of Penitentiary Studies after commenting on the country's poor prison conditions to a foreign journalist (see Section

1.c.). In September, there were news reports of individuals fired from private sector jobs, of students denied internships, and of military officers disciplined or discharged because they signed the petition for a referendum on the Presidency (see Section 3).

Print and electronic media were independent, although many felt threatened by the Government and its sympathizers. There were at least 77 newspapers; 89 magazines and weekly journals; 344 mainstream and over 150 community FM and AM radio stations; and 31 television channels, 23 of which are outside the metropolitan Caracas area. These community radio and television stations are distinct from mainstream commercial media in legal status, frequency licensing requirements, and advertising regulations. Most community media were new and were pro-government in editorial policy.

The Government-owned a national television station, Venezolana de Television (VTV); a metropolitan Caracas television station, TV Venezuela; a national radio network, Radio Nacional; and a newswire service, VenPres, whose directors are named by the President. The President had a weekly show on state television, radio, and the Internet. Independent media observers criticized the state media for extreme pro-government politicization. During the year, state media employees continued to complain about purges of employees considered to be anti-Chavez, and some employees of Radio Nacional and VTV claimed they lost their jobs because of their political views.

Individuals and the media freely and publicly criticized the Government; however, as noted by the IACHR Special Rapporteur on Press Freedom, reprisals and threats of violence against journalists and media organizations restricted freedom of expression in practice. President Chavez repeatedly singled out media owners and editors and charged that the media provoked political unrest. The statements resulted in a precarious situation for journalists, who were often attacked and harassed.

According to media sources and published reports, at least 1 reporter was shot and approximately 70 physically attacked with weapons such as clubs, knives, rocks, and battery acid while covering street demonstrations and political rallies. In 2002, 7 reporters were shot and more than 80 were physically attacked. During the year, approximately 50 reported having received threats, in some instances telephoned death threats; there were 100 such reports in 2002. According to the NGO Reporters Without Borders, the Government committed 93 "aggressions against journalists" during the year. At least six attacks involved the use of bombs or other explosive devices. There were over 60 attacks on installations or media property.

In his annual message to the National Assembly in January, the President declared the "year of the war against the media." International organizations and domestic journalists charged the Government with encouraging a climate of hostility toward the media that jeopardized freedom of the press.

In May, Human Rights Watch (HRW) issued a report regarding threats to freedom of expression, estimating that at least 130 assaults and threats of physical harm to journalists and press property occurred during January 2002 and through February, mostly committed by pro-Chavez civilians. The report also criticized the government investigations into four private television stations and the proposed Law of Social Responsibility in Radio and Television (Broadcast Media Content Law). The Vice President rejected the HRW argument as a biased intrusion in domestic affairs. Under the bill, which was pending its second reading in the Assembly, broadcasters must release "truthful information." Additionally, television companies, advertisers, and broadcasters could be punished for transmitting "contents that promote, defend, or incite lack of respect of legitimate authorities." Programs containing violence of any kind, including coverage of disasters, political conflicts, and criminal incidents, would be restricted to the hours of 11:00 p.m. to 5:00 a.m. The bill would require disclosure of sources of information and would assign to the National Telecommunications Commission (CONATEL) the task of determining whether broadcast contents meet regulations. Heavy fines would be imposed on violators. On October 23, the official news service, VenPres, published comments by the HRW Executive Director that appeared to support the proposed broadcast media law. HRW immediately issued a statement that VenPres had taken the comments out of context and used them in a misleading way.

Both government and private media were highly politicized. HRW criticized private media for their pro-opposition bias. The Government asserted that some of the private media owners participated in the failed 2002 coup attempt, and claimed that some media were continuing to plot anti-constitutional measures. Most media owners state that they feared the Government planned to curtail basic liberties. Many journalists expressed dismay over the hostility and lack of communication between the groups. There were credible reports of state security agents spying on, harassing, intimidating, and physically attacking journalists. There were numerous cases of wiretaps of journalists, media owners, and media telephones, apparently without legal authorization (see Section 1.f.).

In August, the Cuban Government distributed a video titled "The Vulgar Fallacies of El Universal of Caracas," in an

apparent attempt to discredit El Universal's investigation of the alleged diversion of government funds to assist the Cuban regime. Cuban television also broadcast the video. Government media accused private media of defaming and slandering government leaders and attempting to overthrow the Government.

Violent or threatening pro-government demonstrations occurred at several media offices. In August, two men on a motorcycle threw an explosive device into Regional Tachira radio station's parking lot and left flyers saying, "We will eliminate media terrorism." Also in August, El Mundo reported that National Guardsmen had stopped its delivery truck in Barquisimeto and accused the paper of being anti-Chavez; only after paying a small "fine" was the truck allowed to proceed. At year's end, none of these cases had been resolved.

In August, VTV announced a march on RCTV, which was followed by a group of Chavez sympathizers who spray-painted threats to the channel's vice president on the station's front wall: "Marcel G en la mira militar" (Marcel G in the crosshairs of the military), a reference to the station's owner.

Although the bulk of attacks were directed against private media journalists and installations, there were also actions against journalists and installations affiliated with the Government. In June, Catia TV, a government-sponsored community television station closed temporarily by order of opposition Mayor Alfredo Pena with jurisdiction over Catia. Several days later, the mayor's office re-opened the station, apologized for the closure, and noted that it did not have the authority to intervene in the operations of the media.

In November 2002, the Inter-American Human Rights Court applied "provisional actions" to the Government, the next step after the Court's "precautionary actions," for the Government's failure to protect individual rights, safety, and freedom of expression. The provisional actions ordered the Government to investigate and punish those responsible for aggressive acts and to publicly condemn violence against the media. At year's end, the Government had not responded to the Court's provisional actions.

In December 2002, the OAS Permanent Council's Resolution 833 called on the Government to ensure full freedom of expression, based on the OAS Democratic Charter. During the year, the IACHR Special Rapporteur for Freedom of Expression criticized the administrative proceedings against private television channels and radio communications regulations that forbid transmission of false or misleading information; condemned an attack against columnist and talk show host Marta Colomina; and criticized the July 15 Supreme Court decision to uphold laws making it a crime to insult, injure, or threaten public officials. At year's end, the Government had not successfully investigated any of more than 80 assaults on and threats against journalists and at least 40 reported attacks on media installations and equipment during the year.

Since late 2002, the Ministry of the Interior and Infrastructure opened a number of administrative cases against Globovision, RCTV, Venevision, and Televen. The following cases were unresolved: Globovision had three pending cases for alleged misuse of content (including subversion of public order and the slander and libel of government officials and institutions; RCTV had seven court cases based on the Organic Law for the Protection of Children and Adolescents (for inappropriate programming); Venevision had one administrative case for alleged violation of the national broadcasting regulations, which prohibits the transmission of messages that incite rebellion and disrespect for institutions and officials, as well as the broadcasting of propaganda that subverts public order and the transmission of false or misleading news. CONATEL also submitted charges based on its allegations that Venevision was delinquent on its tax payments. Venevision appealed the case; Televen had one administrative case for broadcasting opposition civil and military leaders' statements and propaganda between October 2002 and January, as well as for televising opposition ads between 3:00 p.m. and 6:00 p.m. (hours reserved for children's programming).

On October 3, CONATEL filed administrative charges against Globovision and seized microwave equipment alleging the station had used it to broadcast on illegal frequencies. The seizure limited the 24-hour news station's ability to cover live events. The IACHR issued two precautionary measures in favor of Globovision in October calling on the Government to return the equipment and to ensure a speedy resolution of the case by impartial and independent Venezuelan judges. On October 3, Globovision filed an appeal with the First Court for Contentious Administrative Matters. On October 8, the First Court voted in favor of Globovision and ordered the return of the equipment while CONATEL determined the outcome of the case. The same day, the Supreme Court closed the First Court and suspended the judges who had ruled in favor of Globovision; their ruling was never released. At the request of the Attorney General, the Second Court of Appeals of the Penal Judicial Circumscription ruled that the Court's protective measures previously issued for certain journalists be extended to all journalists, technicians, representatives, directors, and employees of five private television stations: Globovision, RCTV, Venevision, Televen, and CMT. The ruling noted consequences the Government might face if it failed to comply with international obligations, including the IACHR's protective measures. The ruling also ordered local and Miranda State authorities to guarantee the safety of personnel and protection of assets of private TV stations, including microwave and other broadcast equipment. On December 9,

CONATEL fined Globovision approximately $364,000 (582,000,000 bolivars) for illegal use of frequencies and announced that it would not return the microwave equipment it seized from the television station on October 3.

The Constitution states that all persons have the right to "timely, true, and impartial" information, without censorship. The Constitution also provides for the "right to reply" for individuals who believe they are portrayed inaccurately in media reports. Media figures criticized the Supreme Court's 2001 ruling that established criteria for determining and exercising the right to timely, true, and impartial information.

According to the Constitution, it is "contrary to the freedom of information" for a medium to criticize ideas, rulings, etc., without indicating what is being criticized. A 2001 Supreme Court ruling established criteria to determine whether a media report is "true" or not. Violations included expressing opinions that contain statements that were "out of context, disconnected, or unnecessary for the topic, or offensive, insidious, or degrading expressions unconnected to the topic, or unnecessary for the forming of public opinion." The ruling affirmed that information could be censored prior to publication if it violates Article 57 of the Constitution, which prohibits anonymous authorship, war propaganda, and messages that promote discrimination or religious intolerance. The Supreme Court also ruled that the true information clause would be violated if a majority of a medium's editorial writers express the same ideological tendency, unless that medium openly declares itself to be a party to those views. In May 2002, the Supreme Court ruling was taken to the IACHR to be submitted to the Inter-American Court of Human Rights. At year's end, there was no decision on the case.

According to the 2000 Organic Telecommunications Law, the Government may order obligatory national broadcasts (cadenas), pre-empting scheduled programming. Domestic and international observers criticized the Government for excessive abuse of this right. As of August, the Government increased the frequency and length of cadenas. According to private media sources, there were approximately 162 hours of cadenas during the year, compared with 73 hours in 2002.

The Government influenced the press through licensing requirements for journalists, broadcast licensing concessions, and public sector advertising. Some commercial radio stations complained that the allocation of frequencies to community stations violated broadcast regulations, according to the National Venezuelan Radio Broadcasting Chamber. Funding for the stations reportedly came from the Government, not the communities, and the broadcasts were pro-government.

The Government denied equal access of private media journalists to many official events. Beginning in December 2002, the presidential palace denied access to reporters from private media, while state controlled media and some foreign news reporters continued to have access.

Media analysts, journalists, and other observers alleged that the Government used criminal defamation and libel laws to intimidate or harass the media. Because of the lengthy process and considerable legal costs, some observers regarded these lawsuits, or threats of lawsuits, as attempts to discourage investigative journalism. The editor of La Razon newspaper remained overseas because of one such long-running lawsuit. Other media owners and executives sent their families abroad fearing they could be attacked or kidnapped if they were to remain in the country.

In July, army Colonel Angel Bellorin and MVR Deputy Luis Tascon sued journalist Ibeyise Pacheco for defamation of character. Pacheco printed accusations that Bellorin had altered the grades he received while a university student and published a photo linking Tascon to the events of April 11, 2002. The case was pending at year's end.

On December 23, the DIM ordered that a book written by Luis Pineda Castellano, former chief of security for President Chavez, be removed from sales shelves at the National Armed Forces library. Castellano's book included accounts of his 29 years in DISIP, citing stories of the President's responsibility for concealing irregularities.

The Telecommunications Law permits the President to suspend media broadcasts when he judges it to be in the national interest. Some observers believed this law could allow the suspension of broadcasts for vague and arbitrary reasons. During the year, the President referred to this law many times and threatened to revoke commercial broadcast licenses or not convert pre-2000 licenses to new ones. Many media professionals complained that investigations of television and radio stations by CONATEL were politically motivated.

There were at least 15 government administrative interventions in private media during the year, and the President publicly accused media owners and institutions of tax evasion. Media figures charged that the Government used ongoing tax investigations to pressure media owners. The CONATEL web page highlighted its fining of Globovision for the station's alleged delay in tax payments. The fines totaled over $310,000 (496 million bolivars); Globovision

asserted it had paid all required taxes.

The Government did not restrict access to the Internet.

While academic freedom traditionally was generally respected, government funding was withheld from the country's universities. Rectors of those institutions charge that the Government did so to punish them. All of the major public university rectors were elected on anti-government platforms. In July, the Government established the Bolivarian University while withholding budgeted funds to many of the existing universities. Public institutions of higher education designated as "experimental universities" are governed by Superior Councils, to which the Government appoints a majority of members. The Government successfully replaced the leadership of other universities, mostly in the interior of the country, with political allies.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of peaceful assembly and association, and the Government generally respected these rights in practice. Public meetings, including those of all political parties, generally were held unimpeded, although numerous marches and rallies were disrupted by alleged government supporters. The Government required permits for public marches but did not deny them for political reasons.

The Constitution prohibits the use of firearms to control peaceful demonstrations. Supporters and opponents of the Government repeatedly demonstrated in the capital and other cities during the year. Several demonstrations resulted in injuries or loss of life. Both the authorities and the demonstrators used firearms (including military weapons), tear gas, and billy clubs against each other.

The opposition held several rallies in neighborhoods considered pro-government strongholds, leading to government accusations that the rallies were intended to provoke supporters of the President. Opposition organizers claimed their intention was to reveal the opposition's high level of support among the poor. The Government did not stop the rallies from taking place.

On March 8, an opposition march turned violent after DISIP was unable to capture Juan Fernandez, the president of Petroleum People, the civil society organization and support group for fired PDVSA workers. Protesters attacked DISIP vehicles and officers, who withdrew using tear gas.

In April, four men who were identified shooting at demonstrators from Llaguno Bridge in downtown Caracas, and arrested after the temporary alteration of constitutional order in April 2002, were released after an appeals court ruled there was insufficient evidence to hold them. Both opposition and government supporters claimed case evidence had been manipulated to favor the other side. On September 17, a judge cleared the four of all charges against them, citing lack of evidence. The prosecutor appealed the decision, but at year's end the case had not been concluded.

On May 1, Ricardo Herrera was shot while participating in an opposition rally in Caracas. Police claimed to have a suspect in custody. On May 24, Modesto Martinez, described in news reports as an MVR militant and activist, was killed during an opposition march in the Catia neighborhood of Caracas. No one was charged with his death. On July 17, Juan Carlos Osorio was killed by a National Guardsman while demonstrating in Anzoategui State against job losses in the petroleum sector (see Section 1.a.).

The Government alleged that the Caracas Metropolitan Police used excessive force during various demonstrations; however, no charges were brought against officers. On June 13, the Metropolitan Police used tear gas and shotguns to disperse government supporters who were threatening an opposition rally in the Petare district of Caracas. Police reported that pro-government demonstrators targeted them with firebombs, and violence broke out. The pro-government protesters destroyed the police post.

In September 2002, the Government issued a decree establishing eight security zones within Caracas. The decrees gave the central Government, rather than municipal officials, the authority to permit demonstrations there. The zones included areas around military installations, state television and radio stations, and PDVSA headquarters and continued in force throughout the year. Opposition groups criticized these security zones as a restriction on the right of assembly. In August, the Minister of the Interior complained that opposition groups planning a rally in support of the recall of the President had not coordinated security for the event with the proper authorities. The Minister cited concern that the march routes published in newspapers indicated they would be going through some security zones; however, the Government did not impede the marches or the rally.

Professional and academic associations generally operated without interference; however, in 2000, the Supreme Court ruled that NGOs that receive funding from foreign governments or whose leaders are not Venezuelan are not part of "civil society" and therefore may not represent citizens in court or bring their own legal actions; and that religious organizations are not part of civil society and were subject to the same restrictions. The ruling stated that the Government has an obligation to ensure that NGOs are "democratic in nature" and therefore, the internal elections of nonprofit groups (such as for boards of directors) can be regulated by the CNE. The Government had not moved to implement the Court's decision.

c. Freedom of Religion

The Constitution provides for freedom of religion, on the condition that the practice of a religion does not violate public morality, decency, or the public order, and the Government generally respected this right in practice.

In 1964, the Government and the Holy See signed a concordat that underscores the country's historical ties to the Roman Catholic Church and provides government subsidies to the Church, including to its social programs and schools. Other religious groups receive monetary assistance for the repair of building for religious use; however, the amount available to non-Catholic groups was less than 7 percent of the annual religious subsidy budget. Other religious groups are free to establish and run their own schools, but they do not receive subsidies from the Government, except in the form of building repairs.

Religious groups must register with the Directorate of Justice and Religion in the Ministry of Interior and Justice to hold legal status as a religious organization and to own property. The requirements for registration are largely administrative. However, some groups complained that the process of registration was slow and inefficient. A special visa is required for foreign missionaries to enter the country. Missionaries were not refused entry generally, but faced the general bureaucratic inefficiency of the Government taking months or years to process a request.

In May, Archbishop Baltazar Porras, chairman of the Venezuelan Bishops' Conference, accused the Government of seeking to destroy the Catholic Church's credibility by manufacturing scandals aimed at priests and bishops. He described a series of attacks on churches, cathedrals, and priests' houses whose apparent aim was to create fear, rather than steal objects of value. Prior to at least one attack, normal police presence had been withdrawn after authorities allegedly claimed it was a privilege the Catholic Church should not enjoy.

On September 21, during his weekly national broadcast, the President referred to the Bishops' Conference as "liars" and "immoral" for allegedly using church services to distribute leaflets and other messages in support of the opposition.

In December, there were five attacks on churches and church symbols. On December 6, pro-government groups marching to a presidential rally in Caracas decapitated a statue of the Virgin Mary in Altamira Plaza, a site associated with the opposition. On December 9 and 16, unknown arsonists set a church on fire in Los Teques, Miranda State, damaging an outside wall and destroying two shrines. On December 10 and 12, statues of the Virgin Mary and other religious images were destroyed in Cardon, Falcon State. The Catholic Church accused the Government of organizing the attacks. Government officials denied responsibility and blamed dissident military officers, infiltrators, and opposition supporters. Authorities had four suspects in custody for the Falcon State attacks, and at year's end, investigations of all the attacks continued.

For a more detailed discussion, see the 2003 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The Constitution provides for the right of citizens and legal residents to travel within the country and to go abroad and return, and the Government generally respected these rights in practice. However, the Government may suspend the freedom to travel. The Government also restricted foreign travel for persons being investigated for criminal activities. In addition, the Government requires persons who are departing the country with minors that are not their children to present to immigration officials proof of authorization from the minors' parents.

Both the Constitution and the Organic Refugee Law that took effect in October 2001 provide for the granting of refugees status or asylum to persons who meet the definition in the 1951 U.N. Convention Relating to the Status of Refugees and its 1967 Protocol. In practice, the Government provided protection against refoulement, but did not routinely grant refugee or asylum status.

Implementing regulations for the Refugee Law have not been drafted; the new National Refugee Commission was sworn in on August 7. The Commission will receive and decide applications for refugee status. At year's end, there was still no formal mechanism for those seeking asylum to legalize their status. During the year, the UNHCR worked with the Attorney General's office to investigate cases on an ad hoc basis to speed the Commission's ability to decide cases once it can begin doing so.

Persons who applied formally for refugee status received no provisional documentation that legalized their presence in the country. Therefore, they had no legal protection, and could not legally work, attend public school, or receive public health services. National Guard troops rarely investigated the cases of undocumented aliens found at security checkpoints along the border before deporting them. In July 2002, PROVEA requested a ruling from the Supreme Court that would give temporary legal status to refugees. Nearly a year later, the Court requested additional information from PROVEA and the Government but did not issue a ruling. UNHCR reported that files were often lost or misplaced, since the Attorney General's Office had no fixed department to centralize the processing of these cases.

As of August, there were approximately 200 persons in the country who had been granted refugee status from prior years, and approximately 1,500 additional refugee claims pending.

In theory, the Government provides temporary protection; however, the Government denied the existence of all but a small number of Colombian refugees who crossed the border and claimed to be fleeing paramilitary incursions. It called those Colombians whose presence it did acknowledge, "displaced persons in transit." According to UNHCR, the number of small groups entering the country, including individuals and small family groups, increased. In these cases, the persons often chose to blend into the local population rather than apply for formal refugee status.

On December 22, authorities denied Juan Fernandez permission to travel out of the country. Fernandez, the head of Petroleum People, faced pending charges of sabotage and treason for his alleged role in the national work stoppage (see Sections 2.b. and 6.b.).

There were no reports of forced return of persons to a country where they feared persecution. In 2002, the latest year for which numbers were available, the National Guard in the border region in Zulia, Tachira, and Apure states, reported that they deported on average 42 Colombian nationals per day. As of August 2002, they deported 9,533 persons. Although the law requires the authorities to take 30 days to investigate each undocumented person's case, this was done only rarely.

Section 3 Respect for Political Rights: The Right of Citizens to Change their Government

The Constitution provides citizens with the right to change their government peacefully, and citizens exercised this right through periodic, free, and fair elections held on the basis of universal suffrage. The Constitution provides for the direct election of the President and unicameral National Assembly, as well as of state governors, state legislative councils, and local governments. The Constitution also permits citizens to request recall referenda after the mid-point of the term of all elected officials. Political parties organize, and their candidates are allowed to run for office freely and to seek the support of voters. The President has extensive powers, and the legislature appoints the members of the Supreme Court, the CNE, and the Citizen Power Branch consisting of the Ombudsman, Public Prosecutor, and Controller General.

Opposition groups and political parties have sought to remove President Chavez from power since 2002. In April 2002, military officers with the support of some opposition groups illegally detained Chavez, and opposition business leader Pedro Carmona, without any constitutional authority, proclaimed himself interim president and suspended the National Assembly and the courts. On April 14, 2002, troops loyal to Chavez returned him to power. During the accompanying violence, there were as many as 18 deaths and more than 100 injuries, as well as looting. An investigation into the April violence, plagued by irregularities, failed to result in any convictions.

In February, opposition groups collected approximately 3 million signatures from citizens to petition a referendum to recall the President. On August 20, the petitions were submitted, but the Supreme Court ruled they were invalid since they had been collected before the President had completed half of his term of office. On May 29, government and opposition representatives signed an agreement, after months of negotiation under OAS auspices, that acknowledged respect for the Constitution and its provisions that give citizens the right to hold a recall referendum for any elected official, including the President. Meanwhile, the National Assembly failed to agree on the membership of a new CNE and on August 14 was found to be in "constitutional omission" by the Supreme Court for this failure. In September, the Court named the CNE, which then rejected the opposition's petition based on the February signatures. Using rules formulated in September, the opposition then conducted another signature drive at the end of November. The

Government and opposition also collected signatures to petition for referenda to recall more than 70 legislators. The CNE was expected to verify the signatures collected at both events by January 2004.

On August 14, a judge ruled against the Human Rights Ombudsman for converting 79 types of career civil service jobs into political appointments. Career employees who had lost their jobs as a result claimed that the process was used to remove those who were not pro-government. In September, there were news reports of individuals fired from private sector jobs, of students denied internships, and of military officers disciplined or discharged because they signed the February petitions for a referendum.

Women and minorities participated fully in government and politics. The National Assembly's Family, Women, and Youth Committee promotes political opportunities for women. In the 2000 elections, women won 20 seats in the 165-seat Assembly. There are 2 women in the 18-member Cabinet. In the Citizen Power Branch, a woman holds the position of Solicitor General. The 20-member Supreme Court includes 2 female justices.

Indigenous people traditionally have not been integrated fully into the political system due to low voter turnout, geographic isolation, and limited economic and educational opportunities. The 1999 Constitution reserved three seats in the National Assembly for indigenous people, and these seats were filled in the 2000 election. There were no indigenous members in the Cabinet. One of the vice presidents of the National Assembly is an indigenous person.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A wide variety of independent domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were occasionally responsive to their views. However, NGOs objected to a 2000 Supreme Court ruling that imposed restrictions on NGOs that receive funding from foreign governments should they be found to be "undemocratic in nature" (see Section 2.b.). This ruling has not impeded the work of NGOs.

There have been no meetings between President Chavez and NGOs to discuss human rights issues since 1999. However, NGOs have developed relationships with specific government bodies such as the Ministry of Education (to develop educational materials on human rights), the Foreign Ministry (to discuss the resolution of existing human rights cases against the Government in international tribunals), and the National Assembly (to discuss proposed legislation affecting human rights).

Several human rights NGOs received an increased number of threats and intimidation by government representatives and government supporters. Throughout the year, COFAVIC received e-mail and telephone threats from persons who identified themselves as Chavez supporters. The Attorney General's office and Human Rights Ombudsman's office did not pursue requests by COFAVIC for investigations of this harassment. In 2002, the IACHR recommended that the Government provide police protection to COFAVIC's offices and director. The Government did not respond to this request. The Metropolitan Police provided bodyguards for the COFAVIC director and protection in and around COFAVIC's office. On December 2, the IACHR issued a report stating that the Government had not effectively implemented its recommendations. In addition, the IACHR reported that attacks on COFAVIC's director and other officials were directly linked to the NGO's defense of human rights.

In August, the IACHR ordered the Government to pay $1,559,800 (2,495,680,000 bolivars) to compensate relatives of the victims of the Caracazo riots and killings of 1989, the events that prompted formation of COFAVIC. In 2002, the IACHR had called for the Government to prosecute those responsible for the Caracazo and to compensate the victims' families within 1 year.

On October 8, the President declared that the Government was not obligated to comply with decisions of the IACHR. He also stated that compliance with the IACHR order to return confiscated broadcasting equipment to the media outlet Globovision would uphold criminality.

The Ombudsman is responsible for ensuring that citizens' rights are protected in a conflict with the state and, together with the Public Prosecutor and Controller General, make up the Citizen Power branch of government. Human rights NGOs claimed that the Ombudsman's office acted on only a small number of cases presented to it. COFAVIC claimed that the Ombudsman and the Attorney General's Office were not independent of the Executive Branch and were therefore unable to carry out effective investigations.

On August 27, Joe Luis Castillo, an employee of the UNHCR, was assassinated in Machiques, Zulia State. Many

human rights organizations and the IACHR called on the Government to investigate the killing and to do more to protect human rights workers. Rumors circulated that Castillo, in his professional role, may have aided a member of a paramilitary group, garnering the anger of rival groups. Ombudsman German Mundarain asked and Attorney General Isaias Rodriquez agreed to assign a special prosecutor to the case. At year's end, no suspects had been identified or charged.

On July 1, HRW criticized the Government's proposed law to regulate broadcast media and its ongoing investigations of four private television stations as detrimental to the exercise of free speech. The Government responded with a personal attack on the HRW Executive Director but did not address the substance of HRW's concerns (see Section 2.a.).

On June 11, Freddy Gutierrez was elected to the IACHR. Previously, the Government had few dealings with the Commission, causing concern among human rights groups about the Chavez administration's lack of a human rights agenda. Some human rights groups saw Gutierrez' presence on the Commission as the Government's attempt to reduce or deflect criticism from the Commission, rather than as genuine concern for human rights.

The Defense Ministry's human rights office continued to conduct courses as part of the armed forces' training curriculum.

Section 5 Discrimination Based on Race, Sex, Disability, Language, or Social Status

The Constitution expressly prohibits discrimination on the basis of politics, age, race, sex, creed, or any other condition, and the law prohibits discrimination based on ethnic origin, sex, or disability. However, the Government did not protect women adequately against societal and domestic violence and did not ensure persons with disabilities access to jobs and public services, nor did it safeguard adequately the rights of indigenous people during the year. On June 29, several hundred participants demonstrated against discrimination toward homosexuals and to demand equal rights for them.

Women

Violence against women continued to be a problem, and women faced substantial institutional and societal prejudice with respect to rape and domestic violence during the year. Domestic violence against women was common and was aggravated by the country's economic difficulties. The Venezuelan Association for Alternative Sexual Education (AVESA) registered 40 cases of domestic violence. At year's end, AVESA was working to compile domestic violence statistics from other NGOs and governmental entities to reflect more accurately the extent of the problem. Many domestic violence cases were not reported to the police, according to women's organizations. The police generally were unwilling to intervene to prevent domestic violence, and the courts rarely prosecute those accused of such abuse, according to local monitors. In addition, poor women generally were unaware of legal remedies and have little access to them. The law requires police to report domestic violence and obligates hospital personnel to notify the authorities when it admits patients who are victims of domestic abuse cases.

Rape is extremely difficult to prove, requiring at a minimum medical examination within 48 hours of the crime. A provision in the Penal Code also provides that an adult man guilty of raping an adult woman with whom he is acquainted can avoid punishment if, before sentencing, he marries the victim. Few police officers are trained to assist rape victims. AVESA registered 330 cases of rape or attempted rape during the year; a majority of the victims were children. However, women's organizations asserted that these figures were low and did not accurately portray the problem of rape and sexual assault. They claimed that many victims do not report the incident or press charges due to societal pressure and their own feelings of guilt.

One human rights organization received reports that women were trafficked to Europe for purposes of prostitution (see Section 6.f.).

Sexual harassment in the workplace was a common problem but is not a criminal offense.

Women gradually surmounted many of the barriers to their full participation in political and economic life; nonetheless, they still were underrepresented in leadership positions and, on average, earned 30 percent less than men. Women accounted for approximately half the student body of most universities and advanced in many professions, including medicine and law. A 2000 government decision allowed women to attend military academies and serve in expanded roles as officers in the armed forces. As of August, 70 women were in training at the Army's military academy, 60 were in training at the Naval academy, 39 were at the Air Force academy, and 75 were in training at the National Guard

academy.

Women and men are legally equal in marriage. The Constitution provides for sexual equality in exercising the right to work. The 1990 Labor Code specifies that employers must not discriminate against women with regard to pay or working conditions, must not fire them during pregnancy or for 1 year after giving birth, must grant them unpaid leave and benefits for 6 weeks before the birth of a child and 12 weeks after, and must provide them with 10 weeks of unpaid leave if they legally adopt children under 3 years of age. According to the Ministry of Labor and the Confederation of Venezuelan Workers (CTV), the country's major labor federation, these regulations were enforced in the formal sector, although social security payments often were delayed.

In 2001, the National Institute for Women--an agency of the Presidency with representation from the Ministries of Justice, Education, Family, Health, and Labor--designed two programs to assist women in need and enhance the economic independence of women. The first program was the "Women's Bank" to provide small-scale financing to micro-enterprises run by women. In February 2002, the Government said that $10 million (15 billion bolivars) had been placed into this fund, and numerous micro-loans were issued during the year. There were allegations of corruption and mismanagement within the fund. In August, the bank admitted that it had negative balances, and the Central Bank of Venezuela called for it and other microfinancing institutions to be placed under greater regulatory supervision. The second initiative was the Women's Shelters Program-the construction of a series of centers to receive, care for, and rehabilitate women in distress.

There were a number of NGOs concerned with domestic violence, sex education, and economic discrimination. However, the recommendations of these groups were not implemented widely by the police or other concerned government agencies.

Children

The Organic Procedural Law on Adolescents and Children establishes legal protection of children under the age of 18, regardless of nationality; however, observers expressed concern over the slow implementation of the law's provisions. Government expenditures on education, health, and social services decreased during the year due to a weakening economy and government budget deficits. Primary and secondary education was chronically under funded. According to the Constitution, the State is to provide free education up to the university-preparatory level (15 or 16 years old) and the law provides for universal, compulsory, and free education; however, an estimated 57 percent of children left school before the 9th grade.

In addition, approximately 1 million children were not eligible to receive government assistance, including public education, because they were either illegal aliens, or their births were not documented properly, according to the annual report of the NGO Community Centers for Learning (CECODAP). A 1998 government regulation requires hospitals to register the births of all children, but a general lack of resources made compliance nearly impossible. The Center for Peace and Human Rights at the Central University of Venezuela estimated that 20 percent of the poor had no identity documents, and the majority of these were children between the ages of 2 and 18.

According to a 2001 report by CECODAP, approximately 25 percent of children under the age of 15 had a nutritional deficit. Substandard conditions contributed to the increase in preventable diseases that were leading causes of infant mortality.

Reports of child abuse were rare due to a fear of entanglement with the authorities and societal ingrained attitudes regarding family privacy. The judicial system, although slow, ensured that in most situations children were removed from abusive households once a case had been reported. However, public facilities for such children were inadequate and had poorly trained staff.

According to CECODAP, approximately 1.6 million children worked in the country, mostly in the informal sector where they worked as street vendors or as beggars. An estimated 206,000 children were involved in prostitution, drug trafficking, and petty crime (see Section 6.d.).

According to UNICEF, there were 240,000 children on the streets; however, CECODAP reported that there were 500,000 street children. The authorities in Caracas and several other jurisdictions tried to cope with the phenomenon of street children by continuing to impose curfews for unsupervised minors. Children's rights advocates claimed that curfews permitted the police to act arbitrarily and detain persons who had committed no crime. Because reform institutions were filled to capacity, hundreds of children accused of infractions, such as curfew violations, were confined in juvenile detention centers (see Section 1.c.).

Children's rights advocates continued to criticize the Government's lack of success in reuniting children and parents who were separated in the flooding in Vargas state in 1999. At year's end, 119 children remained missing. With the 2002 closing of the police office responsible for investigating the missing children, the Displaced Persons Unit of CICPC began handling the cases. The Ombudsman's office continued to investigate whether some of these children may have been trafficked (see Section 6.f.).

Persons with Disabilities

Persons with disabilities had minimal access to public transportation, and ramps were practically nonexistent, even in government buildings. According to local advocates, persons with disabilities were discriminated against in many sectors, including education, health care, and employment. A comprehensive 1993 law to protect the rights of persons with disabilities requires that all newly constructed or renovated public parks and buildings provide access. The law also prohibits discrimination in employment practices and in the provision of public services. However, the Government had not made a significant effort to implement the law, inform the public of it, or try to change societal prejudice against persons with disabilities.

There were no reports of discrimination against persons with mental disabilities.

Indigenous People

Although the law prohibits discrimination based on ethnic origin, members of the country's indigenous population frequently suffered from inattention to and violation of their rights. There were approximately 316,000 indigenous persons in 27 ethnic groups. Many of the indigenous were isolated from modern civilization and lacked access to basic health and educational facilities. High rates of cholera, hepatitis B, malaria, and other diseases plagued their communities.

The Constitution creates three seats in the National Assembly for indigenous deputies and also provides for "the protection of indigenous communities and their progressive incorporation into the life of the nation." Nonetheless, local political authorities seldom took account of the interests of indigenous people when making decisions affecting their lands, cultures, and traditions, or the allocation of natural resources. Few indigenous persons held title to their land, but many did not want to because most indigenous groups rejected the concept of individual property. Instead, they called on the Government to recognize lands traditionally inhabited by them as territories belonging to each respective indigenous group.

On May 23, the Yaruro indigenous group of Apure State complained to the human rights group PROVEA that landholders and ranchers allegedly invaded Yaruro lands with negative results for the area's natural resources on which the indigenous community depended. Equally worrisome to the Yaruro was the discovery of petroleum within their territory. The Yaruro demanded compliance with Articles 120 and 129 of the Constitution requiring that any exploitation of natural resources within an indigenous group's territory only be undertaken after consultation with the effected group.

In July 2001, three members of the Pume indigenous people in Apure State were killed during an apparent effort to take control of the land they occupied. Two adults and one child were attacked by nonindigenous persons armed with machetes and firearms. Another Pume member, Carmen Flores, witnessed the killings and escaped unnoticed. In August 2001, two persons were arrested in connection with the killings. In November 2001, a court found them innocent and they were released. In July 2002, the Supreme Court reopened the case and ordered that the two men be detained. There were no further developments in this case during the year.

Section 6 Worker Rights

a. The Right of Association

Both the Constitution and the 1990 Labor Code recognize and encourage the right of workers to organize; however, the Government continued to violate the right of association. According to the Constitution, all workers, without prejudice or need of previous authorization, have the right to form freely unions that they believe can help them defend their rights and interests, as well as the right to join—or refrain from joining—these organizations. The Labor Code extends the right to form and join unions of their choosing to all private and public sector employees, except members of the armed forces.

The Constitution provides that labor organizations are not subject to intervention, suspension, or administrative dissolution, and workers are protected against any discrimination or measure contrary to this right. Labor organizers and leaders may not be removed from their positions during the period of time or under the conditions in which they exercise their leadership functions. However, Articles 23 and 95 of the Constitution, which provide for freedom of association, are contradicted by Article 293, which gives the CNE the authority to administer the internal elections of labor confederations. This article, which contravenes ILO Conventions 87 and 98, has been the subject of a long-running dispute between the Government and the ILO. However, during the year, the ILO took note of the will expressed by the Government and the National Assembly to adjust the legislation to the requirements of Convention 87, and requested the Government to furnish a detailed report, including the texts of any new draft elaborated, so that the ILO Committee of Experts could examine the situation once again at its next meeting.

The Inter-American Regional Organization of Workers and International Confederation of Free Trade Unions concluded that the Government seriously violated the right of association. The ILO repeatedly expressed concerns that the 1990 Labor Code violates freedom of association by requiring a high number of workers (100 workers) to form self-employed workers' trade unions and a high number of employers to form employer trade unions (10 employers). The ILO noted that the long and detailed list of duties assigned to workers' and employers' organizations and the requirement that foreign workers must be resident in the country for more than 10 years in order to hold trade union offices also violates freedom of association. It also "deplored allegations of acts of violence committed with government backing [that] had been presented to the ILO mission by workers' and employers' organizations."

According to 2002 figures, approximately 10 to 12 percent of the 10-million-member national labor force was unionized. The CTV, three small union confederations, and a number of independent unions operated freely. The CTV represents most of the unionized workers and was especially strong in the public sector; its membership was approximately 900,000 workers. The CTV's top leadership included members of several political parties, but the majority was affiliated with either Democratic Action (AD) or the Christian Democrats (COPEI). The CTV and the AD traditionally influence each other. The Bolivarian Workers Force (FBT) organized unions within the CTV and participated in the CTV internal elections held in October 2002. During the year, the head of the Caracas metro union established the pro-government National Workers Union (UNT) as a counterweight to the CTV; the UNT claimed to have 630 affiliate unions.

Despite ILO objections, the Government continued to insist on the CNE's oversight authority for labor leadership elections. However, in practice CNE authorities took a broad interpretation of the requirement, allowing the individual union and federation elections to proceed uninterrupted under the authority of the CTV, and generally limiting its activities to an advisory role.

In spite of the CNE's hands-off approach and a 2002 Supreme Court ruling on the matter, the Government did not accept the validity of CTV internal elections in which pro-government candidates were defeated. As a result, the Government invited the UNT to represent labor on the delegation to the annual ILO Conference in June, rather than recognize the CTV leadership as the leading labor representative for the country. On June 2, Manuel Cova, CTV Secretary General, filed a complaint with the Supreme Court against the government delegation and later formally challenged the delegation's credentials at the ILO Conference in Geneva.

The Labor Code mandates registration of unions with the Ministry of Labor, but it limits the Ministry's discretion by specifying that registration may not be denied if the proper documents (a record of the founding meeting, the statutes, and membership list) are submitted. Only a judge may dissolve a union, and only for reasons listed in the law.

The law also prohibits employers from interfering in the formation of unions or in their activities and from stipulating as a condition of employment that new workers must abstain from union activity or must join a specified union. The Constitution prohibits measures that "alter the sanctity and progressiveness" of labor rights and worker benefits, declares labor rights to be irrevocable, and provides that ambiguities regarding the application or interpretation of norms are to be applied in the manner most favorable to the worker.

Ministry of Labor inspectors hear complaints regarding violations of these regulations and traditionally impose a maximum fine of twice the monthly minimum wage for a first infraction. Under the Constitution, union officials have special protection from dismissal. Under the Labor Code, if a judge determines that any worker was fired for union activity, the worker is entitled to back pay plus either reinstatement or payment of a substantial sum of money, which varies according to the worker's seniority.

There are no restrictions on affiliation with international labor organizations, and many union organizations were active internationally; however, a 2000 Supreme Court ruling regarding the legal rights of NGOs that receive funding from

foreign sources has the potential to restrict the international affiliations of union organizers (see Section 2.b.).

b. The Right to Organize and Bargain Collectively

According to the Constitution, all public and private sector workers have the right to voluntary collective bargaining and to arrive at collective bargaining agreements, without any additional requirements other than those established by the law. The Constitution provides that the Government is to ensure development of collective bargaining and to establish conditions favorable to collective relationships and the resolution of labor conflicts. The Labor Code stipulates that employers must negotiate a collective contract with the union that represents the majority of their workers. The ILO repeatedly expressed concerns over this and in March 2000 requested that the Government amend it so that "in cases where no union organization represents an absolute majority of workers, minority organizations may jointly negotiate a collective agreement on behalf of their members." The Code contains a provision stating that wages may be raised by administrative decree, provided that the legislature approves the decree.

During the year, the conflict between the Government and the CTV intensified, beginning with the labor confederation's leadership of a national work stoppage from December 2002 to February 1. On February 20, a criminal court ordered CTV Secretary General Carlos Ortega's detention on charges of rebellion, sabotage, and treason. On March 27, Ortega arrived in Costa Rica after being granted asylum in the Costa Rican embassy in Caracas. According to the media, Ortega said several times that he will return to the country but had not done so at year's end.

On February 19, DISIP officers detained strike leader and Fedecamaras president Carlos Fernandez and held him incommunicado until around 10:00 a.m. February 20 when he was allowed to speak with his wife via telephone. The Government announced that Fernando was being held on charges including rebellion, treason, instigation to commit a crime(s), criminal association, and "devestation." An opposition attorney stated that no warrant or court order was displayed at the time of Fernandez's capture. Human Rights Ombudsman German Mundarain acknowledged that Fernandez's detention was not "entirely transparent" because judicial officials were prohibited from seeing Fernandez immediately following his detention. Later in the year, Ortega and Fernandez submitted a complaint against President Chavez to the IACHR, alleging that Chavez breached internationally recognized human rights. On March 20, a court of appeals authorized the release from house arrest of Fernandez citing insufficient evidence. However, the judge stated that Fernandez could be re-arrested if the Public Ministry presented sufficient evidence at a later date. Fernandez had left the country at year's end.

The Constitution and the Labor Code recognize the right of all public and private sector workers to strike in accordance with conditions established by labor law. However, public servants may strike only if the strike does not cause "irreparable damage to the population or to institutions." Replacement workers are not permitted during legal strikes. The Labor Code allows the President to order public or private sector strikers back to work and to submit their dispute to arbitration if the strike "puts in immediate danger the lives or security of all or part of the population."

During and after the national work stoppage, PDVSA fired 19,000 mostly white-collar petroleum sector workers, saying they had abandoned their jobs for more than 3 days and were therefore terminated under the Labor Code. The Government denied the former workers continued access to company housing, schools, and medical benefits. Claiming their termination was illegal, fired employees filed suit for either reinstatement or compensation. The Government filed criminal charges against seven former oil company executives for alleged incitement to rebellion and sabotage of the oil industry. On June 10, the Supreme Court ruled that the Government's case had procedural errors and would have to be refiled.

During the year, several brief strikes occurred among government employees such as doctors and health workers in public hospitals and clinics, teachers, and transportation workers.

Labor law and practice are the same in the sole export processing zone of Punto Fijo, Falcon State, as in the rest of the country.

c. Prohibition of Forced or Bonded Labor

The 1990 Labor Code states that no one may "obligate others to work against their will," and such practices generally were not known to occur; however, there were reports of trafficking in children for employment purposes (see Sections 6.d. and 6.f.).

d. Status of Child Labor Practices and Minimum Age for Employment

The Labor Code and the Tutelary Law for Minors contain provisions to protect children from exploitation in the workplace. The Ministry of Labor and the National Institute for Minors enforce child labor policies effectively in the formal sector of the economy but less so in the informal sector. In 2002, according to UNICEF, approximately 2.5 percent of children were in the labor market, and they worked in agriculture, as artisans, in offices, and in the services sector.

The Labor Code allows children between the ages of 12 and 14 to work only if the National Institute for Minors or the Labor Ministry grants special permission. It states that children between the ages of 14 and 16 may not work without the permission of their legal guardians. Minors may not work in mines or smelting factories; in occupations that risk life or health, or could damage intellectual or moral development; or in public spectacles. The Constitution prohibits adolescents from working in jobs that will affect their development (see Section 5). The Criminal Code prohibits inducing the prostitution and corruption of minors. Persons convicted of these crimes may be sentenced to imprisonment from 3 to 18 months, and up to 4 years if the minor is younger than 12 years old.

Those under 16 years of age may by law work no more than 6 hours per day or 30 hours per week. Minors under the age of 18 may only work between 6 a.m. and 7 p.m. Children who worked in the informal sector, mostly as street vendors, generally worked more hours than the total permitted under the law. According to a Foundation for Social Action (FUNDAS) study, 63 percent of child street vendors work 7 days a week and 69 percent began working between the ages of 2 and 3. The Government's Central Office of Statistics and Information reported that 12 percent of the country's children between the ages of 10 and 17 were working, had worked at some time, or were seeking work. Of that number, approximately 70 percent work in the informal sector of the economy. According to another report, 1.1 million children worked in the informal sector, 300,000 in the formal sector, and 206,000 in jobs related to prostitution, drugs, and theft.

e. Acceptable Conditions of Work

The Constitution provides workers with the right to a salary that is sufficient to allow them to live with dignity, and provides them and their families with the right to basic material, social, and intellectual necessities. The Constitution obliges the State to provide public and private sector workers with an annually adjusted minimum wage, using the cost of the basic basket of necessities as a reference point. Under the Labor Code, minimum wage rates are set by administrative decree, which the legislature may suspend or ratify but may not change. The law excludes only domestic workers and concierges from coverage under the minimum wage decrees. On April 30, President Chavez announced a plan to increase the minimum wage by 30 percent. The plan was designed to raise the monthly minimum wage in two increments during the year. In July, the Government raised the minimum wage for public and private employees by 10 percent. Following the increase, the monthly minimum wage was $125 (200,000 bolivars) in the private sector for urban workers, $120 (192,000 bolivars) for employees of small and medium-sized companies, and approximately the same for rural workers. The President decreed a 20 percent increase to take effect October 1. The increases applied only to those already earning the minimum wage-approximately 15 percent of the labor force. Total take-home pay in the private sector, the product of a presidential decree, was at least equal to that received by public sector minimum wage workers. Fringe benefits added to these minimum figures generally increased wages by about one-third. However, even with these benefits, the minimum wage was not sufficient to provide a decent standard of living for a worker and family. Unions noted that a worker's income was often less than the cost of basic monthly food for a family of five, estimated by the Government's Central Office of Statistics and Information to be $158 (253,000 bolivars). The figure did not include other necessities such as medical care, transportation, clothing, and housing. The Ministry of Labor enforced minimum wage rates effectively in the formal sector of the economy, but approximately 55 percent of the population worked in the informal sector where labor laws and protections generally were not enforced.

The Constitution stipulates that the workday may not exceed 8 hours daily or 44 hours weekly and that night work may not exceed 7 hours daily or 35 hours weekly. Managers are prohibited from obligating employees to work additional overtime, and workers have the right to weekly time away from work and annual paid vacations. Some unions, such as the petroleum workers' union, have negotiated a 40-hour week. Overtime may not exceed 2 hours daily, 10 hours weekly, or 100 hours annually, and may not be paid at a rate less than time-and-one-half. The Ministry of Labor effectively enforced these standards in the formal sector.

The Constitution provides for secure, hygienic, and adequate working conditions; however, authorities have not yet promulgated regulations to implement the 1986 Health and Safety Law, which was not enforced. The delay is due largely to concern that the law provides penal sanctions against management when violations of health and safety occur and that there is ambiguity in the law over what constitutes a violation. The Labor Code states that employers are obligated to pay specified amounts (up to a maximum of 25 times the minimum monthly salary) to workers for accidents or occupational illnesses, regardless of who is responsible for the injury.

The code also requires that workplaces maintain "sufficient protection for health and life against sickness and accidents," and it imposes fines ranging from one-quarter to twice the minimum monthly salary for first infractions. However, in practice Ministry of Labor inspectors seldom closed unsafe job sites. Under the law, workers may remove themselves from dangerous workplace situations without jeopardy to continued employment.

f. Trafficking in Persons

The Constitution prohibits trafficking in persons, although there is no implementing law specifically for prosecution of all forms of trafficking in persons; however, there were reports that the country was a source, destination and transit country for trafficked men, women, and children during the year.

Trafficking may be prosecuted under laws against forced disappearance and kidnapping (punishable by 2 to 6 years' imprisonment) and, in the case of children, under the 2000 Organic Law to Protect Children and Adolescents (which carries a fine of 1 to 10 months salary for trafficking in children). The Government did not prosecute any individuals for trafficking in persons during the year, and no figures were available from either government or NGO sources, making it difficult to gauge the extent of the problem. The authorities showed little awareness of trafficking in persons as a human rights problem. An underdeveloped legal framework, corruption among immigration authorities, and the ease with which fraudulent Venezuelan passports, identity cards, and birth certificates can be obtained created favorable conditions for trafficking. In June, the Director General of the passport agency and the General Manager of Simon Bolivar International Airport were replaced due to their alleged involvement in trafficking of Chinese nationals.

PROVEA received complaints that women were trafficked to Europe for purposes of prostitution. Undocumented or fraudulently documented Ecuadorian and Chinese nationals transited the country en route to Mexico and reportedly were forced to work off the cost of their transportation in conditions of servitude. The Ombudsman's office continued to investigate whether some of the children separated from their parents in the December 1999 flooding in Vargas state may have been trafficked. At year's end, 119 children remained missing. In 2002, there were reports that children from other South American countries, especially Ecuador, were trafficked to work in Caracas as street vendors and housemaids; there were no further reports of this during the year. It also was believed widely that young women were lured from rural areas to urban centers by misleading newspaper advertisements promising domestic or other employment and educational opportunities; they then became victims of sexual exploitation. Organized criminal groups, possibly including Colombian drug traffickers, Ecuadorian citizens, and Chinese mafia groups, reportedly were behind some of these trafficking activities.

Government efforts to prevent trafficking are the responsibility of the Public Prosecutor's Family Protection Directorate and the National Institutes for Women and Minors. Female victims of trafficking had recourse to the Government's national system of women's shelters (see Section 5). NGOs such as CECODAP and the Coalition Against Trafficking in Women also were involved in activities to combat trafficking.

HUMAN RIGHTS WATCH

# Letter to President Hugo Rafael Chávez Frías

Washington, D.C., April 9, 2004

President Hugo Rafael Chávez Frías
President of the Bolivarian Republic of Venezuela
Palacio de Miraflores
Caracas – VENEZUELA

*Fax: 58212 806 3221*

Dear President Chávez:

I am writing to express Human Rights Watch's deep concern about credible reports we have received that National Guard and police officers beat and tortured people who were detained during the recent protests in Caracas and other Venezuelan cities. Such cases were not unusual or exceptional. The abuses allegedly committed were widespread and appeared to enjoy official approval at some level of command in the forces responsible for them.

On March 14, during your 'Alo Presidente' address from the Burros Island, you denied that government security forces committed human rights violations during the protests and insisted that the rights of all detainees in Venezuela are respected. Indeed, you challenged those who had complained about human rights abuse to present you with the names of victims, and you declared your uncompromising commitment to promoting human rights and bringing human rights abusers to justice. In the spirit of that commitment, we respectfully urge you to ensure that investigations into these alleged abuses are impartial and thorough, and that the parties responsible for human rights abuses are prosecuted.

Human Rights Watch does not take sides in the current political conflict in Venezuela. Our commitment is solely to the protection of fundamental human rights enshrined in international treaties such as the United Nations Convention against Torture and Other, Cruel, Inhuman or Degrading Treatment or Punishment, the International Covenant on Civil and Political Rights, and the American Convention on Human Rights, which categorically prohibit torture under any circumstances. As a party to both of these treaties, Venezuela has an obligation not only to prevent violations, but also to conduct thorough and impartial investigations, and to prosecute those found responsible for committing them.

Over the past several weeks, Human Rights Watch has collected testimony regarding alleged ill-treatment and torture that took place from February 27 until March 5. The cases described below are based on Human Rights Watch's interviews with young people who were detained during the protests and, in one case, with a detainee's parents. Venezuelan nongovernmental human rights groups have also documented similar abuses, as have press accounts based on interviews with former detainees. Altogether, the available information suggests a disturbing pattern of conduct that clearly violates international law enforcement standards.

During the week in question, Venezuela experienced the most serious unrest since the attempted coup



EXHIBIT
C

05/11/2006

MAY-31-2006  12:54     USAID GC                                        202 216 3859     P.29
Case 1:06-cv-00635-PLF   Document 6   Filed 06/07/2006   Page 28 of 69
Letter to President Hugo Rafael Chavez Frias (Human Rights Watch, April 12, 2004)     Page 2 of 6

against your government on April 11, 2002. An opposition march on February 27 turned violent as demonstrators clashed with units of the National Guard who were preventing the protesters from gaining access to the Plaza Morelos, in central Caracas. On that day, and in the days that followed, security forces repeatedly used tear gas and plastic bullets to disband demonstrations.

Civilians on the government as well as the opposition side are alleged to have used firearms, as are members of the Directorate of Services of Intelligence and Prevention (DISIP), dressed in civilian clothes. Thirteen people died between February 27 and March 16 from bullet wounds after being shot in circumstances that have still to be clarified, and 119 people were wounded, forty-nine from gunshots.

Between 300 and 400 people were reportedly detained during the protests. Most of the Caracas detainees were released during the weeks that followed, except for eight who reportedly remain in detention at the time of this writing. Most of those charged face charges such as illegal assembly, obstruction of roads, resisting arrest, and illegal possession of explosive material.

Former detainees told Human Rights Watch that they were beaten during and after their arrests with nightsticks, with the flat side of sabres, and with helmets, gunstocks, and other articles. These beatings often continued as they were being transported in National Guard vehicles. Two detainees stated that their captors hurled tear gas bombs into a closed vehicle in which they had just been seated, causing extreme distress, near suffocation, and panic, while three described how the powder from tear gas canisters was sprinkled on their faces and eyes, causing burns and skin irritation. Three stated that they were shocked with electric batons while in custody and defenseless.

The repeated reports of tear gas powder being sprinkled on the faces and bodies of individuals in custody, as well as the release of tear gas and pepper spray in vehicles crammed with prisoners, are particularly disturbing. Gas used in confined spaces is more concentrated and lasting in its effects than when used in the open. It could cause individuals who are incapacitated or unable to move to suffocate. It is also potentially fatal to those with lung or heart ailments. Direct contact with tear gas powder can cause blistering skin burns, eye injury, and lasting respiratory effects. There should be a full investigation into the alleged abuse of chemical riot control agents and, if the reports are confirmed, strict orders should be issued to prevent a recurrence of this practice in the future.

Carlos Eduardo Izcaray Pinto, solo cellist of the Venezuela Symphony orchestra, was arrested during the night of March 2 near Altamira Plaza, where he had been watching anti-government protests close to his home. Izcaray told Human Rights Watch that the National Guard had come under a barrage of stones and fireworks and had charged the demonstrators, who ran in all directions. He decided to walk home but was intercepted by a National Guardsman riding a motorbike, who stopped him for questioning. Ignoring his protests that he was only a bystander, the guardsman beat him repeatedly around the head, insulted him, and forced him onto the back of the motorbike. He was later put into a truck in which there were five or six other detainees. He told Human Rights Watch:

> The guardsmen in the truck continued to hit me on the neck and body with their nightsticks, helmets, and even traffic cones. One hit me on the elbow with a stick so hard that my arm and hand went numb. Another emptied a teargas bomb and smeared the contents on my hair and face, then set light to my hair, burning my neck. One guy put a pistol in my mouth and made me repeat a phrase after him, "I am going home to my husband." I suppose it was meant to humiliate me.

MAY-31-2006  12:54       USAID GC                          202 216 3058     P.30
Case 1:06-cv-00635-RHE    Document 6    Filed 06/07/2006    Page 29 of 69
Letter to President Hugo Rafael Chavez Frias (Human Rights Watch, April 12, 2004)      Page 3 of 6

After a while they moved us into a second truck. Inside, they made us inhale tear gas after closing the
canvas sides of the truck and putting on their gas masks. They threw one of the big [teargas] bombs
inside, closed all the doors and if any one pushed on the canvas sides to escape they got beaten. My
lungs were burning and I really thought I was going to die. Eventually I managed to get out the side of
the vehicle and they didn't try to stop me.

We were taken to the 51st Detachment of the National Guard at El Paraíso in Western Caracas. They
made us all kneel in a corner looking at the ground and they hit anyone who moved with their helmets
or sticks. Then they gave me electric shocks on the neck and arms from some equipment I couldn't see
because it was above my head.

Izcaray told Human Rights Watch that there were three minors in the group with whom he was arrested,
including a fifteen-year-old. "They were treated as badly as the rest of us. The guards made us stand up and
sit down in quick order and the slowest would get teargas powder thrown in his eyes. Most of the time it was
the kid they threw the powder at."

According to Izcaray's father, orchestral conductor Felipe Izcaray, "Carlos was released thanks to a kindly
soul in the National Guard who allowed him to make a phone call, as he was on a list of people to be
transferred to La Planta. The alert mobilized his family, friends and colleagues and he was eventually set
free, but he was not allowed to see his lawyer during all the time he was detained." Carlos Izcaray told
Human Rights Watch that, before he was released, a National Guard officer warned him of reprisals if he
publicly denounced his maltreatment. When Human Rights Watch spoke to him on March 19, he said that
his hand was still numb and he was unable to hold the bow of his cello.

Although arrested by a different police force, the experience of eighteen-year-old high-school student
Asdrúbal Joaquín Rojas Monteverde was similar. Rojas was arrested on March 1 in Maripérez, Caracas, by
armed officers of the military police. He told Human Rights Watch that his mother had sent him to buy some
cell-phone cards. He was on his way to buy them accompanied by two friends (one of them a minor), when
they were stopped by the military police. Rojas told Human Rights Watch:

The military police took us to the Plaza Venezuela, where they put us in a truck. They beat me with
their helmets, especially on my left arm. They sprinkled powder from a tear gas can over my eyes. It
stung like crazy. Then they threw a tear gas bomb into the truck. I took a deep breath and held my
breath as long as I could, but then I was breathing pure gas. I was suffocating...the police did nothing
to help us, but I beat against the canvas sides of the truck and managed to find an opening. I was able
to breathe air again. After this, the officers made me appear in front of the television cameras in the
Plaza Venezuela and say that I had received the money I was carrying from the Acción Democrática as
payment for participating in the protests. They threatened to beat me more if I refused.

The truck then took us to the military police headquarters in Fuerte Tiuna, where they continued to
mistreat me. They gave me electric shocks five times from a baton that they carry (one of them also
used it when he arrested me). It made my muscles contract from the effect of the electricity, and then
my whole body started trembling.

MAY-31-2006  12:55       USAID GC                    202 216 3058     P.31
Case 1:06-cv-00635-PLF   Document 6   Filed 06/07/2006   Page 30 of 69
Letter to President Hugo Rafael Chávez Frías (Human Rights Watch, April 12, 2004)        Page 4 of 6

Rojas' mother, Ivette Monteverde de Rojas, told Human Rights Watch that she saw bruises on his neck and his shoulder when she visited him on the following day.

Rojas was released conditionally on March 25 after being held for more than three weeks in the military police's 35th regiment headquarters in San José de San Martín, Fuerte Tiuna. He was charged with illegal assembly, obstruction of the street, resisting authority, and possession of inflammable substances. He was required to sign in every fifteen days at the courts until his case was heard. Rojas told Human Rights Watch after his release that he had never participated in the protests, which he didn't agree with.

The parents of Rodrigo Luis Alegrett Salazar, a twenty-one-year-old architecture student at the Universidad Santa María in Caracas, say that he gave them a similar account. Alegrett was released on March 31 from the detention facility at La Planta after all the charges against him— which included obstruction of the street, civil disobedience, and illegal possession of explosive substances—were dropped. According to members of his family, National Guardsmen arrested him during the night of February 29, near the Altamira Plaza, when he was about to catch the Metro to return home hours after participating in the demonstrations. Both his parents and his sister assert that he was beaten repeatedly with the flat side of a sabre, and doused with cold water while in National Guard custody.

Alegrett's father, Luis Alegrett, told Human Rights Watch that, according to his son, the guardsmen beat the detainees when they were in the truck. Later in the barracks, they maltreated them physically and mentally, making them sing pro-Chavez slogans and hitting anyone who didn't sing loudly enough. The father said that, according to his son, the guardsmen sprinkled them with powder, apparently from tear gas canisters, which irritates the skin. They didn't let the detainees sleep or call anyone, he said. At one point, the guardsman sprayed his son and another boy with a high-pressure hose and shocked them afterwards with an electric baton.

The cases described above are consistent with reports we have received from other credible sources. The human rights NGO, Una Ventana a La Libertad, for example, reported visiting five of the detainees held with Alegrett in La Planta, on March 9. All five claimed to have been beaten while they were detained in a National Guard installation in El Paraíso. David Alejandro Amundaraín, for instance, suffered a burst eardrum allegedly as result of a beating administered by a guardsman.

Another source of information on the mistreatment of detainees was Dorindo Burgos Arias, a Spanish-born priest who was arrested by the National Guard in the demonstration on February 29 and released later that night. Burgos told Human Rights Watch that the detainees were jammed on top of one another in the truck that took them to the Guardia Nacional headquarters in El Paraíso (the 51st detachment) and that he had to shout for help because he could hardly breathe. "They shoved me into the truck like a sack of potatoes and with insults, blows and obscenities and repeating every moment, don't raise your head, don't look at us. They continued to insult and beat us and kept throwing more detainees on top of us. They threatened to throw a tear gas bomb in."

Burgos reported that the guards stopped beating him when they learned he was a priest. Before releasing him, however, they made him sign a form stating that he had not been mistreated.

Félix Ernesto Farías Arias, a thirty-two-year-old psychologist and leader of Bandera Roja (a left-wing

opposition party), told Human Rights Watch that he participated in anti-government demonstrations in the Candelaria district during the evening of March 2. After the Caracas municipal police (Policaracas) and DISIP police in plain clothes broke up the protests, Farías headed home but was stopped about 100 meters from his house by two men in civilian clothes wearing ski masks and black flak jackets, and armed with handguns. The men forced him into a van where two other men were sitting. Amid threats and insults, one man hit him on the neck to make him lower his head and forced what he took to be a ski mask on his head back to front, so that he could not see. As Farías told Human Rights Watch:

> When about fifteen minutes had passed, or so it seemed, they rolled up the sleeves of my jacket, gripped both my arms hard and after a few seconds I felt the first burn, which they did without asking me anything at all. I cried out and they gave me another slap and told me to be quiet. After that burn they said, "well, you s.o.b., maybe you'd like to tell us what the **** you were doing in the Candelaria." I replied that I was just in the protest, and they burned me again saying: "this guy thinks we're clowns." A long time passed—I later found out it was an hour and a half—while they burned me, insulted me, and put what I thought were pistols to my head and testicles, saying repeatedly that they were going to kill me. After the second or third burn I could make out between the shouts and threats the click of a cigarette lighter and after a few seconds they pressed the hot object to my arm.

After interrogating him about members of his organization and threatening him, eventually Farías' captors ordered him to close his eyes, removed the ski mask and threw him from the vehicle while it was moving at a slow speed. He fell, bruising and skinning his right shoulder. Photographs published in the newspaper *El Universal* on March 4 show burn marks on both of Farías' arms that look like they could have been inflicted with a fork.

The human rights ombudsman, Dr. Germán Mundaraín, has confirmed reports of ill-treatment and torture. Dr. Mundaraín told Human Rights Watch that his staff has visited all the detainees held in Caracas, and most of those held in the rest of the country, to assess their physical and mental health and collect information regarding the circumstances of their arrest and their treatment while in detention. He said his staff had received credible first-hand accounts of ill treatment of detainees in police stations, military installations, and government vehicles. The ombudsman's preliminary report, published on March 25, states that "the security forces were responsible for excesses in the use of force, possible arbitrary detentions, mistreatment and also, torture." The report documents seven cases of torture and seventeen cases of alleged ill-treatment, in some cases listing the injuries noted in medical examinations.

We understand that the attorney general's office is investigating the alleged mistreatment of detainees. The attorney general, Dr. Isaías Rodríguez, reports that his office is investigating nine cases. Dr. Gilberto Venere, the public ministry official conducting the investigations, told Human Rights Watch that they involve six of the La Planta detainees: Rodrigo Luis Alegrett Salazar, José Ramón Merlo Rojas, Heber Gustavo Prado, Angel Daviott, José Rafael Peralta Medina, and David Alejandro Amandaraín. Complaints filed by three adolescents that members of the National Guard tortured them after their arrest in Caracas on March 1 are also under investigation. Dr. Venere told Human Rights Watch that he had taken statements from the victims, ordered medical examinations, and is now trying to establish which officers participated in the arrest and custody of these detainees. He will question these officers once they are identified.

MAY-31-2006 12:56        USAID GC                           202 216 3058        P.33
Case 1:06-cv-00635-PLF   Document 6   Filed 06/07/2006   Page 32 of 69
Letter to President Hugo Rafael Chávez Frías (Human Rights Watch, April 12, 2004)        Page 6 of 6

Human Rights Watch welcomes these steps. We urge you to ensure that the investigations are thorough and impartial, and that their findings are used to prosecute those responsible for human rights violations. We also urge you to ensure that any police or military personnel being prosecuted for these crimes be immediately suspended from service. In order to prevent future violations, we strongly recommend that you issue instructions to all the security forces that abusive treatment and torture will not be tolerated under any circumstances, and that officers who engage in these practices will be fired and face criminal prosecution. To ensure that your position on this issue is widely disseminated, we would encourage you to make these instructions public on your television program.

Thank you for you attention to this urgent matter.

Sincerely,

José Miguel Vivanco

Cc: Dr. José Vicente Rangel, Vice-President of the Republic
Cc: Dr. Jesús Arnaldo Pérez, Minister of Foreign Affairs
Cc: Gen. Jorge García Carneiro, Minister of Defense
Cc: Gen. Lucas Rincón Romero, Minister of the Interior and Justice
Cc: Dr. Isaías Rodríguez, Attorney General of the Republic
Cc: Dr. Jesse Chacón, Minister of Communication and Information
Cc: Dr. Germán Mundaraín, Human Rights Ombudsman

---

**Related Material**

More Information on Human Rights in Venezuela
Country Page

Venezuela: Investigate Charges of Abuses Against Protestors
Press Release, March 5, 2004

---

From: http://hrw.org/english/docs/2004/04/12/venezu8423.htm

© Copyright 2003, Human Rights Watch    350 Fifth Avenue, 34th Floor    New York, NY 10118-3299    USA





washingtonpost.com > World > Columnists > Nora Boustany




Nora Boustany

# Signing On To Challenge Hugo Chavez

*By Nora Boustany*
*Friday, July 9, 2004; Page A15*

Hers is a heroic fight. **Maria Corina Machado** smiles bravely but admits she is terrified. They are after her, she explained; the machinery of the state.

*'It was a
Corina M
organize
Sumate)*

▼ ADVERTISING

Machado is vice president of Sumate, a Venezuelan civic organization that has helped organize the drive for a recall referendum on President **Hugo Chavez**. She recently found out that she was under investigation for conspiracy and treason because Sumate accepted $53,400 from the National Endowment for Democracy, which receives funding from the U.S. Congress. Chavez has accused Machado, **Alejandro Plaz**, the president of Sumate, and two other members of the group of treason.

For the uninitiated, democracy is never simple. But the group's slow, systematic collection of signatures has empowered Venezuelans to hold a referendum next month that could force Chavez to step down.

Chavez, a former army lieutenant colonel who led a coup attempt against the government in 1992, was elected in 1998 on a vow to lift up the country's impoverished majority. Many Venezuelans have rejected his populist programs and rhetoric, and critics say his rule is headed toward authoritarianism.



EXHIBIT
D

To learn more:

1-800-GO-TO-JHU

www.business.jhu.edu

Or attend an
information session.

Machado, 36, was invited to the United States by the Council of the Americas to address members in New York and Washington. She said she also plans to meet with U.S.-based human rights organizations and with officials from the Inter-American Commission on Human Rights.

This week, on a recent bright, sunny day at a coffee shop in Bethesda, she explained how a movement was born.

In 2001, during a hurried conversation in the lobby of a hotel in Caracas, Machado and Plaz fretted about the course that was being shaped for Venezuela as they watched from the sideline.

"Something clicked," Machado said about the encounter with Plaz, a former regional director of an American firm. "I had this unsettling feeling that I could not stay at home and watch the country get polarized and collapse. . . . We had to keep the electoral process but change the course, to give Venezuelans the chance to count ourselves, to dissipate tensions before they built up. It was a choice of ballots over bullets."

Sumate, originally composed of professionals, now has 30,000 volunteers nationwide from all walks of life.

When Chavez came to office, he overhauled the constitution. Machado said: "We realized he established tools giving citizens the power to recall officials in midterm by referendum. If 10 percent of all registered voters signed a petition to have a referendum -- 1.2 million signatures out of 12 million by Aug. 19, 2003 -- it was enough to have a recall of any elected official."

There have been several attempts to collect signatures since 2002. A drive completed last November, with international observers -- the Organization of American States, the Carter Center and the United Nations Development Program -- six months after those organizations brokered an agreement between the government and the opposition that the

constitution must be upheld.

"Now we have a referendum," she said. Machado, the eldest of four daughters born to a steel entrepreneur and an accomplished psychologist, had a good education. She graduated as an engineer at the top of her class, later earned a master's degree in finance and worked in the auto-parts industry in Valencia before moving to Caracas in 1993.

Politics had never interested her, and she had been indifferent to the economic and social ills plaguing less fortunate families. But one day, she joined her mother on a tour of a center that housed homeless orphans and abandoned youngsters brought in from the streets. The complex was like a prison, she said, and the children often ran away, scaling walls and leaping into a stream leading out, seeking to return to street life. Machado, who was pregnant with her second child, became physically ill from the stench.

The visit transformed her life.

She quit her job and began lobbying to have the management of the facility privatized, ultimately devoting eight years to its betterment.

She then ran an Internet-based services firm for three years before joining Sumate.

"This is God's work," **Moises Naim**, editor of Foreign Policy magazine, said of Sumate's drive. He was once Venezuela's minister of finance.

Chavez remains charismatic, in control and calling the shots at each twist and turn of the saga. A week before he finally agreed to the referendum, he signed a law packing the Supreme Court with 12 extra justices and giving his coalition's majority in the legislature authority to nullify the terms of sitting justices.

"Yet another example that democracy is not just about voting -- this is a delusion," Naim said. "It is also about checks and balances, independent arbiters and referees supervising the electoral process. It is not just one man, one vote, one time."

Newspapers have run pictures of Machado with headlines calling her the country's Enemy No. 1. Her children cannot understand her predicament. She has learned to steel herself against Blackberry messages urging her to run away and telephone calls pleading with her to hide.

She is trapped between formidable foes and a sea of sympathizers. "It is scary . . . all public powers of the state are stacked against you, but at the same time, people stop to tell you they are relying on you," she said. "I feel greater responsibility and I'm terrified."

---

© 2004 The Washington Post Company

---

| Navigate to News Sections ▼ | 🔘 |                                                              | Naviga |

SEARCH: [                    ]  [go] ⊙ News ○ Web results by **Google**™

NEWS | OPINIONS | SPORTS | ARTS & LIVING  Discussions | Photos & Video | City Guide  CLASSIFIEDS | JOBS | (

washingtonpost.com: Help | Contact Us | About Us | Advertise With Us | Site Index | Site Map | Make Us Your Homepage |
mywashingtonpost.com | Work at washingtonpost.com
The Washington Post: Subscribe | Subscriber Services | Advertise | Electronic Edition | Online Photo Store | The Washington

http://www.washingtonpost.com/wp-dyn/articles/A37649-2004Jul8.html          05/04/2006

**washingtonpost.com**   Hello abfru    **The Washington Post**
Change Preferences | Sign Out    Print Edition | Subscribe

NEWS | OPINIONS | SPORTS | ARTS & LIVING | DISCUSSIONS | PHOTOS & VIDEO | CITY GUIDE | CLASSIFIEDS | JOBS | CARS | RE

SEARCH: [          ] go  ⊙ News ○ Web results by Google   | Search Archives

**TAKE ACTION NOW.**
**Help stop Medicare drug restrictions.**    Paid fo
CLICK HERE

washingtonpost.com > Opinion > Editorials

EDITORIAL

# A Venezuelan Monitor

Friday, July 30, 2004; Page A18

NEXT MONTH Venezuela will have a chance, maybe its last, to resolve years of political turmoil by peaceful and democratic means. A referendum is scheduled for Aug. 15 on the tenure of populist president Hugo Chavez. If it is fairly held and Mr. Chavez wins, an opposition that in the past has supported a military coup and a general strike in an attempt to force the president from office will be obliged to accept his rule for 2 1/2 more years. If he loses, Mr. Chavez -- a self-styled revolutionary who once led a military rebellion against a democratic government -- will be removed, and new elections for president will be held.

▼ ADVERTISING

That this democratic opportunity exists at all is due in no small part to a civil society group called Sumate ("join up" in Spanish), which for a year has advocated for and organized the referendum that is provided for in the Venezuelan constitution. The vote itself will have a greater chance of being staged and judged fairly thanks to Sumate, which has recruited tens of thousands of volunteers to monitor the process and conduct independent exit polls and quick counts. So it is disturbing, if not exactly surprising, that Mr. Chavez, who resisted the referendum all along, has instigated an ugly campaign against the organization, including criminal charges against its leaders.

The two founders of Sumate, Alejandro Plaz and Maria Corina Machado, and two of their collaborators are being formally investigated by a state prosecutor for conspiracy to commit treason. Their alleged crime, first raised by Mr. Chavez in a television appearance in February, is Sumate's acceptance of $53,400, or 2 percent of its annual

E-Mail This Article
Print This Article

——Today's Post Edi
• Darfur's Real Death T
April 24, 2005)
• The Senate's Hypocri
April 24, 2005)
• Viewer Beware (Post,
2005)

——What's Your Op
• Share Your Views
About Editorials and
Opinion Pieces on Our
Message Boards
• About Message
Boards

——Message Boa
• Post Your Comments

——Free E-mail New:
• News Headlines
• News Alert

Subscribe to The Wash

FEATURED ADVERTISER

Refinance Rates As Low A
QUOTES

For College Graduates, Re
Student Loans

Seating Charts. Tim McGr.
Faith Hill, Pavarotti Ticket
Tickets

ReNu Lawyer, Seroquel, B

EXHIBIT
E

budget, from the U.S. National Endowment for Democracy (NED), a bipartisan, congressionally funded organization that supports democratic movements around the world. Reports by pro-government media have suggested that the prosecutor may seek the detention of the activists before the referendum takes place; if convicted, they could face prison terms of eight to 16 years.

Why would it be treasonous to accept U.S. funds in an effort to organize a fair election? Surely not because foreign aid is alien to Venezuela: The country's political parties have received it for decades, and Mr. Chavez's own political apparatus has been bolstered by thousands of Cubans dispatched by his principal ally, Fidel Castro. Sumate does not advocate Mr. Chavez's removal but only the resolution of the country's conflict by constitutional means.

But Mr. Chavez does not genuinely accept democracy or the rule of law. He delayed the referendum for a year through legal manipulation and political dirty tricks. Now he flirts with outright political repression in an attempt to determine its outcome. In that sense, Sumate and its leaders are the proverbial canary in the coal mine: If they are prosecuted or jailed, the world will know that Venezuela's referendum is tainted.

© 2004 The Washington Post Company

$145,000 Mortgage for Und

Get a $200,000 loan for $8.

Promotional Pens, T-shirts

Have a Business to Buy or How

Cool Gadgets, Great Deals CircuitCity.com

Earn a free trip on Acela. L

Get Free Checking with dir

Secure Your Passwords, C logins - RoboForm

To learn more:

**1-800-GO-TO-JHU**

www.business.jhu.edu/its

Or attend an IT information session.

**Johns Hopkins Business** The MBA and more.

---

Navigate to News Sections ▾ 📀    Navigate the Opinion Sec

Advertisement

SEARCH: [                    ] GO ⊙ News ⊙ Web results by **Google™**

NEWS | OPINIONS | SPORTS | ARTS & LIVING    Discussions | Photos & Video | City Guide    CLASSIFIEDS | JOBS |

**washingtonpost.com:** Help | Contact Us | About Us | Advertise With Us | Site Index | Site Map | Make Us Your Homepage | mywashingtonpost.com | Work at washingtonpost.com
**The Washington Post: Subscribe** | Subscriber Services | Advertise | Electronic Edition | Online Photo Store | The Washington Post Store | About The Post
**The Washington Post Company:** Information and Other Post Co. Websites

© Copyright 1996- 2006 The Washington Post Company | User Agreement and Privacy Policy | Rights and Permissions

**U.S. DEPARTMENT OF STATE**

# Venezuela



EXHIBIT

F

### Country Reports on Human Rights Practices - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

Venezuela is a constitutional democracy with a president and unicameral legislature. In addition to the executive, legislative, and judicial branches of government, the Constitution provides for a "Citizen Power" branch—which includes the Ombudsman, the Public Prosecutor, and the Comptroller General—and an "Electoral Power" branch, headed by the National Electoral Council (CNE). In July 2000, voters elected President Hugo Chavez of the Fifth Republic Movement (MVR) in generally free and fair elections. The MVR and the pro-Chavez Movimiento al Socialismo party won a majority in the legislature. In August 2003, the Supreme Court appointed a transitional CNE after the National Assembly failed to do so. According to the Constitution, the civilian judiciary is an independent branch of power; however, it was highly inefficient, corrupt, and subject to political influence from both the executive and legislative branches.

Following a national strike from December 2002 to February 2003, government and opposition representatives signed an agreement in May 2003 that committed both sides to follow the Constitution and laws and acknowledged the constitutional right to hold a presidential recall referendum if legal criteria were met. After the CNE rejected a first group of signatures, opponents of President Chavez gathered sufficient signatures at the end of November 2003 for the presidential recall referendum. In February, the CNE disallowed, on what appeared to be political rather than legal grounds, more than 1 million of the approximately 3.7 million signatures. The opposition subsequently succeeded in ratifying sufficient signatures to activate the recall referendum through the appeals process (reparos), despite government threats of retaliation against signers. On August 15, 5.8 million persons voted to keep Chavez in office, and 3.9 million persons voted to remove him, according to official results. Opponents of the President charged that the process was fraught with irregularities and that electronic manipulation of the vote constituted fraud. Although the Organization of American States (OAS) and Carter Center observers noted that the process "suffered from some irregularities, politicization, and intimidation," they found that the official results were compatible with their own quick count and "reflected the will of the electorate."

The security apparatus consists of civilian and military elements, both accountable to elected authorities. The military played an increasingly larger role in civilian life. Active and retired military officers held high-ranking government positions, and 6 of the 21 cabinet members previously served in the military. The presidents of three major state-owned corporations—Corporacion Venezolana de Guayana, Corporacion Zulia, and PDV Marina—are active duty military officers. The military also administered and executed numerous public service projects. The Ministry of Defense controlled the General Directorate for Military Intelligence (DIM), which is responsible for collecting intelligence related to national security and sovereignty. The National Guard, an active branch of the military, has arrest powers and is largely responsible for maintaining public order. The Ministry of Interior and Justice controls the Investigative and Criminal Police Corps (CICPC), which conducts most criminal investigations, and the Directorate for Intelligence and Prevention Services (DISIP), which collects intelligence and has a law enforcement role. Mayors and state governors are responsible for local and state police forces and maintain independence from the central Government. The Caracas Metropolitan Police is the main civilian police force in the five municipalities that form the capital. While civilian authorities generally maintained control over security forces, members of the security forces committed numerous and serious human rights abuses during the year.

The population was approximately 25 million. The country is abundant in natural resources and has a mixed agricultural and industrial market-based economy; however, the vast majority of natural resource extraction and production was done by entities owned and operated wholly or in part by the Government. The economy began to recover, with growth of more than 16 percent, following contraction of 8.9 percent in 2002 and 7.6 percent in 2003. Government statistics placed the unemployment rate at 15 percent; however, approximately 50 percent of employed adults worked in the informal sector. The petroleum sector provided the majority of foreign exchange earnings. Despite record oil prices and resulting revenue for the Government, the country faced ongoing deficits and other financial difficulties. Independent economists estimated the Government's deficit for the year was 7.2 percent of gross domestic product.

The Government's human rights record remained poor; despite attempts at improvement in a few areas, its performance deteriorated in other areas, particularly regarding politicization of the judiciary and restrictions on electronic media, and serious problems remained. The police and military committed unlawful killings of criminal suspects. The police reportedly had links to vigilante groups that killed suspected criminals. Investigations into unlawful killings by the security forces of criminal suspects remained extremely slow. Torture and abuse of detainees persisted, and the Government failed to punish police and security officers guilty of abuses. Prison conditions remained harsh; violence and severe overcrowding constituted inhuman and degrading treatment. Arbitrary arrests and detentions continued. Impunity was one of the country's most serious human rights problems. Crimes involving human rights abuses did not proceed to trial due to judicial and administrative delays. Corruption, lengthy pretrial

F

detention, and severe inefficiency in the judicial and law enforcement systems also were problems. A law enacted in May increased the number of Supreme Court judges and the power of the executive branch, the legislature, and the citizen power over the judiciary. Some judges were summarily dismissed or forced to retire. Prosecutors selectively investigated several opposition leaders and brought charges against some.

The Government conducted illegal wiretapping of private citizens and intimidated political opponents. President Chavez, officials in his administration, and members of his political party consistently attacked the independent media, the political opposition, labor unions, the courts, the Church, and human rights groups. Many government supporters interpreted these remarks as tacit approval of violence; they then threatened, intimidated, and physically harmed at least dozens of individuals opposed to Chavez during the year. The International Association of Broadcasters complained that the Government abused its legal power to order that all television and radio stations air material of national interest by requiring the transmission of speeches by President Chavez and other government officials and of other political programming favorable to the Government. A press law enacted in December places restrictions on broadcast content that threaten press freedom. Violence and discrimination against women, abuse of children, discrimination against persons with disabilities, and inadequate protection of the rights of indigenous people remained problems. Trafficking in persons was a problem. The Government's confrontation with the Venezuelan Workers Confederation (CTV) and fired petroleum sector employees continued, and child labor increased.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

Unlike in the previous year, there were no politically motivated killings by the Government or its agents; however, police, soldiers, and government supporters killed several persons at anti-government demonstrations (see Section 2.b.).

According to human rights groups, security forces committed unlawful killings, including summary executions of criminal suspects, used excessive force, and mistreated persons in custody resulting in deaths.

The human rights group Red de Apoyo reported that, on January 10, a group of men, presumably Lara State police officers dressed in black, rounded up nine men and executed them. On March 10, Juan Carlos Zambrano died after being beaten by soldiers who had detained him on March 4 in Lagunillas, Zulia. Six soldiers were arrested on charges of murder in October and ordered detained pending trial (see Section 1.c.). Amnesty International (AI) reported that, in May, Enmary Cava was killed in Cagua, Aragua State, after she and her family had received death threats. The family had called on prosecutors to investigate the death of two brothers and their father at the hands of Aragua State police.

The Venezuelan Program of Action and Education in Human Rights (PROVEA), a human rights nongovernmental organization (NGO), documented 231 unlawful killings from October 2003 through September. PROVEA and the human rights NGO Committee for the Families of the Victims of February 1989 (COFAVIC) identified cases of police death squad activity, linked to police participation in criminal activity. PROVEA noted that such activity decreased in Portuguesa, Yaracuy, and Anzoategui States as a result of media attention and prosecutions.

Prosecutors rarely brought cases against perpetrators of unlawful killings. The police characterized such incidents as "confrontations" (thereby asserting a legal justification for using deadly force) even when eyewitness testimony and evidence strongly indicated otherwise. When prosecutors did investigate, they alleged that unsecured crime scenes, poor investigative techniques, and constantly changing or inexperienced personnel ensured that political and human rights abuse cases were delayed indefinitely or had a pre-ordained result. In addition, the civilian judicial system struggled to implement the Organic Criminal Procedures Code (COPP) and remained highly inefficient and corrupt (see Section 1.e.). In the small number of cases in which the courts convicted perpetrators of unlawful and other killings, sentences frequently were light, or the convictions were overturned on appeal. Members of the security forces charged with or convicted of crimes rarely were imprisoned.

In March, Red de Apoyo called on the mayor of Metropolitan Caracas to fire three Metropolitan Police officers found guilty of murder in November 2003, who were still working as police officers; the authorities subsequently opened administrative procedures to fire the officers but had not acted by year's end.

On August 23, a judge approved release on bail for 14 Portuguesa State police officers being held on 68 counts of murder for their alleged participation in the death squad "Exterminio." The men had been in custody for 20 months longer than the legal 24-month pre-trial detention limit, a delay due in part to the reluctance of citizens to serve as lay judges in the case. Prosecutors appealed the decision to release the officers from detention, and the measure was suspended. A trial was pending at year's end.

There were no developments in the investigation of the August 2003 killing of human rights worker Joe Luis Castillo in Machiques, Zulia State. Police suspected two Colombian alleged paramilitaries who were subsequently killed, according to press accounts, and no new developments were expected in the investigation.

Police fired on criminal suspects who disobeyed orders to halt and often used deadly force when confronting suspects or rescuing kidnap victims. In November, for example, the Interior Ministry reported that police killed 135 persons who "resisted authority" that month. Security forces also killed some prisoners; however, the majority of deaths resulted from other causes (see Section 1.c.).

In March, prosecutors charged four National Guardsmen with the November 2003 killing of seven prisoners at the Vista Hermosa prison; the guardsmen also allegedly participated in the severe beating of 200 prisoners. While detained, two of the officers were promoted. The case had not gone to trial by year's end.

During demonstrations from February 27 to March 5, unidentified persons killed between 9 (official figure) and 16 (opposition figure) persons and injured 193 throughout the country; on August 16, a group of government supporters fired into a crowd of protesters killing 1 person and injuring 9 others, including a National Assembly deputy (see Section 2.b.).

There were two high profile cases of mistreatment of soldiers resulting in death. On March 5, Army Private Roberto Aguilar died of drowning in a cesspool on a military installation in Zulia State. His family claimed he was forced into the cesspool as punishment. After a conflict between military and civilian courts, on August 4, the Supreme Court ruled that a civilian court had jurisdiction. Four soldiers were detained, and the case had not gone to trial by year's end.

On March 30, eight soldiers were burned in a punishment cell in Fuerte Mara in Zulia State; two of the soldiers died of their injuries. Family members charged that one of the soldiers claimed the prisoners were set on fire from outside the cell. In December, prosecutors charged one of the victims with setting the fire, and three doctors with malpractice for the death of one of the soldiers.

On April 2, army Lieutenant Alessandro Sicat was convicted of murder and attempted murder and sentenced to 21 years in prison. Sicat sprayed and ignited paint thinner in the holding cell of three allegedly disobedient soldiers in 2001.

The press reported several cases of lynching and attempted lynching of suspected criminals. A significant portion of the population tacitly supported vigilante activity to control crime.

b. Disappearance

On October 31, retired Air Force Colonel Silvino Bustillo, one of the leaders of the Plaza Francia military dissidents in 2002, allegedly disappeared after being followed by agents of the DIM. The Government alleged that Colonel Bustillos was in hiding, and had contacted his family, which they denied. As of December, Colonel Bustillo's whereabouts and condition were unknown.

Human rights groups noted that police officers sometimes disposed of the bodies of their victims to avoid investigations. PROVEA recorded 11 reports of disappearances allegedly involving security forces from October 2003 to September.

On May 16, CICPC officers allegedly detained three persons in San Cristobal, Tachira State. The three were never brought before a judge and were presumed to have been killed. Prosecutors began an investigation and ordered the detention of seven CICPC officers, but the officers had not been apprehended by year's end.

From January through August, 88 ranchers were kidnapped, according to the National Cattle Ranchers Federation (Fedenaga). Although rancher kidnappings by Colombian terrorist organizations have been a problem in the border states for decades, Fedenaga attributed most of the increase to domestic criminal gangs, common criminals, and the Bolivarian Liberation Forces (FBL), a relatively new organization allegedly composed of militant supporters of the President. They believed that the FBL targeted ranchers as much for political as for economic reasons. The Government denied any links to the FBL. In September, the head of the CICPC in Tachira State told reporters that some police and National Guard officers collaborated with kidnappers.

On August 9, the Inter-American Court of Human Rights agreed to hear a case against DISIP Commissioner Jose Yanez Casimiro and retired Commissioner General Justiniano Martinez Carreno in the alleged disappearances of Oscar Blanco Romero and Marco Monasterio following the Vargas floods in 1999. In December, Attorney General Isaias Rodriguez announced that the officers had been charged in the disappearance of the two men; a judge released the officers on bail.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution prohibits torture and the holding of detainees incommunicado, provides for the prosecution of officials who instigate or tolerate torture, and grants victims the right to medical rehabilitation; however, security forces continued to torture and abuse detainees. Abuse most commonly consisted of beatings during arrest or interrogation, but there also were incidents in which the security forces used near-suffocation and other forms of torture.

PROVEA reported that between October 2003 and September, it received 58 complaints of torture and 491 regarding cruel, inhuman, and degrading treatment. From January to June, Red de Apoyo received 30 complaints from alleged torture victims.

The Government did not ensure independent investigation of complaints of torture. COFAVIC questioned the Attorney General's

abiilty to oversee neutral investigations, because he was an active member of the President's political party and a former vice president in the current Government. Human rights groups also asserted that the Institute of Forensic Medicine, part of the CICPC, was unlikely to be impartial in the examinations of cases that involved torture by CICPC members. Few cases of torture resulted in convictions.

The Human Rights Ombudsman documented 7 complaints of torture and 17 of abuse during the disturbances from February 27 to March 5 (see Section 2.b.). Many of the complaints were reported to prosecutors, but no arrests had been made as of year's end. COFAVIC reported nine cases of torture, with an identifiable pattern throughout the country. There were no arrests associated with these cases. For example, on March 1, National Guard troops detained Carlos Eduardo Izcaray, a National Symphony cellist, near a violent street protest. According to AI, Izcaray was beaten repeatedly, given electric shocks, exposed to tear gas in a confined space, had tear gas powder smeared on his face, and was threatened with death.

Reports of beatings and other humiliating treatment of suspects during arrests were common and involved various law enforcement agencies.

In March, the soldiers who arrested Carlos Zambrano and beat him to death (see Section 1.a.) also raped his girlfriend.

In November, police arrested three ex-police officers as suspects in the November 18 killing of prosecutor Danilo Anderson. Lawyers for the three accused the police of torturing the three men after illegally detaining them. All three were arrested days after being reported missing. The torture allegations included the use of electric shock, sensory deprivation, and psychological torture. A judge ordered an investigation into the allegations of torture, but no arrests had been made by year's end.

Prison conditions were harsh due to scarce resources, poorly trained and corrupt prison staff, and violence by guards and inmates. The prison population was at 118 percent of capacity; 22 of the country's 32 prisons were overpopulated, some severely, according to the Ministry of the Interior and Justice. Severe overcrowding in some prisons constituted inhuman and degrading treatment. Prisoners often complained of food and water shortages.

Inmates often had to pay guards and other inmates to obtain necessities such as space in a cell, a bed, and food. Most prisoners obtained food from their families, by paying prison guards, or in barter with other prisoners. Many inmates also profited from exploiting and abusing others, especially as convicted murderers and rapists often were held with unsentenced or first-time petty offenders. Trafficking in arms and drugs fueled gang-related violence and extortion. Prison officials often illegally demanded payment from prisoners for transportation to judicial proceedings (see Sections 1.d. and 1.e.).

The Government failed to provide adequate prison security. The National Guard and the Ministry of Interior and Justice have responsibility for exterior and interior security, respectively. The Venezuelan Prison Observatory (OVP), a prison monitoring NGO, estimated that interior guard force had only one-tenth the required strength. Violence between gangs was common, with shootouts and riots common occurrences. From January through December 31, the OVP recorded 327 deaths and 655 injuries in the prisons. Security forces committed some of the killings in prisons (see Section 1.a.), but most inmate deaths resulted from prisoner-on-prisoner violence, riots, fires, and from generally unsanitary and unsafe conditions. Prisoners also died as a consequence of poor diet and inadequate medical care.

On August 5, prisoners in the Barcelona prison staged a "blood strike," inflicting wounds on themselves, to protest prison conditions.

Women inmates were held in separate prisons, where conditions generally were better than those in the men's facilities. Security forces and law enforcement authorities often imprisoned minors together with adults, even though separate facilities existed for juveniles. Because reform institutions were filled to capacity, hundreds of children accused of infractions were confined in juvenile detention centers where they were crowded into small, filthy cells, fed only once a day, and forced to sleep on bare concrete floors. Pretrial detainees were not held separately from convicted prisoners.

The Government permitted prison visits by independent human rights observers, and such visits took place during the year.

d. Arbitrary Arrest or Detention

The Constitution and the law prohibit arbitrary arrest and detention; however, the security forces continued to arrest and detain citizens arbitrarily.

The National Guard, a branch of the military, has arrest powers and is largely responsible for maintaining public order, guarding the exterior of key government installations and prisons, conducting counter narcotics operations, monitoring borders, and providing law enforcement in remote areas. The Ministry of Interior and Justice controls the CICPC, which conducts most criminal investigations, and the DISIP, which collects intelligence and is responsible for investigating cases of corruption, subversion, and arms trafficking. Mayors and governors oversee local and state police forces. Often, mayors and governors recruited retired National Guard officers for the top leadership of their police. Corruption was a major problem among all police forces, whose members were poorly paid and trained. Impunity for corruption, brutality, and other acts of violence were major problems. Some local police forces offered

human rights training for their personnel.

The COPP states that a person accused of a crime cannot be incarcerated during criminal proceedings unless that person was apprehended in the act of committing a crime or a judge determines that there is a danger that the accused may flee or impede the investigation. All detainees must be taken before a prosecutor within 12 hours and before a judge within 48 hours to determine the legality of the detention. To keep a suspect in pretrial detention, a judge must rule that: A crime meriting a prison sentence of more than 2 years has been committed; there is solid evidence that the suspect is guilty of the crime; and there is a danger of flight or that the detainee might try to obstruct the investigation. A person accused of a crime may not be detained for longer than the possible minimum sentence for that crime, nor for longer than 2 years, except in certain circumstances, as when the defendant is responsible for the delay in the proceedings. Although COPP procedures generally were followed once suspects entered the justice system, confusion over its implementation remained, and arbitrary detention continued to be common.

There was a bail system, but it was common to hold prisoners without according them access to bail. According to the OVP, there were approximately 18,781 prisoners in December, of whom 8,915 had not been convicted of a crime and were held without bail, and the Ministry of the Interior and Justice reported that 48 percent of all prisoners were in pretrial detention. Trials were delayed due to many factors, including the limited power of judges to compel authorities to transport prisoners to court.

Prisoners often had to bribe police to transport them to court for hearings. Judges, prosecutors, and defense lawyers also were responsible for delays, due to excessive workload, corruption, and attempts to avoid controversial cases. Prisoners had reasonably good access to counsel and family members.

The Human Rights Ombudsman's office reported that, during the disturbances from February 27 to March 5, authorities arrested 513 persons and held 53 persons in pretrial detention for their actions. Arbitrary detentions by the Caracas Metropolitan Police, the DISIP, municipal police forces, the National Guard, and the CICPC continued; however, PROVEA estimated that the number of persons detained in anti-drug sweeps had declined.

The Government used the justice system selectively against the political opposition, including investigations against, and arrests of, opposition leaders on charges of conspiracy and treason.

On May 4, a judge ordered Baruta mayor Henrique Capriles Radonski detained on charges relating to a violent demonstration in front of the Cuban Embassy in 2002, despite the lack of evidence and the fact that Capriles was a public official. On September 6, a judge ordered him released on bail. Human rights groups, the political opposition, and media called Capriles a political prisoner. On October 18, an appeals court dismissed the Capriles case, a decision that the prosecution appealed.

On May 22, a military court ordered the detention of retired Army General Francisco Uson for "defaming" the army, despite the fact that Uson was retired and not subject to military jurisdiction. When asked about the Fuerte Mara case (see Section 1.a.) in an interview program, Uson had explained how a flamethrower functions. On October 4, the military court found Uson guilty of insulting the army and sentenced him to 5?years in prison. The defense appealed the decision.

On August 9, in the 2002 case against National Guard General Carlos Alfonzo Martinez, a judge ruled that the general was not guilty of instigating rebellion and abandoning his command but found him guilty of violating a security zone. General Martinez was sentenced to 5 years' probation and was forbidden to contact the media. Prosecutors and defense lawyers appealed the decision, and prosecutors also opened a new investigation against General Martinez for his actions in support of the Plaza Francia military dissidents in 2002. In October, an appeals court overturned General Martinez' conviction and set him free, a decision that the prosecutors appealed.

Prior to the August 15 presidential recall referendum, Carlos Melo, an opposition leader, was detained on charges of weapons possession, and was held until an appeals court ordered him released a few weeks later. Images captured by a video monitor at the time of Melo's detention supported his contention that the charges were fabricated.

In March, three judges were fired without cause, immediately after releasing protesters arrested in the February-March disturbances (see Section 1.e.). In May, one of the tenured judges who ruled to free Carlos Melo was suspended indefinitely, while the tenured judge who wrote the decisions to release Capriles and General Alfonzo Martinez was suspended in December; in both cases, the alleged reasons for the suspensions were minor infractions of judicial rules.

e. Denial of Fair Public Trial

The civilian judiciary is an independent branch of power according to the Constitution; however, it was subject to political influence, highly inefficient, and sometimes corrupt.

The judicial sector consists of the Supreme Court, the Attorney General's office, and the Ministry Interior and Justice. The Supreme Court is the country's highest court and directly administers the lower courts. It is divided into six chambers: Constitutional, criminal, social, administrative, electoral, and civil. The Supreme Court administers the lower courts through the Executive Directorate of the Magistracy (DEM). The competitive exams to select permanent judges remained suspended, and only provisional and temporary

judges, who constituted 80 percent of all working judges, were hired. The Supreme Court's Judicial Committee may hire and fire temporary judges without cause and did so, without explanation. Provisional judges legally have the same rights as permanent judges; however, in March, the Judicial Committee fired without cause a temporary judge who had been working for 3 years and at least two provisional judges (see Section 1.d.). Human Rights Watch (HRW) raised the problem that this situation represents for judicial independence, as did leaders of the judicial system.

On May 18, the National Assembly passed the Organic Law of the Supreme Court, which increased the number of Supreme Court judges from 20 to 32 and allowed them to be appointed with a simple, rather than a two-thirds, majority vote of the National Assembly. The law also permits the Moral Council (Attorney General, Human Rights Ombudsman, and Comptroller General) to suspend judges and allows the National Assembly to revoke the appointment of Supreme Court judges by a simple majority vote, even if they were appointed by a two-thirds majority. On June 15, using this authority, the legislature annulled the appointment of the Court's vice president. HRW noted that the law threatens the independence of the judiciary by subjecting it to political control.

Control judges oversee the protection of the rights of suspects and hear prosecution and defense motions prior to criminal cases going to trial stage. Executive judges oversee the application of sentences. Appeals courts, consisting of three-judge panels, review lower court decisions. The Attorney General oversees the prosecutors who investigate crimes and bring charges against criminal suspects.

Corruption was widespread, and judges also were susceptible to political pressure. Following the February/March protests, several provisional judges who freed protesters were fired. Human rights groups and judicial observers believed that they were fired for their refusal to detain protesters. In September, police detained provisional control judge Juan Ramon Leon Villanueva for soliciting a bribe from the head of the CICPC. Leon was the most recent judge to confirm the detention of Baruta mayor Capriles, prior to his release (see Section 1.d.). Leon accused other judges of setting him up. Following the killing of prosecutor Danilo Anderson on November 18, prosecutors investigated allegations that Anderson may have been involved in extorting money from persons in return for not pursuing investigations against them. The investigation was ongoing at year's end.

The COPP provides for the right to a fair trial and considers the accused innocent until proven guilty. The COPP also provides for open, public trials with oral proceedings. Suspects have the right to plead guilty without trial and make reparation agreements. Trial delays were common. A professional judge and two lay judges try serious cases. A single judge may hear serious cases, if the defendant or victim so requests and the judge agrees, or if attempts to appoint lay judges have failed. Difficulty in finding persons willing or able to serve as lay judges frequently caused delays. Usually, single judges try minor cases. Defendants and complainants have the right of appeal.

The law provides for public defenders for those unable to afford an attorney; however, there were not enough public defenders. According to the DEM, as of September 2003, there were 619 public defense attorneys for the entire country, of whom 188 handled juvenile cases exclusively.

Prison officials often illegally demanded payment from prisoners for transportation to judicial proceedings. Those who were unable to pay often were forced to forgo their hearings (see Section 1.c.).

On July 19, the Supreme Court president swore in the members of the First and Second Courts for contentious administrative matters. The Committee of Judicial Restructuring disbanded the First Court in 2003 following a series of decisions unfavorable to the Government. Citing reasons of workload, the DEM then created two courts.

The military created executive courts, as part of the restructuring the military justice system, mirroring the civilian courts. The Constitution establishes that trials for military personnel charged with human rights abuses would be held in civilian rather than military courts. However, the provision does not apply to cases that predate the 1999 Constitution.

On April 2, army Lieutenant Alessandro Sicat was convicted of murder and attempted murder and sentenced to 21 years in prison (see Section 1.a.).

Human rights NGOs continued to express concern that the Supreme Court's selection of military judges from a list of candidates provided by the Minister of Defense linked the careers of military judges to the high command, making them more responsive to the views of their military leaders and influencing them to act slowly in cases in which the military is implicated. In May, without due administrative process, five military judges were fired for incompetence, although they had between 15 and 19 years' experience. Four of the judges were handling politically sensitive cases at the time.

There were no reports of political prisoners.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The Constitution prohibits such actions; however, the security forces continued to infringe on citizens' privacy rights by conducting searches of homes without warrants, such as during anticrime sweeps in poor neighborhoods. There were reports of illegal wiretapping and invasion of privacy by the security forces.

Throughout the country, witnesses to abuses by security forces reported instances in which their family members later were harassed, threatened, or killed (see Section 1.a.). There were also reports that the family members of persons, including military personnel, who signed the petitions for a recall referendum were threatened with loss of jobs and benefits.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and of the press; however, persons associated with the Government provoked, threatened, physically harmed, or encouraged others to attack private media owners, their installations, and journalists. The Government did not restrict academic freedom.

International organizations such as the Inter American Press Association (IAPA) and domestic journalists charged the Government with encouraging a climate of hostility toward the media. The IAPA called on the Government to end anti-democratic practices. Although assaults against the media declined compared with 2003, journalists attributed this trend to their lack of access to government events and their avoidance of activities in pro-government neighborhoods. Pro-government assailants shot and injured four reporters, and one reporter was killed, allegedly by drug traffickers. National Guard troops shot and injured several reporters with rubber bullets and tear gas cannisters, sometimes fired at close range. Legislative and administrative efforts to limit private media's right to freedom of expression continued, including threats of prosecution and the enactment of a restrictive law to govern media content.

The country has 15 national newspapers (14 based in Caracas, 1 in Maracaibo); 77 regional newspapers; 89 magazines and weekly journals; 34 representatives of foreign media outlets; 47 national and international television and radio news agencies; 344 commercial and over 150 FM and AM community radio stations; and 31 television channels, 23 of which were in the interior. Both government and private media were highly politicized. The majority of the larger newspapers opposed the President. One tabloid in Caracas, whose sole source of advertisement appeared to be the Government, sided fully with the Government.

Print and electronic media were independent, and many criticized the Government, although they felt threatened by the Government and pro-government sympathizers. In 2003, the OAS's Inter-American Commission on Human Rights (IACHR) Special Reporter on Press Freedom noted that reprisals and threats of violence restricted freedom of expression in practice. During the year, the IACHR granted "precautionary" protective measures to petitioners in 12 cases and granted "provisional" protective measures in another 4 cases. The Supreme Court ruled in 2002 that such international orders were not binding in the country, and media owners and journalists complained that they were not carried out in good faith by the Government. President Chavez repeatedly singled out media owners and editors, charging that the media provoked political unrest. The National Press Union accused the Government of punishing or firing state press employees for political reasons, particularly for signing the petition for the August 15 referendum. The country remained on the International Press Institute's watch list of countries with a growing tendency toward suppression or restriction of press freedom.

Journalists lodged 30 complaints of harassment during the year. Supporters of the Government committed most of the incidents against the private media; however, opposition supporters committed a few acts against state-owned or community media. The National Guard, the DIM, the DISIP, and some local police forces also harassed journalists. Government sympathizers also harassed, vandalized property and equipment, and threatened the private media.

On September 1, unidentified assailants killed radio personality, opinion columnist, and activist Mauro Marcano Ramos of the State of Monagas. Ramos was known as a harsh critic of drug traffickers. In February and March, National Guard and other unidentified persons shot and injured several journalists covering protests in Caracas.

The National Union of Press Workers reported 35 cases of assaults on journalists in the first 8 months of the year. The Committee to Protect Journalists investigated and verified 28 of those cases.

Pro-government and state-owned media reported four assaults, one case of vandalism, and three cases of harassment. On March 2, for example, opposition supporters vandalized the offices of VTV. Outside the capital, opposition demonstrators surrounded, threatened, and beat two operators of a community radio station. The IACHR later granted the couple precautionary measures.

The Government had two national television stations, a national radio network, and a newswire service whose directors were named by the President. The President had a weekly show on television and radio and frequently demanded access to major media outlets. Independent media observers criticized the state media for extreme pro-government politicization. Most community media–radio and television stations with different frequency licensing requirements and advertising regulations—were pro-government in editorial policy.

The 2002 Organic Telecommunications Law establishes that the President can suspend telecommunications broadcasts. The President referred to this law repeatedly and threatened to revoke commercial broadcast licenses or not convert pre-2000 licenses to new ones. Media professionals complained that investigations of television and radio stations by state broadcast regulation agency CONATEL were politically motivated.

On August 11, government sympathizers attacked a crew from news channel Globovision in front of the vice presidency in sight of both the building's staff and nearby National Guard troops. The National Guard troops made no effort to intervene. The attackers stole one of the station's radios and used the stolen radio to disrupt the station's ability to communicate with its crews. National Guard troops prevented a crew from changing the radio frequency and detained crew members at the site of the tower for 2 days, during which they were not allowed to receive any food or supplies. On August 15, the day of the presidential recall referendum, CONATEL workers made surprise inspections of the facilities of several private television stations.

Media analysts, journalists, and other observers alleged that the Government used criminal defamation and libel laws to intimidate or harass the media.

On December 7, the Government enacted the Law of Social Responsibility in Radio and Television, which restricts certain content, such as sex and violence, to specific hours of the day and requires disclosure of sources of information. The law also requires private radio and television stations to show a set amount of domestically and independently produced programming. The law makes CONATEL the arbiter of compliance with the law. The IAPA criticized the law as a "clear interference in news media content and a restriction of the work of journalists to report and provide opinion." HRW said that the law "severely threatens press freedom." The IACHR also expressed concern over enactment of the law, noting that it places conditions on information carried by news broadcasts, employs vague terminology, provides for "potentially excessive penalties," and places broad restrictions on the content of programs that could have the effect of intimidating the media.

The Government influenced the media through licensing requirements for journalists, broadcast licensing concessions for television and radio stations, and lucrative public sector advertising. In July, the Supreme Court reaffirmed the law that requires practicing journalists to have journalism degrees and be members of the National College of Journalists and prescribes 3- to 6-month jail terms for those who practice journalism illegally. These requirements are waived for foreigners and for opinion columnists.

Some commercial radio stations complained that broadcasting frequencies for community radios were not allocated in accordance with broadcast regulations. According to the National Venezuelan Radio Broadcasting Chamber, most of these community radio stations neither received broadcasting licenses nor followed regulations and interfered with the broadcasts of licensed stations. The Government, not the communities, reportedly funded the community stations, whose broadcasting was pro-government and anti-opposition.

The law permits the Government to order national broadcasts (cadenas) requiring all broadcast media to pre-empt scheduled programming and transmit the Government's message in its entirety. Domestic and international observers criticized the Government for abusing this legal provision. The International Association of Broadcasters stated that it considered the Government's "unlimited abuse of official 'cadenas' on radio and television" a violation of Article 13 of the American Convention on Human Rights and "one of several direct or indirect means the Government uses to intimidate the communications media and society in general." According to private media sources, through December, there had been 282 hours of cadenas.

The Government denied private media equal access to many official events, and, in cases when private media had access to government facilities, they often did not have access to officials and information. For example, only the government radio and television stations were authorized to have reporters at the presidential palace. State-controlled television and radio stations and many foreign news reporters continued to have full access to official events.

There were recurrent, violent pro-government demonstrations in front of the studios of RCTV. On June 3, a group of men surrounded the station's headquarters, shot at office windows, vandalized the building, and drove a truck into the lobby of the building and set it afire. On June 8, video captured by the station showed a DISIP truck pulling up to the same building and several men, dressed in civilian clothing, getting out of the truck and further vandalizing the building.

Also on June 3, government sympathizers attacked the offices of the dailies El Nacional and Asi es la Noticia for 4 hours. Approximately 20 persons threw rocks and bottles, crashed a truck into the building's parking lot, set ablaze a distribution truck, and ransacked the offices of Asi es la Noticia.

Journalists complained that official actors, including the National Guard, DIM, DISIP, and some local and municipal police forces, perpetrated a significant number of violent or threatening incidents against the media. Complaints lodged with the National Syndicate of Press Workers listed 7 assaults, 13 cases of harassment, and 2 incidents of vandalism directly involving such official perpetrators. In February, several police officers beat Victor Serra, a Merida reporter. On March 2, three National Guardsmen harassed and attacked Juan Carlos Aguirre and Francisco Marcano, of CMT television, while they covered a protest in Caracas. On May 10, DIM agents stopped a reporter, photographer, and driver at a roadblock; beat and threatened them at gunpoint; and confiscated their cameras, tape recorders, radios, and press credentials.

The Government did not restrict access to the Internet.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of peaceful assembly and association, and the Government generally respected these rights in practice. Public meetings, including those of all political parties, generally were held unimpeded, although government supporters

disrupted numerous marches and rallies. The Government required permits for public marches but did not deny them for political reasons. A 2002 government decree established eight security zones in Caracas and gave the central Government, rather than municipal officials, the authority to permit demonstrations there. The zones included areas around military installations, state television and radio stations, and headquarters of Petroleos de Venezuela, S.A. (PDVSA).

The Constitution prohibits the use of firearms to control peaceful demonstrations. Supporters and opponents of the Government repeatedly demonstrated in the capital and other cities during the year, and several demonstrations resulted in injuries or loss of life. The authorities used firearms (including military weapons), tear gas, and billy clubs against demonstrators, and occasionally demonstrators fought back with clubs and rocks.

On February 27, National Guard troops confronted a peaceful opposition march using tear gas and rubber bullets. The Government had changed the ending point of the march 24 hours beforehand. The ensuing violent confrontation continued for many hours, with civilian Chavez supporters and police using firearms to support the National Guard. A preschool was evacuated when the children were affected by tear gas. Demonstrations throughout the country, at times violent, followed for the next 7 days. According to the Human Rights Ombudsman, 9 persons were killed, 193 injured, and 513 detained. Human rights organizations and the political opposition claimed 16 persons were killed. Among those killed was Evangelina Coromoto Carrizo Leal, a local leader of Democratic Action, who was shot to death during a demonstration in Machiques, Tachira State on March 4. One National Guard officer was arrested, but was confined to his base, rather than detained. In November, a judge ordered the case to go forward. Many of those detained, and human rights organizations accused the police and National Guard of excessive use of force, torture, and abuse, and the Human Rights Ombudsman documented 7 cases of torture and 17 cases of abuse (see Section 1.c.).

On August 16, some 50 persons demonstrated at Caracas' Plaza Francia against alleged fraud in the August 15 referendum. A group of government supporters arrived, and after a verbal confrontation, began shooting. One demonstrator was killed, and nine injured. Police arrested three of the gunmen after the media showed photos and videotape of them shooting into the crowd. In November, a judge ordered the three to stand trial.

Professional and academic associations generally operated without interference; however, in 2000, the Supreme Court defined which organizations could act in the name of "civil society" to defend collective rights before the courts. The ruling declared that groups belonging to civil society could not receive money from foreign governments or groups influenced by foreign governments, engage in political activism, or be run by members of the military or religious groups. The Government brought charges of conspiracy against the NGO SUMATE based in part on the fact that the organization received financing from abroad (see Section 4).

c. Freedom of Religion

The Constitution provides for freedom of religion, on the condition that its practice does not violate public morality, decency, or the public order, and the Government generally respected this right in practice.

The Government and the Holy See have signed a concordat that underscores the country's historical ties to the Roman Catholic Church and provides government subsidies to the Church, including to its social programs and schools. Other religious groups are free to establish and run their own schools. While these groups do not receive subsidies from the Government, they may receive funding to repair buildings for religious use.

Religious groups must register with the Ministry of Interior and Justice's Directorate of Justice and Religion to hold legal status as a religious organization and to own property. The requirements for registration are largely administrative; however, some groups complained that the process was slow and inefficient. Foreign missionaries must have a special visa to enter the country. Missionaries generally were not refused entry but faced the general bureaucratic inefficiency of the Government taking months or years to process a request.

Several senior government officials, including the President, personally attacked Catholic Church leaders and made numerous public statements intended to intimidate the Church. In April, President Chavez denounced the country's Catholic Church leadership as "immoral liars."

Statements by senior government officials supporting Iraq's Saddam Hussein and Islamic extremist movements raised tensions and intimidated the country's Jewish community. In April, the office of Vice President Rangel released a press statement referring to the owners of a business involved in a labor dispute as being "of Jewish nationality," although they were citizens of the country. Anti-Semitic leaflets also were available to the public in an office waiting room at the Ministry of Interior and Justice.

On May 27, small explosive devices went off near two Mormon churches. Damages were slight, and there were no injuries. Anti-Mormon propaganda pamphlets were found at each site.

In November, CICPC officers investigating the killing of prosecutor Danilo Anderson searched the Hebrew Center of Caracas, just as a school on the site was opening. Jewish community leaders expressed outrage and indicated doubt regarding the authorities' explanation for the search.

For a more detailed discussion, see the 2004 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The Constitution provides for these rights, and the Government generally respected them in practice, although there were numerous reports that persons were denied passports and other official documents by government agencies for having signed the petition for the recall of the President. There were also reports that those whose identification numbers appeared on a list of petition signers had to pay exorbitant bribes to receive their documents.

A judge issued an order preventing the departure from the country of a lawyer representing former National Assembly workers in a corruption suit against the former President of the National Assembly.

The Constitution prohibits forced exile, and the Government did not use it.

Both the Constitution and the Organic Refugee Law provide for the granting of asylum or refugee status in accordance with the 1951 U.N. Convention Relating to the Status of Refugees or its 1967 Protocol. In practice, the Government provided protection against refoulement, the return of persons to a country where they feared persecution.

In February, the Government began granting refugee status to a small number of applicants. As of December, 3,800 persons had applied for refugee status to the National Refugee Commission (NRC), which was constituted in August 2003. The NRC approved 207 persons and denied 200 persons. The U.N. High Commissioner for Refugees (UNHCR) worked with the NCR to investigate cases to speed the Commission's work.

Persons who applied formally for refugee status received a 90-day renewable identification card allowing them to work, attend public school, or receive public health services. As of September 13, approximately 300,000 Colombians along the border were naturalized or granted residency through a government campaign that began in February. There were no statistics on how many of those naturalized or given residency were refugees, because it was common for Colombians fleeing across the boarder to blend into local communities where they had familial or ethnic ties rather than apply for formal refugee status. The NCR and UNHCR assumed that many Colombians chose to be naturalized rather than apply for refugee status because the process was quicker, required minimal documentation, and offered greater protection under the law.

Few undocumented aliens found at security checkpoints along the border were deported unless an investigation revealed a criminal background. In late May, some 300 indigenous Wayuu fled into the country from Colombia and received temporary protective status.

Section 3 Respect for Political Rights: The Right of Citizens to Change their Government

The Constitution provides citizens with the right to change their government peacefully, and citizens exercised this right through periodic elections held on the basis of universal suffrage. The Constitution provides for the direct election of the President and unicameral National Assembly, as well as of state governors, state legislative councils, and local governments. The Constitution also permits citizens to request recall referenda after the mid-point of the term of any elected official. Political parties organize and their candidates are allowed to run for office freely and to seek the support of voters. The President has extensive powers, and the legislature appoints the Supreme Court and the Citizen Power Branch consisting of the Ombudsman, Public Prosecutor, and Comptroller General. In August 2003, after the National Assembly failed to do so, the Supreme Court appointed a transitional five-member CNE, which included two members and a president generally known to be pro-government.

Opponents of the President have sought to remove him from power since 2002. Following a national strike from December 2002 to February 2003, government and opposition representatives signed an agreement in May 2003 that committed both sides to follow the Constitution and laws and acknowledged the constitutional right to hold a recall referendum if legal criteria were met. At the end of November 2003, opponents of President Chavez gathered sufficient signatures for the recall referendum. Opposition and non-government parties also collected signatures to recall 70 National Assembly deputies. In February, the CNE disallowed more than 1 million of the approximately 3.7 million signatures collected for a presidential recall, on what appeared to be political rather than legal grounds. The opposition subsequently obtained sufficient signatures to activate the presidential recall referendum through the appeals process (reparos) in which nearly 1.2 million signers were asked to appear again to confirm their signatures.

The Carter Center found that signature collections during the reparo period were conducted in "an atmosphere mostly free of violence and with mostly clear and transparent procedures"; however, MVR Deputy Luis Tascon placed the names and national identification numbers of all those persons who had signed the petitions on his webpage. The information was used to discriminate against those who had signed, some of whom lost their government jobs, and many more of whom were denied government services, such as passports and identity cards. There were numerous reports that persons were intimidated by government officials not to ratify their signatures or to withdraw them, threatening loss of jobs, scholarships, pensions, and even denial of medical treatment.

Following the CNE's June 3 decision to allow the referendum, the Government engaged in a massive naturalization and

identification effort that took place in a few months. The Government claimed that the intention was to redress years of unjustified delays in granting citizenship and identity documents to poor citizens. CNE employees whose loyalty to the Government was unclear were reportedly not allowed to work in the units responsible for changes in the registry. Opposition supporters were denied any opportunity to observe the process, and the electoral registry grew by more than 1.4 million. Many of these voters had no addresses. Additional unexplained changes in voter addresses occurred just before the referendum, making it impossible for some persons to vote.

On August 15, the country held its first-ever referendum to recall a president. The OAS found that irregularities and pro-government bias marked the process leading up to the vote. Because of delays reportedly related to the implementation of an untried electronic voting and fingerprint system, the CNE allowed the polls to stay open an extra 8 hours. On August 16, some 3 hours after the polls closed, the CNE announced that President Chavez had won the vote. International observers declared that the CNE results were compatible with their findings. Chavez opponents challenged the CNE results, alleging irregularities, including that the vote count had been manipulated electronically and that the Government had illegally registered more than 1 million new voters. There were widespread media reports of intimidation, forced retractions, and threats of government retaliation against those who signed the petition or intended to vote to recall the President. Neither the CNE nor the Supreme Court found merit in the opposition's challenges, the Carter Center concluded that the automated machines worked well, and the CNE announced that the Government had received 59 percent of the nearly 10 million votes recorded. The OAS "found no element of fraud in the process," although the Carter Center observers noted that the process "suffered from some irregularities, politicization, and intimidation." The OAS and the Carter Center stated that the official results were compatible with their own quick count and "reflected the will of the electorate," and the OAS Permanent Council passed a resolution that acknowledged the referendum results.

There was a popular perception of widespread corruption among all levels of the Government. The Comptroller General's office was largely inactive, except to accuse the Government's opponents of corruption. Journalists reported several cases of apparent corruption implicating high-level government officials, but none were investigated. The National Office of Identification and Immigration, the agency responsible for issuing identity cards and passports, was corrupt, a fact openly acknowledged by officials.

The Constitution provides for citizens' access to government information and forbids censoring. Human rights groups reported that the Government routinely ignored this requirement, and did not make information available.

On September 24, in response to a lawsuit by the NGO PROVEA, the Human Rights Ombudsman's office defended its right to refuse to release information on human rights abuses on the grounds that it was protecting the privacy rights of victims and that it had no legal responsibility to give information to PROVEA.

Women and minorities participated fully in government and politics. The National Assembly's Family, Women, and Youth Committee promoted political opportunities for women. In the 2000 elections, women won 20 seats in the 165-seat Assembly. There were 3 women in the 21-member cabinet and 8 women among the 32 Supreme Court justices.

Indigenous people traditionally have not been integrated fully into the political system due to low voter turnout, geographic isolation, and limited economic and educational opportunities. The Constitution reserves three seats in the National Assembly for indigenous people, and these seats were filled in the 2000 election. There were no indigenous members in the cabinet. One of the vice presidents of the National Assembly was an indigenous person.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A wide variety of independent domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were occasionally responsive to their views. However, during the year, NGOs complained that a 2000 Supreme Court ruling that restricts the rights of NGOs that receive funding from foreign sources was being used to prosecute some NGOs (see Section 2.b.).

On February 15, President Chavez accused the electoral NGO SUMATE of treason for accepting funding from a foreign source. Prosecutors subsequently began an investigation of four principal members of the NGO and, in August, charged SUMATE with conspiracy to destroy the country's republican form of government. Following a Supreme Court ruling that the prosecution had violated procedures, the case was suspended pending the gathering of testimony from overseas. Prosecutors also opened an investigation of the leader of the education reform NGO Assembly of Educators for receiving money from a foreign source.

President Chavez and NGOs have not met to discuss human rights problems since 1999. However, NGOs developed relationships with specific government bodies such as the Ministry of Education, the Ministry of Foreign Affairs, and the National Assembly; The CNE designated the nonpartisan NGO Electoral Eye as the only national observation group for the August 15 referendum.

Several human rights NGOs received threats and intimidation by government representatives and supporters. Throughout the year, COFAVIC received e-mail and telephone threats from persons who identified themselves as Chavez supporters. The Metropolitan Police provided bodyguards for the COFAVIC director and protection in and around COFAVIC's office, in fulfillment by local authorities of an IACHR protective order. In February, the Government complied with a December 2003 IACHR order to pay $1.56 million (2,496 million bolivars) to compensate relatives of the victims of the Caracazo riots and killings of 1989.

In June, police harassed the leader of a local human rights NGO on two occasions, and presumed government supporters spread threatening material near his home.

Police stated that they suspected Colombian paramilitaries killed human rights activist Joe Luis Castillo in 2003 (see Section 1.a.).

In June, HRW criticized the new Organic Law of the Supreme Court and the politicization of the justice system. The Government responded with a personal attack on the HRW Executive Director, but did not address the substance of HRW's concerns (see Section 1.e.).

PROVEA reported that, in December, the president of Corpozulia (a government-owned and controlled regional development corporation in the State of Zulia) and a Ministry of Energy and Mines official accused an environmental activist of being an agent of a foreign government and a terrorist. The activist was protesting potentially environmentally destructive coal mining operations.

The Ombudsman is responsible for ensuring that citizens' rights are protected in a conflict with the state; however, human rights NGOs claimed that the Ombudsman's office acted on only a small number of cases presented to it. COFAVIC claimed that the Ombudsman and the Attorney General's office were not independent of the Executive Branch and therefore were unable to carry out effective investigations. During the year, the Ombudsman's office repeatedly defended the Government when accusations of human rights violations were made against it. In February and March, while recognizing the excesses of the security forces, the Ombudsman's office justified the repression against demonstrators by stating that protesters violated citizens' rights to work, travel, and education. The Ombudsman's office played no role in protesting the CNE's lack of openness and partisan decisions in the run-up to the presidential recall referendum.

The National Assembly's Sub-Commission on Human Rights played an insignificant role in the national debate on human rights and released no public reports.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The Constitution prohibits discrimination on the basis of politics, age, race, sex, creed, or any other condition, and the law prohibits discrimination based on ethnic origin, sex, or disability; however, the Government did not protect women adequately against societal and domestic violence and did not ensure persons with disabilities access to jobs and public services, nor did it safeguard adequately the rights of indigenous people during the year.

Women

Violence against women continued to be a problem, and women faced substantial institutional and societal prejudice with respect to rape and domestic violence. Domestic violence and rape often were not reported to the police. According to the Center for Women's Studies at the Central University of Venezuela (CEM), there were 900 reported rape cases as of June, compared with 2,100 such cases throughout 2003. There were 8,000 cases of reported domestic violence from January 2003 to June 2004. Police generally were reluctant to intervene to prevent domestic violence, and the courts rarely prosecuted those accused of such abuse. The law requires police to report domestic violence and obligates hospital personnel to notify the authorities when they admit patients who are victims of domestic abuse cases. Women generally were unaware of legal remedies and had little access to them. Few police officers were trained to assist rape victims. Only 1,500 of the 11,000 women who reported rape or abuse in 2003 and the first half of the year filed formal charges. In August, Linda Loaiza, the victim of brutal mistreatment and torture, staged a 6-day hunger strike to protest that her alleged aggressor had not been brought to trial in 2 years and thus could be released.

Rape was difficult to prove largely because a medical examination was required within 48 hours of the crime. The Penal Code also provides that an adult man guilty of raping an adult woman with whom he is acquainted can avoid punishment if, before sentencing, he marries the victim. If the rape victim is a prostitute, the rapist must serve only one-fifth of the sentence if convicted, a rule that applies to any crime committed against a prostitute. Prostitution is not illegal.

Sexual harassment in the workplace was a common problem but is not a criminal offense.

Women accounted for approximately half the student body of most universities and worked in many professions, including medicine and law. They were underrepresented in leadership positions and, on average, earned 30 percent less than men. Women attended military academies and served as officers in the armed forces.

Women and men are legally equal in marriage. The Constitution provides for sexual equality in exercising the right to work. The Labor Code specifies that employers must not discriminate against women with regard to pay or working conditions, must not fire them during pregnancy or for 1 year after giving birth, must grant them unpaid leave and benefits for 6 weeks before the birth of a child and 12 weeks after, and must provide them with 10 weeks of unpaid leave if they legally adopt children under 3 years of age. According to the Ministry of Labor and the CTV, these regulations were enforced in the formal sector.

The National Institute for Women, a government agency, had two programs to assist women in need and enhance the economic independence of women. The Women's Bank provided approximately 40,000 women with business and empowerment training and

small-scale financing for micro-enterprises managed by women. During the year, the Women's Shelters Program opened its first shelter to receive, care for, and rehabilitate women in distress.

There were at least 10 NGOs in Caracas concerned with domestic violence, sex education, and economic discrimination. However, the recommendations of these groups were not implemented widely by the police or other concerned government agencies. Political differences created division among women's organizations, decreasing their effectiveness in advancing women's rights.

Children

The Organic Procedural Law on Adolescents and Children establishes legal protection of children under the age of 18, regardless of nationality; however, the law was not fully implemented. The Constitution provides that the State is to provide free education up to the university-preparatory level, and the law provides for universal, compulsory, and free education; however, an estimated 57 percent of children left school before the ninth grade. The Ministry of Education, Culture, and Sports provided a public school feeding program for some children to promote school access and attendance through the high school level. Primary and secondary education was chronically underfunded.

There were numerous government health care programs provided for boys and girls on the basis of equal access. UNICEF reported that the under-5 mortality rate was 21 per 1,000 and that the Government financed the expanded program of immunization.

Reports of child abuse were rare due to a fear of entanglement with the authorities and societal ingrained attitudes regarding family privacy. According to UNICEF and other NGOs working with children and women, child abuse often included incest. The judicial system, although slow, ensured that in most situations children were removed from abusive households once a case had been reported; however, public facilities for such children were inadequate and had poorly trained staff.

UNICEF and CECODAP estimated that approximately 15,000 children lived on the street. Authorities in Caracas and several other jurisdictions tried to cope with the phenomenon of street children by imposing curfews for unsupervised minors. Reform institutions were filled to capacity, so hundreds of children accused of infractions, such as curfew violations, were confined in inadequate juvenile detention centers (see Section 1.c.).

Trafficking in Persons

The Constitution prohibits trafficking in persons, although there is no implementing law specifically for prosecution of all forms of trafficking in persons; however, there were reports that the country was a source, destination, and transit country for trafficked men, women, and children.

Trafficking may be prosecuted under laws against forced disappearance and kidnapping (punishable by 2 to 6 years' imprisonment) and, in the case of children, under the Organic Law to Protect Children and Adolescents (which carries a fine of 1 to 10 months' income for trafficking in children). The Law of Migration and Immigration, published on May 24, makes human smuggling punishable by 4 to 8 years in prison.

In January, the Ministry of Foreign Affairs inaugurated an interdepartmental working group to develop plans to combat trafficking in persons. The working group designed but has yet to implement an informational campaign.

The Government did not arrest or prosecute any individuals for trafficking in persons during the year, and no figures on trafficking were available from either government or NGO sources. CICPC's Interpol Division worked on two human trafficking cases involving seven women trafficked to Mexico and Spain. The two women lured to Mexico for sexual exploitation with false offers of employment were repatriated, but, despite cooperation with Spanish law enforcement, the five women trafficked to Spain had not been repatriated by year's end.

PROVEA received complaints that women were trafficked to Europe for purposes of prostitution. Undocumented or fraudulently documented Ecuadorian and Chinese nationals transited the country and reportedly were forced to work off the cost of their transportation in conditions of servitude. Organized criminal groups, possibly including Colombian drug traffickers, Ecuadorian citizens, and Chinese mafia groups, reportedly were behind some of these trafficking activities. The Ombudsman's office continued to investigate whether some of the children separated from their parents in the 1999 flooding in Vargas State may have been trafficked.

An underdeveloped legal framework, corruption among immigration authorities, and the ease with which fraudulent passports, identity cards, and birth certificates could be obtained created favorable conditions for trafficking.

There were small specially trained CICPC sections devoted to prostitution and the protection of women.

Government efforts to prevent trafficking are the responsibility of the Public Prosecutor's Family Protection Directorate and the National Institutes for Women and Minors. NGOs such as CECODAP and the Coalition Against Trafficking in Women also were

involved in activities to combat trafficking; however, no details on their work were available.

Persons with Disabilities

According to local advocates, persons with disabilities encountered discrimination in many sectors, including education, health care, and employment. Persons with disabilities had minimal access to public transportation, and ramps were practically nonexistent, even in government buildings. The law requires that all newly constructed or renovated public parks and buildings provide access and prohibits discrimination in employment practices and in the provision of public services; however, the Government had not made a significant effort to implement the law, inform the public of it, or to change societal prejudice against persons with disabilities.

There were no reports of discrimination against persons with mental disabilities.

Indigenous People

Although the law prohibits discrimination based on ethnic origin, members of the country's indigenous population suffered from inattention to and violation of their rights. There were approximately 316,000 indigenous people in 27 ethnic groups, many of whom were isolated from modern civilization and lacked access to basic health and educational facilities. High rates of cholera, hepatitis B, malaria, and other diseases plagued their communities. The Government included indigenous people in its literacy campaigns, in some cases, teaching them to read and write in their own languages as well as in Spanish.

The Constitution creates three seats in the National Assembly for indigenous deputies and also provides for "the protection of indigenous communities and their progressive incorporation into the life of the nation." Nonetheless, local political authorities seldom took account of the interests of indigenous people when making decisions affecting their lands, cultures, traditions, or the allocation of natural resources. Few indigenous people held title to their land, and many did not want to do so because most indigenous groups rejected the concept of individual property. Instead, they called on the Government to recognize lands traditionally inhabited by them as territories belonging to each respective indigenous group.

There were no developments in the May 2003 case of the Yaruro indigenous group in Apure State who complained to the human rights group PROVEA that ranchers and others had invaded their lands, adversely impacting the area's natural resources on which the indigenous community depended. The Yaruro had also demanded compliance with Articles 120 and 129 of the Constitution requiring that any exploitation of natural resources within an indigenous group's territory only be undertaken after consultation with the effected group.

Section 6 Worker Rights

a. The Right of Association

Both the Constitution and the Labor Code recognize and encourage the right of workers to organize; however, the Government continued to violate the right of association. According to the Constitution, all workers, without prejudice or need of previous authorization, have the right to form and join unions of their choice. The Labor Code extends this right to all private and public sector employees, except members of the armed forces. Approximately 10 to 12 percent of the 12-million-member national labor force was unionized.

The Constitution provides that labor organizations are not subject to intervention, suspension, or administrative dissolution, and workers are protected against any discrimination or measure contrary to this right. Labor organizers and leaders may not be removed from their positions during the period of time or under the conditions in which they exercise their leadership functions. The CNE has the authority to administer the internal elections of labor confederations, which contravenes International Labor Organization (ILO) Conventions 87 and 98. A 2002 law gives the CNE a technical advisory role in elections, which has proven to be the general practice. However, labor groups complained that the CNE is still empowered to certify union election winners, nullify elections, and adjudicate disputes.

The Inter-American Regional Organization of Workers and International Confederation of Free Trade Unions (ICFTU) concluded that the Government seriously violated the right of association. The ILO repeatedly expressed concerns that the Labor Code violates freedom of association by requiring a high number of workers (100 workers) to form workers' trade unions and a high number of employers to form employer trade unions (10 employers). A constitutional requirement for alternation in union leadership leaves vague the right of unions to re-elect their leaders. The ILO noted the Government's intent to reform the Labor Code to address these deficiencies, although the legislation remained pending in the National Assembly.

The Government still refused to recognize the legitimacy of the CTV's elected leadership and refused to appoint the CTV Secretary General as labor's representative at the ILO's annual meetings in 2003 and during the year. The ILO determined that the CTV was the country's most representative labor confederation.

The Labor Code mandates registration of unions with the Ministry of Labor, but it limits the Ministry's discretion by specifying that

registration may not be denied if the proper documents (a record of the founding meeting, the statutes, and membership list) are submitted. Nonetheless, the Ministry of Labor continued to deny registration to UNAPETROL, a union composed of oil workers who were later fired for participating in the December 2002-February 2004 national strike (see Section 6.b.).

The CTV filed a formal complaint with the ILO that, during the year, 1,200 public sector workers had been fired or forced to retire in retaliation for having signed the petition calling for a recall referendum on President Chavez. The CTV alleged that the total number of public sector workers removed from their positions was more than 5,000 (see Section 3).

b. The Right to Organize and Bargain Collectively

The Constitution provides that all public and private sector workers have the right to voluntary collective bargaining and to arrive at collective bargaining agreements. The Constitution directs the Government to ensure development of collective bargaining and to establish conditions favorable to collective relationships and the resolution of labor conflicts. The Labor Code stipulates that employers must negotiate a collective contract with the union that represents the majority of their workers. The ILO continued to object to this provision and requested that the Government amend it so that "in cases where no union organization represents an absolute majority of workers, minority organizations may jointly negotiate a collective agreement on behalf of their members."

The Government continued to show preference in collective bargaining agreements toward sympathetic unions and fostered the creation of parallel unions. CTV leaders claimed that the Ministry of Labor routinely rejected collective bargaining agreements negotiated by CTV affiliates on administrative grounds. CTV leaders further claimed that, in those sectors or firms where contracts were rejected, Ministry of Labor officials facilitated the rapid formation of parallel unions, which legally could force a vote among workers over which union would represent them. The CTV also complained that the Labor Ministry usually designated the parallel union as the one authorized to negotiate the contract.

The Constitution and the Labor Code recognize the right of all public and private sector workers to strike in accordance with conditions established by labor law; however, public servants may strike only if the strike does not cause "irreparable damage to the population or to institutions." Replacement workers are not permitted during legal strikes. The Labor Code allows the President to order public or private sector strikers back to work and to submit their dispute to arbitration if the strike "puts in immediate danger the lives or security of all or part of the population."

The status of approximately 19,000 employees of PDVSA who were fired during and in the aftermath of the December 2002-February 2003 national strike remained legally uncertain. The Government continued to deny the former workers severance and pension benefits as well as access to company housing, schools, and medical clinics. The Minister of Labor rejected a petition from the workers requesting compensation for what they claimed was an illegal firing. Although the ILO concluded in June that the PDVSA workers had engaged in a national strike, the Government permitted only a few employees to return to their jobs. The Government reportedly reinstated or compensated some workers who were on excused leave prior to or during the strike. The Government continued to pursue criminal charges against seven former PDVSA executives for alleged incitement to rebellion and sabotage of the oil industry.

There were unconfirmed reports that CTV President Carlos Ortega, who fled the country in March 2003, had returned but was in hiding. Prosecutors were seeking to try Ortega for civil rebellion and incitement to commit a crime for his participation in the national strike. The ILO recommended the Government lift the arrest orders against the strike leaders.

There were brief strikes throughout the year, including one in April-May in an important steel complex in Bolivar State.

Labor law and practice are the same in the sole export processing zone of Punto Fijo, Falcon State, as in the rest of the country.

c. Prohibition of Forced or Compulsory Labor

The Labor Code states that no one may "obligate others to work against their will," and such practices generally were not known to occur; however, there were reports of trafficking in children for employment purposes (see Sections 5 and 6.d.).

d. Prohibition of Child Labor and Minimum Age for Employment

The law contains provisions to protect children from exploitation in the workplace. The Ministry of Labor and the National Institute for Minors enforced child labor policies effectively in the formal sector of the economy but less so in the informal sector. UNICEF's latest data reported that, as of 2001, 7 percent of children were in the labor market. A 2002 ICFTU report estimated that 1.2 million children were working in such areas as agriculture, domestic service, and street vending and that approximately 300,000 children worked in the formal sector.

The Labor Code allows children between the ages of 12 and 14 to work only if the National Institute for Minors or the Ministry of Labor grants special permission. It states that children between the ages of 14 and 16 may not work without the permission of their legal guardians. Minors may not work in mines or smelting factories; in occupations that risk life or health or could damage intellectual or moral development; or in public spectacles. The Constitution prohibits adolescents from working in jobs that will affect

their development (see Section 5). The Criminal Code prohibits inducing the prostitution and corruption of minors. Persons convicted of these crimes may be sentenced to imprisonment from 3 to 18 months, and up to 4 years if the minor is younger than 12 years old.

Those under 16 years of age may by law work no more than 6 hours per day or 30 hours per week. Minors under the age of 18 may work only between 6 a.m. and 7 p.m. Children working in the informal sector, mostly as street vendors, generally worked more hours than permitted under the law. According to a 2003 Foundation for Social Action study, 63 percent of child street vendors worked 7 days a week. The Ministry of Education, Culture, and Sports ran educational programs to reincorporate school drop-outs and adults into the educational system; however, there was no independent accounting of the effectiveness of the programs.

e. Acceptable Conditions of Work

The Constitution provides workers with the right to a salary that is sufficient to allow them to live with dignity, and provides them and their families with the right to basic material, social, and intellectual necessities. The Constitution obliges the State to provide public and private sector workers with an annually adjusted minimum wage, using the cost of the basic basket of necessities as a reference point. Under the Labor Code, minimum wage rates are set by administrative decree, which the legislature may suspend or ratify but may not change. The national minimum wage did not provide a decent standard of living for a worker and family, although the Government in May raised the monthly minimum wage by 30 percent to $167 (321,235 bolivars). Unions noted that a worker's income was often less than the cost of basic monthly food for a family of five, which, in June, was estimated by the Government's Central Office of Statistics and Information to be $168 (322,088 bolivars). The figure did not include other necessities such as medical care, transportation, clothing, and housing. The Ministry of Labor enforced minimum wage rates effectively in the formal sector of the economy, but approximately 50 percent of the population worked in the informal sector where labor laws and protections generally were not enforced.

The Constitution stipulates that the workday may not exceed 8 hours daily or 44 hours weekly and that night work may not exceed 7 hours daily or 35 hours weekly. Managers are prohibited from obligating employees to work additional time, and workers have the right to weekly time away from work and annual paid vacations. Some unions, such as the petroleum workers' union, have negotiated a 40-hour week. Overtime may not exceed 2 hours daily, 10 hours weekly, or 100 hours annually, and may not be paid at a rate less than time-and-one-half. The Ministry of Labor effectively enforced these standards in the formal sector.

The Constitution provides for secure, hygienic, and adequate working conditions; however, authorities have not yet promulgated regulations to implement the Health and Safety Law, which was not enforced. The Labor Code states that employers are obligated to pay specified amounts (up to a maximum of 25 times the minimum monthly salary) to workers for accidents or occupational illnesses, regardless of who is responsible for the injury.

The Code also requires that workplaces maintain "sufficient protection for health and life against sickness and accidents," and it imposes fines ranging from one-quarter to twice the minimum monthly salary for first infractions. However, in practice, Ministry of Labor inspectors seldom closed unsafe job sites. Under the law, workers may remove themselves from dangerous workplace situations without jeopardy to continued employment.

hrw.org   DEFENDING HUMAN RIGHTS WORLDWIDE

Home
News Releases
About HRW
Get Involved
Publications
Info by Country
Africa
Americas
Asia
Europe/Central Asia
Middle East/N. Africa
United States

Global Issues
Arms
Children's Rights
Economic, Social &
Cultural Rights
HIV/AIDS
International Justice
LGBT Rights
Prisons
Refugees
Torture and Abuse
United Nations
Women's Rights
More...

Campaigns
Film Festival
Photo Galleries
Audio / Video
Site Map
Contact Us
Corrections
Permissions
RSS



PORTUGÊS  FRANÇAIS  РУССКИЙ  DEUTSCH
ESPAÑOL  中文  العربية  OTHER

# Venezuela: Curbs on Free Expression Tightened

(Santiago, March 24, 2005) — Amendments to Venezuela's Criminal Code that entered into force last week may stifle press criticism of government authorities and restrict the public's ability to monitor government actions, Human Rights Watch said today.

> **" By broadening laws that punish disrespect for government authorities, the Venezuelan government has flouted international human rights principles that protect free expression. "**
>
> **José Miguel Vivanco, Americas director at Human Rights Watch**

🖨 Printer Friendly Version

Also Available in

ESPAÑOL

Related Material

Venezuela: Media Law Undercuts Freedom of Expression
Press Release, November 30, 2004

More Information on Human Rights in Venezuela
Country Page

Free Email Newsletter

Contribute to Human Rights Watch

"By broadening laws that punish disrespect for government authorities, the Venezuelan government has flouted international human rights principles that protect free expression," said José Miguel Vivanco, Americas director at Human Rights Watch. "While countries across Latin America are moving to repeal such laws, Venezuela has enacted further restrictions on the press that will shield officials from public scrutiny."

The amendments extend the scope of existing provisions that make it a criminal offense to insult or show disrespect for the president and other government authorities. Venezuela's measures run counter to a continent-wide trend to repeal such "disrespect" (or "desacato") laws. In recent years, Argentina, Costa Rica, Paraguay, and Peru have already repealed such laws, and other countries like Chile and Panama are currently considering legislation that would do so.

The human rights bodies of the United Nations and of the Organization of American States have repeatedly urged states to repeal such provisions.

The president, vice-president, government ministers, state governors and members of the Supreme Court are already protected from disrespect under the law. The new provisions extend this protection to legislators of the National Assembly, members of the National Electoral Council, the attorney general, the public prosecutor, the human rights ombudsman, the treasury inspector, and members of the high military command.

EXHIBIT

G



Anyone convicted of offending these authorities could go to prison for up to 20 months. Anyone who gravely offends the president, on the other hand, can incur a penalty of up to 40 months in prison.

Other amendments increase the penalties for defamation and libel. Penalties for defamation have been increased from a maximum of 30 months of imprisonment to a new maximum of four years if the statement is made in a document distributed to the public. Those convicted would also have to pay a fine of up to 2,000 tax units (currently equivalent to more than US$ 27,000). The penalty for libel rises from a maximum jail term of three months to a new maximum of two years.

These changes to the criminal code follow a Law on the Social Responsibility of Radio and Television, which entered force in November and imposes wide-ranging administrative restrictions on radio and television broadcasting.

"These new provisions add to the arsenal of press restrictions already at the government's disposal," Vivanco said. "By further criminalizing criticism of government authorities, these laws will restrict the public's ability to monitor abuse by those in power."



Contribute to Human Rights Watch

Home | About Us | News Releases | Publications | Info by Country | Global Issues | Campaigns | What You Can Do | Community | Bookstore | Film Festival | Search | Site Map | Contact Us | Press Contacts | Privacy Policy

© Copyright 2004, Human Rights Watch    350 Fifth Avenue, 34th Floor    New York, NY 10118-3299    USA

Copyright 2005 The Economist Newspapers Ltd.
All Rights Reserved
The Economist

**April 2, 2005**
U.S. Edition

**SECTION:** THE AMERICAS

**LENGTH:** 566 words

**HEADLINE:** Repeat class;
**Venezuela's** education reforms

**DATELINE:** caracas

**HIGHLIGHT:**

A controversy over education reform in **Venezuela**

**BODY:**

Arguing over schooling for all

BACK in 2001, the embryonic opposition to **Venezuela's** leftist president, Hugo Chávez, had a slogan that brought hundreds on to the streets in protest at a plan to reform education. "Don't mess around with our kids," the placards read. The opposition's fear was that the reform would lead to the indoctrination of schoolchildren by political commissars thinly disguised as teachers.

As Mr Chávez went on to confront other groups—the Church, trade unions, the media and private business—educational reform dropped from view. Four years, a failed coup, a two-month national strike and an unsuccessful recall referendum later, the opposition has imploded. Mr Chávez is pressing ahead with his "revolution" on all fronts, education included. So some aspiring rebuilders of opposition are testing a new slogan: "Don't mess around with our kids."

This time, criticisms focus on three things: an alleged threat to university autonomy; new "political" criteria for teachers' appointments and—as in 2001—the government's purported hostility to private education. According to Samuel Moncada, the minister for higher education, they are all unfounded. He says that the "fascist, coup-plotting opposition" is engaged in a "campaign of media manipulation" against the government.

One bone of contention is Decree 3444, which changes some of the ministry's regulations. The opposition says it undermines the constitutional guarantee of university



autonomy, giving the government control over budgets and planning. The minister argues it mainly codifies existing practice. But his view of autonomy, he admits, is different from the "elitist, oligarchic" principle preached by "middle-class, white, media-savvy **civil-society** groups backed by the United States".

The government's policy is to guarantee education up to university level to anyone who wants it. To this end, it has created a parallel educational system with hundreds of thousands of beneficiaries. These "missions", created with help from Cuba's communist government, must now somehow be fused with a reluctant traditional system. Few would argue that reform is not needed. The fear of opponents is that pedagogy will lose out to ideologically slanted training.

In the schools, the government stopped giving new teachers job tenure in 2001. Instead, tens of thousands have been given interim appointments. Critics claim that these are based on political, not professional, criteria. The education ministry is considering whether to allow these interim teachers to obtain tenure, bypassing the normal appointments criteria. Government supporters argue as they did in the case of the state oil company, where 20,000 were sacked in 2003, that "meritocracy" favours vested interests.

The government roundly denies it is attempting to eliminate private education, much less impose a one-party ideology. It rejects fears of Cubanisation. Officials say that they take advice from other countries, too—though they point out that Cuba's system of education for all has been widely praised. This week, Mr Moncada and the schools minister defended their plans before the National Assembly. Whatever the validity of the opposition's claims, the government shows little sign of heeding them. Mr Chávez recently said that **Venezuela** needs "rapid, revolutionary results". A new version of that old educational creed, the three Rs, perhaps.

**LOAD-DATE:** April 1, 2005

hrw.org   DEFENDING HUMAN RIGHTS WORLDWIDE

PORTUGUÊS  FRANÇAIS  РУССКИЙ  DEUTSCH
ESPAÑOL    中文      العربية   OTHER

Home
News Releases
About HRW
Get Involved
Publications
Info by Country
Africa
Americas
Asia
Europe/Central Asia
Middle East/N. Africa
United States

Global Issues
Arms
Children's Rights
Economic, Social &
Cultural Rights
HIV/AIDS
International Justice
LGBT Rights
Prisons
Refugees
Torture and Abuse
United Nations
Women's Rights
More...

Campaigns
Film Festival
Photo Galleries
Audio / Video
Site Map
Contact Us
Corrections
Permissions
RSS



# Venezuela: Rights Lawyer Faces Judicial Persecution

### Criminal Investigation Launched to Intimidate Critic of Government's Rights Record

(Washington, April 5, 2005) — The Venezuelan government should immediately halt criminal proceedings opened against one of Latin America's most prominent human rights lawyers, Human Rights Watch said today.

**❝ This is a clear-cut case of political persecution, targeting someone who has been an effective critic of the Chávez government's rights record. ❞**

**José Miguel Vivanco, Americas director at Human Rights Watch**

Carlos Ayala Corao, a distinguished Venezuelan jurist and human rights expert, was summoned to appear this morning before a Caracas public prosecutor. The prosecutor was to notify Ayala of the opening of a criminal investigation against him, apparently for alleged involvement in the failed April 2002 coup against Venezuelan President Hugo Chávez. Ayala, who is currently president of the nongovernmental Andean Commission of Jurists, is a former president of the Inter-American Commission on Human Rights.

Ayala appeared before the prosecutor who told him that his case had been postponed, and ordered him to present himself next week. He was given no explanation for the delay nor informed about the grounds of the investigation.

"This is a clear-cut case of political persecution, targeting someone who has been an effective critic of the Chávez government's human rights record," said José Miguel Vivanco, Americas director at Human Rights Watch. "This outrageous accusation would be rejected out of hand in any independent court of law."

Human Rights Watch urges Venezuelan Attorney General Isaías Rodríguez to halt

🖨 Printer Friendly Version

Also Available In

ESPAÑOL

Related Material

Rigging the Rule of Law: Judicial Independence Under Siege in Venezuela
Report, June 17, 2004

Venezuela: Chávez Allies Pack Supreme Court
Press Release, December 14, 2004

More Information on Human Rights in Venezuela
Country Page

Free Email Newsletter

Contribute to Human Rights Watch



EXHIBIT
I

immediately the judicial persecution of the distinguished human rights lawyer.

Carlos Ayala has been a prominent litigant in cases of human rights violations in Venezuela before the Inter-American Court of Human Rights, often accompanying representatives of Venezuelan non-governmental human rights groups. On March 3 he participated in a special session of the Inter-American Commission on Human Rights devoted to an examination of human rights in Venezuela. After the meeting, the commission issued a statement expressing concern at the situation of risk and stigmatization affecting human rights defenders in Venezuela.

During the aborted coup attempt, Ayala intervened to protect the rights of a pro-Chávez congressman who had been detained illegally and was being held incommunicado by the security services. The congressman, Tarek William Saab, subsequently thanked Ayala on television for his timely action. A special committee of the National Assembly that investigated the events of April 2002 also noted that Ayala waited for five hours outside police headquarters while he was seeking Tarek William Saab's release.

Over the past year, the pro-Chávez majority in the Venezuelan legislature has severely weakened judicial independence in Venezuela. In December, the National Assembly named 12 new justices to the Supreme Court after a law passed the previous May enlarged the court from 20 to 32 members. The pro-Chávez coalition justifies the enlargement of the Supreme Court as a response to pro-opposition rulings, such as a highly questionable decision that absolved four military officers charged with participating in the 2002 coup.

Last month, following the new judicial appointments, the court's Constitutional Chamber annulled the acquittals—a decision apparently without precedent in recent Venezuelan legal history.

Numerous recent newspaper articles indicate that the attorney general is currently considering criminal proceedings against more than 200 people for politically motivated offenses, including involvement in the coup attempt. Defense lawyers expect the number to rise significantly in the coming months.

"This case signals that the Venezuelan authorities have now decided to resort to criminal prosecutions as a tool to harass government critics," said Vivanco.



Contribute to Human Rights Watch

Home | About Us | News Releases | Publications | Info by Country | Global Issues | Campaigns | What You Can Do | Community | Bookstore | Film Festival | Search | Site Map | Contact Us | Press Contacts | Privacy Policy

© Copyright 2004, Human Rights Watch    350 Fifth Avenue, 34th Floor   New York, NY 10118-3299   USA

Copyright 2005 Financial Times Information
All rights reserved
Global News Wire - Asia Africa Intelligence Wire
Copyright 2005 BBC Monitoring/BBC
BBC Monitoring International Reports

June 17, 2005

**LENGTH:** 767 words

**HEADLINE:** VENEZUELAN ACTIVIST WARNS OF INCREASED CRIMES
AGAINST HUMAN RIGHTS

**BODY:**

Text of report by Venezuelan newspaper El Nacional web site on 15 June

Liliana Ortega, executive director of Cofavic [Committee for the Relatives and Victims
of the Events of February and March of 1989], warned that impunity, a recurring
phenomenon in investigations of police abuse, is generating an increase in crimes against
human rights. For that reason Ortega urged the authorities and the **civil society** to get
involved in solving the problem. "Impunity in these cases is closing democratic channels
for the country," she said.

Ortega reiterated the warning during her presentation of the Report on Parapolice Groups
prepared by Cofavic in the year 2004 at the forum entitled Crime Control and Human
Rights, organized by Venamcham [Venezuelan-American Chamber of Commerce and
Industry]. At the event several experts made a diagnosis of the violence in the country
and discussed security programmes for dealing with the problem.

Besides Ortega, others who participated as presenters included sociologist Roberto
Briceno-Leon, an expert in urban violence, who spoke at length on the phenomenon and
its causes in the country; criminal lawyer Fernando Fernandez, a member of the
Executive Committee of the Venezuela Section of Amnesty International, who focused
his presentation on UN recommendations and international human rights agreements on
the prevention and control of crime and violence; Ombudsman German Mundarain, who
was responsible for explaining the role of that institution in dealing with cases of human
rights violations; and Caracas Metropolitan Mayor Juan Barreto, who commented on the
programmes of the mayor's office and the role of municipal police officers in dealing
with the violence in Caracas.

80% without a trial



EXHIBIT
J

Several of the relevant statistics from the study conducted by Cofavic in 2003-2004, among a population of 103 direct victims from Anzoategui, Portuguesa, Falcon and Yaracuy States, show a high percentage of murders by parapolice groups: from 91% in Anzoategui to 50% in Yaracuy. But there is also a high percentage of forced disappearances, which reached 19% in Yaracuy.

Ortega pointed out that the impunity of parapolice groups (understood to be people who left a group of uniformed police officers and not those belonging to a police force) is a national phenomenon that is related to inadequate investigations and the absence of punishment.

In the report it is revealed that 80% of the cases pursued against these parapolice officers do not go to court. In other words, they do not go beyond the preliminary phase in which the Prosecutor-General's Office is involved.

But those cases that do go to trial result in acquittals. "That does not just mean that the sentence is favourable. There could be a favourable sentence that is arrived at in accordance with the law, but in this case the acquittals violate human rights," the Cofavic director explained.

She stressed the need for the criminal investigation institutions to answer both administratively and operationally to the Prosecutor-General's Office or the Supreme Tribunal of Justice.

"I believe that the COPP [Organic Criminal Procedures Code] has brought advances in that respect, but the administrative dependence of the executive branch (regional or national) continues to have a negative impact on the conduct of police officers," she added.

Criminal lawyer Fernando Fernandez commented on the United Nations' 10 basic norms on human rights and the connection between international agreements and Venezuelan laws. He emphasized that illegally depriving someone of his freedom by any authority or person in the service of the state that also impedes the exercise of that person's rights and constitutional guarantees is considered to be the most serious crime in the Penal Code (Article 180-A) and is punishable with 15 to 25 years in prison.

At the forum a warning was also sounded about the increase in the phenomenon of support for human rights violations. Sociologist Roberto Briceno-Leon noted that the perception of the lack of efficient crime control, along with the increase in abusive conduct on the part of high-ranking public officials, has even produced pronounced support for rights violations. He cited studies that have been conducted: while in 1996 32% of the population thought that the police had the right to kill, in 2004 the figure was 38.4%. "If we don't want homicides to continue rising, we have to respect human rights," he said.

Source: El Nacional web site, Caracas, in Spanish 15 Jun 05

© BBC Monitoring

**JOURNAL-CODE:** WBMS

**LOAD-DATE:** June 17, 2005

HUMAN RIGHTS WATCH

hrw.org **DEFENDING HUMAN RIGHTS WORLDWIDE**

Home
News Releases
About HRW
Get Involved
Publications
Info by Country
Africa
Americas
Asia
Europe/Central Asia
Middle East/N. Africa
United States

Global Issues
Arms
Children's Rights
Economic, Social &
Cultural Rights
HIV/AIDS
International Justice
LGBT Rights
Prisons
Refugees
Torture and Abuse
United Nations
Women's Rights
More...

Campaigns
Film Festival
Photo Galleries
Audio / Video
Site Map
Contact Us
Corrections
Permissions
RSS



# Venezuela: Court Orders Trial of Civil Society Leaders

(Washington, July 8, 2005) — In ordering the trial of four civil society leaders on dubious charges of treason, a Venezuelan court has assented to government persecution of political opponents, Human Rights Watch said today.

❝ The court has given the government a green light to persecute its opponents. Prosecuting people for treason when they engage in legitimate electoral activities is utterly absurd. ❞

**José Miguel Vivanco, Americas director at Human Rights Watch**

Yesterday, a court in Caracas ordered that María Corina Machado and Alejandro Plaz be tried on treason charges

🖨 Printer Friendly Version

Also Available in

ESPAÑOL

Related Material



EXHIBIT
K

More Information on Human Rights in Venezuela
Country Page

Free Email Newsletter

Contribute to Human Rights Watch

brought by a public prosecutor because their nongovernmental organization, Súmate, accepted foreign funds for a program that encouraged citizen participation in a referendum on President Hugo Chávez's presidency in 2004. Two other Súmate leaders, Luis Enrique Palacios and Ricardo Estévez, will also be tried on charges of complicity with this alleged crime.

"The court has given the government a green light to persecute its opponents," said José Miguel Vivanco, Americas director at Human Rights Watch. "Prosecuting people for treason when they engage in legitimate electoral activities is utterly absurd."

Machado and Plaz have been charged under article 132 of the Venezuelan Penal Code with "conspiracy to destroy the nation's republican form of government." If convicted, they face up to 16 years in prison.

Súmate engaged in voter outreach and education that encouraged participation in a national referendum to determine whether Chávez should remain in office. The Venezuelan Constitution establishes that elected officials can be subject to recall referendums solicited by at least 20 percent of the corresponding electorate. Chávez won the August referendum by a substantial margin.

The prosecution charged Machado and Plaz with violating Article 132 by receiving financial support for their referendum-related activities from the National Endowment for Democracy (NED), an organization which is itself financed by the U.S. Congress.

According to the NED, Súmate received US$31,150 which was used for workshops to educate citizens regarding Venezuela's constitutional referendum process.

Contribute to Human Rights Watch

Home | About Us | News Releases | Publications | Info by Country | Global Issues | Campaigns | What You Can Do | Community | Bookstore | Film Festival | Search | Site Map | Contact Us | Press Contacts | Privacy Policy

© Copyright 2004, Human Rights Watch    350 Fifth Avenue, 34th Floor    New York, NY 10118-3299    USA

Copyright 2005 The Miami Herald
All Rights Reserved

## The Miami Herald

Found on Miami ● com
The Miami Herald

**August** 1, 2005 Monday FL EDITION

**SECTION:** A; Pg. 20

**LENGTH:** 298 words

**HEADLINE:** A vengeful prosecution;
OUR OPINION: CHARGES AGAINST SUMATE ATTACK **VENEZUELA'S CIVIL SOCIETY**

**BODY:**
When does democracy building and voter education land you in legal trouble? When you are a civic group trying to check government abuses in Venezuela. The case in point involves Maria Corina Machado and three other leaders of Sumate, a pro-democracy group that helped organize the recall election that ultimately failed to unseat President Hugo Chavez. The four now are charged with "conspiracy to destroy the nation's republican form of government." They face trial and possible prison terms of up to 16 years.

As evidence of the crime, government prosecutors cite a $31,000 grant that Sumate accepted from the National Endowment for Democracy (NED), a foundation funded by the U.S. Congress. They argue that Sumate leaders took U.S. government money to dislodge Mr. Chavez from power. What Sumate actually did with the money was teach Venezuelans about their constitutional, voting and other legal rights.

Admittedly, Sumate encouraged people to participate in the recall election. The group would have done the same with any other government in power. This is exactly what groups, such as the League of Women Voters, do in a democracy. Prosecuting Sumate's leaders now smacks of vengeance.

Accepting money from foundations such as the NED, and similar institutions funded by Canadian, European, Japanese and other governments, also is routine for civic groups worldwide. Groups like Sumate form the backbone of civil society; they check and balance governments, a vital role in weak democracies.

Mr. Chavez has accumulated sweeping powers, blurring the boundaries between government branches. A "content" law already exists to intimidate the press. Now the target is civil society. By eliminating all checks on government, Mr. Chavez may yet achieve absolute power.

**LOAD-DATE:** August 1, 2005



EXHIBIT

washingtonpost.com

# Venezuela's Conscience

Sunday, October 30, 2005; B06

ONE OF THE BEST measures of freedom in any country is the existence, independence and effectiveness of human rights groups. They are something of a bellwether: In autocratic states, their appearance can be an early sign that a political liberalization, or democratic revolution, is on the way. That's why the recent sprouting of human rights groups in places such as Egypt and Jordan is encouraging. Conversely, the intimidation or elimination of such organizations is a sure sign that political rights are being constricted; that is what has happened in Russia, for example. Now, according to testimony presented this month before the Inter-American Commission on Human Rights, Venezuela's human rights community is under siege. Its troubles ought to send a message to anyone who still wonders whether President Hugo Chavez intends to preserve the democratic system that brought him to power.

Unlike most of its neighbors, Venezuela maintained a real if imperfect democracy for 40 years before Mr. Chavez's election, and so its human rights community is well-developed. The seven organizations that testified before the commission, an arm of the Organization of American States, have been active for many years. It's not new for them to be at odds with Venezuela's government. What is new, under Mr. Chavez's regime, is the targeting of the groups themselves. Not only are their reports on such problems as government manipulation of the Venezuelan judiciary, police brutality and intimidation of the press dismissed or ignored; they themselves are labeled traitors and coup plotters for having spoken out.

One conspicuous victim of this phenomenon is Carlos Ayala, who testified before the commission about the growing threat to journalists and press freedom. One of the most respected human rights lawyers in Latin America, Mr. Ayala is a former president of the Inter-American Commission as well as the Andean Commission of Jurists. When dissident military leaders tried to stage a coup against Mr. Chavez in April 2002, Mr. Ayala not only denounced the plot, which eventually failed, but intervened with police to free a militant pro-Chavez legislator. Yet, last April, after he brought human rights cases against the Chavez government, prosecutors announced that they had opened a criminal investigation against Mr. Ayala for allegedly supporting the coup. Charges are still pending.

Such attacks are widespread. Government representatives and supportive media, including an "information office" in Washington that has spent millions in an attempt to influence U.S. opinion, routinely refer to human rights groups leaders and other civil society activists as coup plotters. The Venezuelan government has meanwhile rejected the judgments of the Inter-American Commission as a violation of its sovereignty. The commission has already issued a couple of critical reports of Mr. Chavez's human rights



EXHIBIT

M

record; its members could only have been sobered by what they heard from the veteran Venezuelan activists. The question is whether the OAS leadership, and the governments that stand behind it, will have the courage to recognize Mr. Chavez's campaign against human rights monitors for what it is -- and for what it portends.

Copyright 2005 States News Service
States News Service

**December** 1, 2005 Thursday

**LENGTH:** 754 words

**HEADLINE:** THE STATE OF DEMOCRACY IN VENEZUELA

**BYLINE:** States News Service

**DATELINE:** WASHINGTON

**BODY:**

The following information was released by the U.S. Department of State:

"...I am anxious to work with countries to help make sure that the institutions, universal institutions of democracy become entrenched in society freedom to worship, freedom of the press, rule of law."

President George W. Bush

The United States' goal in the Americas is to promote democratically elected governments that govern responsibly, expand economic opportunity for their people, and work cooperatively with their neighbors. Of increasing concern to the U.S., its hemispheric partners, and international bodies is the assault on Venezuela's democratic institutions.

Abandoning Democratic Tradition

The election of Hugo Chavez in 1998 came at a time when Venezuelans were looking for an alternative to the lethargy and corruption of old-line political parties. The Venezuelan electorate gave Chavez the opportunity to create a new consensus around the development and modernization of the country. Instead, Chavez embraced a repressive political agenda that has polarized the country, created political upheaval, marginalized the opposition, suffocated the democratic debate, and resisted external efforts to support democratic political activity.

There is growing consensus that democracy in Venezuela is in grave peril, as documented by international human rights groups, the Inter-American Commission on Human Rights, and independent Venezuelan non-governmental organizations, among others. Human Rights Watch Americas has called the state of rule of law in Venezuela "extraordinarily grave" and in need of intervention by the Inter-American countries. There is unchecked concentration of power in the executive; politicization of the judiciary, the electoral authorities, and the legal system; political persecution of civil society and the democratic opposition; intimidation of the press; and threats to free association.

Areas of Concern

The Judiciary


EXHIBIT

Actions taken to undermine the independence of the judiciary have continued unabated since Chavez turned his back on the Venezuelan electorate. Human Rights Watch called the politically motivated expansion of the Supreme Court "a severe blow to judicial independence," and a move that would "degrade" and "betray" Venezuela's democracy. Politicization of the lower courts has deteriorated the judicial system, causing as a result a rising climate of impunity, criminality, and violence.

The Press

Freedom of expression is being eroded in Venezuela. Enactment of laws that place arbitrary restrictions on broadcast content has imposed a self-censorship by media outlets and the termination of certain radio and TV programs. Amendments to the Criminal Code to expand the reach and increase criminal penalties for "contempt" of public officials are intended to stifle press freedom and intimidate government critics.

Civil Society

There is continued persecution of political opponents. Many vocal government critics have been denied basic government services (including passports and national identity cards), forced from their jobs, and excluded from government contracts as a punishment for exercising their constitutional right to petition their government. There is a reported 13% increase in politically motivated detentions.

The Electoral Process

The upcoming legislative elections will test the transparency and fairness of the electoral authorities and the electoral system in Venezuela. International observers will monitor preparations for this election at a time when voter turn-out and confidence among the electorate is at an all-time low. Recent polls show that over 60% of Venezuelans do not trust the electoral system. The abstention rate is predicted at 80%.

How the U.S. Promotes Democracy in Venezuela

Working with the Organization of American States, the European Union, the Council of Europe, and other international organizations to support Venezuelan civil society, speak out against abuses of democracy, and hold the Venezuelan Government accountable to its democratic commitments under the Inter-American Democratic Charter.

Reaching out to human rights and other non-governmental organizations to help create an international network to support and defend **Venezuela's civil society.**

Working within Venezuela to preserve political and civic

participation for increasingly at-risk groups by establishing links with organized labor, independent media, NGOs, and religious institutions to offer the checks and balances that Venezuela's Government institutions are no longer able to provide.

**LOAD-DATE:** December 7, 2005